# APPENDIX D

# Report on Lethal Injection in Florida Executions

Joel Zivot, M.D., F.R.C.P.(C)., M.A., J.M.

September 24, 2026

## REFERRAL:

Counsel for Jesse Guardado asked me to conduct a review of the lethal injections in Florida in 2025 and to date in 2026. Specifically, this report focuses on the corresponding autopsies, including toxicology results, and considers other publicly available information described below, in forming conclusions about Florida's lethal injection protocol and administration of the protocol.

## QUALIFICATIONS OF THE EXPERT:

I am a professor of Anesthesiology and Surgery at Emory University School of Medicine in Atlanta, Georgia. I am the former Medical Director of the Cardiothoracic Intensive Care Unit at Emory University Hospital. I am also the former fellowship director for the Critical Care Medicine training program. I hold board certification in Anesthesiology from the Royal College of Physicians and Surgeons of Canada and the American Board of Anesthesiology. I am board-certified in Critical Care Medicine by the American Board of Anesthesiology. I have an MA in bioethics and a Master of Laws (JM).

I hold an unrestricted medical license in Georgia and have held unrestricted medical licenses in Ohio, the District of Columbia, Michigan, and the Canadian provinces of Ontario and Manitoba. I also have a license to prescribe narcotics and other controlled substances from the US Drug Enforcement Administration (DEA). I have been in continuous practice of anesthesiology and critical care medicine for the last 31 years, during which time I have personally performed or supervised the care of over 50,000 patients.

I have been retained as a medical expert in death penalty cases. In this capacity, I have reviewed lethal injection protocols in multiple jurisdictions, including Tennessee, Georgia, Florida, Ohio, Arkansas, Missouri, Nevada, Arizona, South Carolina, Texas, California, and the Federal Government. I have previously evaluated condemned inmates in multiple states, including Florida.

**DOCUMENTS AND RESOURCES CONSIDERED:**

In my capacity as a medical expert in cases involving execution, I have studied over 250 autopsies of executed individuals. In 2025, the Florida Department of Corrections (FDOC) executed 19 individuals. I have reviewed the autopsies of all 19 cases. As of September 2026, FDOC has carried out 15 executions. I have reviewed the autopsies of 11, through the autopsy of James Duckett who was executed on July 28, 2026. These autopsy documents include examination of the body and a review of the obtained toxicology reports.

I have also been retained as a medical expert in the cases of Richard Randolph, Frank Walls, and Kayle Bates. In that capacity, I had the opportunity to review their medical records and meet them in person to examine them. All these men have subsequently been executed, and their autopsies are among the 19 I reviewed for that year.

I have also been previously retained to review drug inventory logs originating from FDOC and coinciding with several executions in 2025. The logs contain relevant information on the dates and amounts of drugs removed from the inventory for use in executions, as well as the drugs' expiration dates.

I have also reviewed publicly available descriptions of all Florida executions from 2025 to the present.

**OVERVIEW OF RELEVANT INFORMATION AND BACKGROUND:**

**I. Florida's Lethal Injection Protocol**

FDOC's lethal injection protocol requires the placement of 2 intravenous lines and then involves the sequential intravenous delivery of three drugs: 200 mg of etomidate, followed by 1000 mg of rocuronium bromide, and then 240 mEq of potassium acetate. The purpose of this protocol is to cause death.

FDOC has the authority to establish Florida's lethal injection procedure and identify specific drugs used. Florida has always used a three-drug protocol, but with different variations of chemicals as the state struggled to bypass drug shortages and other limitations. Florida is the only state to use etomidate during lethal injections as of the date of this report.

There are unresolved issues with Florida's lethal injection protocol both in how it is written and how it is carried out. FDOC's own drug inventory records, disclosed in 2025, reveal multiple deviations from the protocol. The logs reflect that drugs were used beyond their expiration dates in the executions of Victor Jones, David Pittman, Curtis Windom, and Kayle Bates; that doses were not consistently prepared and documented as the protocol specifies in the executions of Anthony Wainwright and Thomas Gudinas; and that on at least 2 occasions, during the executions of Edward James and Michael Tanzi, FDOC administered lidocaine, a drug not included in the written protocol, in effect converting the three-drug protocol into a four-drug protocol. Whatever the reason for adding lidocaine, its use shows that the protocol as written is not the protocol as practiced. In administering any drug, timing, quantity, and quality matter. Deviations of this kind make it impossible to know what dose of which drug a given prisoner actually received.

### A. Etomidate: Characteristics and Clinical Effects

Etomidate, a non-barbiturate sedative hypnotic drug, is a short-acting intravenous anesthetic used for the induction of general anesthesia and sedation. It has a rapid onset of action with minimal respiratory depression and exceptional cardiovascular stability. It is a preferred agent for induction in patients in shock or with low blood pressure. The hypnotic effects of etomidate may be as short as 3 minutes, owing to the rapid redistribution of the drug from the plasma to other tissues.

Other three-drug protocols typically administer a barbiturate as the first drug. Drugs in this class act on a variety of physiological systems, notably the brain and cardiovascular system. For example, even modest doses of sodium thiopental (a short-acting barbiturate) injected in a medical setting were associated with stupor, obtundation, and unresponsiveness, as well as a significant fall in blood pressure. This blood pressure effect could be fatal if not mitigated. Unlike in a medical setting, during an execution, such a dangerous fall in blood pressure and the potential for death would be desirable. Conversely, etomidate has been developed and used specifically in medical settings because it is much less likely to cause dangerous drops in blood pressure.

In a medical setting, the standard anesthetic induction dose of etomidate is 0.3 mg/kg administered intravenously over 30-60 seconds. Dosage adjustments depend on factors such as the patient population (distinction between geriatric and pediatric patients), obesity, and concomitant renal and hepatic impairment. Certain medications interact with etomidate, and patients in shock require

dose adjustments. What we know about etomidate's mechanism of action is based on studies in which it is used as a medicine. The FDOC lethal injection protocol delivers the same dose of etomidate to every prisoner, irrespective of weight, co-existing illness, or potential drug interactions.

FDOC's 200 mg dose is roughly ten times the 0.3 mg/kg induction dose for a 70 kg adult. It might be argued that a dose of this size produces hypnosis long enough to outlast the rest of the execution, making weight-based dosing irrelevant. That argument cannot be made with confidence. Etomidate is not given in doses of this magnitude in clinical practice. Etomidate's measured pharmacokinetics extend only to induction doses roughly an order of magnitude below 200 mg, so any statement about its behavior at the protocol dose is an extrapolation rather than an observation.

Etomidate's efficacy also depends on the drug actually reaching the circulation: an infiltrated line, a partially delivered syringe, or degraded drug reduces the effective dose regardless of the nominal amount. The postmortem etomidate levels discussed below, which vary tenfold among men given the same nominal dose, indicate that the dose reaching the circulation is not consistent.

The traditional formulation of etomidate uses propylene glycol as a solubilizer, producing a solution with a pH of approximately 4–7 (typically around 5). This is roughly two orders of magnitude more acidic than blood and an osmolarity many times that of physiologic plasma. This formulation is well documented to cause pain and venous irritation on injection in clinical use. A 2024 case series in minipigs found that etomidate formulated in propylene glycol produced pulmonary alveolar and interstitial edema and laryngeal edema at necropsy, findings that did not occur when the same drug was administered in a lipid-emulsion formulation instead.[1]

The authors noted that the precise mechanism, whether related to the acidity, the hyperosmolarity of the solution, or another property of the propylene glycol vehicle, has not been fully established. While this evidence derives from an animal model rather than human subjects, the pattern of pulmonary edema and lung injury observed at autopsy in FDOC executions, described below, is

---

[1] Petrucci M, de Brot S, Casoni D. Case report: Side effects of etomidate in propylene glycol in five Göttingen Minipigs. *Front Vet Sci*. 2024 Jul 11;11:1376604. doi:10.3389/fvets.2024.1376604. PMID: 39055863; PMCID: PMC11270138.

consistent with a comparable first-pass injury to pulmonary tissue from the acidic, hyperosmolar formulation of etomidate used in Florida's protocol.

Whatever its cause, the executed prisoner's apparent lack of reaction to any such injury is explained by the rapid onset of paralysis from the subsequent large dose of rocuronium, discussed in Section B. A paralyzed individual will appear outwardly peaceful regardless of their internal physiologic state, including if the mechanism above is operative, the sensation of fluid accumulating in the lungs.

Etomidate is not considered an analgesic (a medication used to control pain). Its ultra-short-acting properties mean that a prisoner will be fully awake and responsive as soon as 2-3 minutes after the injection of the first drug. While it can be used during induction of general anesthesia, it cannot be used to maintain it. Owing to etomidate's properties, it cannot be known with certainty whether it functions as a proximate cause of death in FDOC's protocol. From an arm's-length perspective, it might be surmised that the FDOC lethal injection protocol is intended to mimic some elements of a general anesthetic. FDOC might believe that by choosing a sequence of chemicals sometimes used in the operating room, it has captured the basic idea of blocking awareness during pain. To reliably achieve this in a medical setting, anesthesiology utilizes a much more complex array of chemicals along with continuous physiologic monitoring. FDOC's protocol does not incorporate these safeguards. Based on the pharmacology and physiology described in this report, this increases the risk that a prisoner experiences pain during the execution process.

## B. Rocuronium Bromide: Characteristics and Clinical Effects

Rocuronium bromide, the second drug in the protocol, is a paralytic agent that affects the respiratory and skeletal muscles. It is known as a non-depolarizing muscle relaxant. Its mechanism of action is to block the body's capacity to move the muscles involved in normal muscle movement, including normal breathing. In the practice of anesthesiology, anyone receiving this drug will need to be rapidly intubated and placed on a mechanical ventilator. Spontaneous breathing and movement are blocked. Rocuronium has no analgesic or sedative properties of its own and has no effect on consciousness. A person given rocuronium will be wide awake but unable to move or breathe.

Rocuronium must be stored in a refrigerator between 2°C and 8°C (36°F and 46°F). It cannot be frozen. Once at room temperature (25°C / 77°F), it must be used within 60 days. Opened vials must be discarded within 30 days. The clinical duration of action of rocuronium is typically 20 to 35 minutes at standard intubating doses. However, its duration is highly dose-dependent and can range from 10 to over 80 minutes, depending on the dose, the patient's age, and underlying organ function.

FDOC's protocol specifies 1000 mg of rocuronium bromide, delivered as two 500 mg syringes. A standard intubating dose is approximately 0.6 to 1.2 mg/kg; for an average adult, FDOC's dose represents roughly ten to twenty times a standard intubating dose. Because rocuronium's duration of action is dose-dependent, a dose of this magnitude would be expected to produce a substantially longer period of paralysis than even the extended durations described above. FDOC's own dosing choices therefore likely prolong, rather than shorten, the period of awake paralysis a prisoner would experience if inadequately anesthetized.

Of the three drugs used in Florida's protocol, rocuronium is capable of causing death independently of the other two, through asphyxiation resulting from paralysis of the respiratory muscles. If administered to a person who remains conscious, this asphyxiation would be experienced as suffocation while immobilized and unable to move or communicate. A widely recognized "never event" in medicine occurs when a critically ill patient is given a paralytic but is not provided adequate sedative or amnestic drugs. Accounts of such events describe significant psychological harm. Survivors of accidental awake paralysis commonly suffer from debilitating post-traumatic stress disorder, insomnia, and fear; the experience of paralysis itself appears to be the principal driver of distress.[2]

The combination of etomidate with rocuronium means that prisoners face an added risk of experiencing the painful effects of the protocol while being unable to communicate that experience. Etomidate is not a complete anesthetic. It lacks any pain-relieving properties and cannot provide the muscle relaxation occasionally needed during surgery. It also cannot be given in repeated doses or as a continuous infusion due to its profound capacity to suppress adrenal

[2] Pandit JJ, Andrade J, Bogod DG, et al. The 5th National Audit Project (NAP5) on accidental awareness during general anaesthesia: summary of main findings and risk factors. *Br J Anaesth.* 2014;113(4):549–559. (Published simultaneously in *Anaesthesia* 2014;69:1089–1101.)

function. Owing to the ultrashort effects of etomidate and the longer effects of rocuronium, the pharmacological mismatch between the two drugs creates a foreseeable risk of awake paralysis under the protocol as currently designed.

### C. Potassium Acetate: Characteristics and Clinical Effects

Potassium acetate is the third drug administered in FDOC's lethal injection protocol. Injected potassium arrests cardiac function by disrupting the electrochemical gradient across the cell membrane that the heart depends on to generate a normal action potential. Independent of whether the intended cardiac effect is achieved, injected potassium is well documented to be intensely painful as it reaches sensory nerve fibers in and around the injection site.

The same electrochemical mechanism that depolarizes cardiac tissue also depolarizes peripheral nociceptors, directly triggering a pain signal. Concentrated potassium solutions are also directly irritating to venous endothelium; this is well documented even in routine, dilute clinical potassium replacement, where hospital protocols mandate slow administration specifically because concentrated potassium reliably causes burning and phlebitis.

Because FDOC's protocol delivers a far more concentrated bolus, at a far faster rate, than any therapeutic use of potassium, the resulting local nociceptor activation would be expected to be correspondingly more severe and would occur within seconds of injection, essentially simultaneously with, or before, any cardiac effect, given that IV-to-heart transit time is measured in seconds. Whether this pain is experienced consciously depends entirely on whether the first two drugs in the sequence have already rendered the prisoner unconscious and insensate. As discussed in Sections A and B above, and Section D below, there is substantial reason to doubt that this is reliably the case.

### D. Consciousness Checks

According to the FDOC lethal injection protocol, the warden is responsible for determining whether unconsciousness has been achieved before authorizing the administration of rocuronium. In anesthesiology, unconsciousness is an operationally defined state, distinct from sleep or sedation. Anesthesia is a state that permits a painless, unremembered experience during surgery. An anesthesiologist undergoes years of rigorous training and uses a complex array of monitoring

technologies to confirm this state, precisely because no single behavioral sign can be relied upon to establish it.

Unconsciousness, as assessed by FDOC, is an entirely different state, established through a three-part behavioral check: calling the prisoner's name, brushing the eyelashes, and pinching the trapezius muscle. The trapezius pinch is a recognized method of testing for a response to a painful stimulus, similar in principle to elements of the Glasgow Coma Scale used to assess responsiveness in unconscious or critically ill patients. But this similarity does not make FDOC's check equivalent to a clinical determination of unconsciousness. A behavioral response, or the absence of one, to a verbal, tactile, or painful stimulus reflects the integrity of brainstem and spinal reflex arcs; it does not establish, and was never designed to establish, whether the cortex is still processing that stimulus as pain. This is the same distinction between immobility and awareness discussed above with respect to rocuronium: an absence of motor response confirms only that the prisoner did not move, not that the prisoner did not perceive.

FDOC has provided no evidence that this three-part check has been validated, in this setting or any other, as a reliable indicator of the cortical unconsciousness the protocol claims to produce before rocuronium is administered. Nor has FDOC accounted for known confounders specific to its protocol, including etomidate-induced myoclonus, which can independently produce movement, complicating interpretation of the check. Absent such evidence, FDOC's designation of this state as "unconsciousness" reflects an assumption rather than a validated clinical finding.

**E. Reports of Recent Executions in Florida**

The description of the November 13, 2025, execution of Bryan Jennings was highly unusual. Media reports indicate Bryan Jennings' execution took 20 minutes, with documented movements well into the execution.[3] His prolonged movement suggests a problem with the administration of the protocol.

[3] Curt Anderson, *Florida Man Executed for the 1979 Killing of a Girl, 6, Who Was Abducted From Her Bedroom*, ASSOCIATED PRESS (Nov. 13, 2025); https://apnews.com/article/execution-florida-record-desantis-jennings-5e608f68d6e6be37074f838bf390fe14

More recently, the execution of Billy Leon Kearse on March 3, 2026, extended over 24 minutes. While Kearse was observed twitching and moving after the drugs were first injected, another 15 minutes passed before Kearse was declared dead.[4]

Both accounts are highly unusual and support speculation that there is an issue with FDOC's administration of the protocol. This movement could be explained by an issue with the drug potency, dosage, or another unexplained issue. Regardless, the prolonged duration and documented movement are indicators of distress. It is my conclusion that both Jennings and Kearse experienced prolonged, unrelieved distress during their executions, consistent with an inadequately anesthetized state.

**IMPRESSIONS**

For this report, I reviewed all autopsies and toxicology reports for inmates executed in 2025, as well as the autopsies and toxicology reports produced through July 2026. This review revealed more flaws in Florida's implementation of the lethal injection protocol that demonstrate a breakdown in how the protocol is administered. I can conclude that the protocol is no longer working as FDOC has intended.

The autopsy and toxicology reports of the 19 executions carried out in 2025 show a high prevalence of concerning irregularities. In 17 of 19 cases, some degree of lung congestion and pulmonary edema was seen. In the remaining two cases, no notation of pulmonary edema was made. Frothy or foamy pulmonary fluid, as documented in these autopsies, is a recognized marker of an antemortem, agonal process: foam in the airway requires active respiratory effort to mix air with fluid, and cannot form through passive postmortem fluid pooling alone. Its presence in the majority of these autopsies indicates that these men were still breathing, with their hearts pumping blood into the lungs as the fluid accumulated. This is consistent with death by choking and drowning in one's own blood.

Some prisoners executed in 2025 (Edward James, Edward Zakrzewski, and Bryan Jennings) had individual lung weights over 1000 grams each, a shockingly high number considering the average

---

[4] Freida Fusaro, *Man Who Fatally Shot A Police Officer With His Service Revolver Is Executed In Florida*, ASSOCIATED PRESS (Mar. 3, 2026); https://apnews.com/article/florida-execution-billy-leon-kearse-desantis-3eef0267677a5ae99313aaeed8a40654

human lung weighs 400-450 grams. There were also notes of white, frothy fluid built up in prisoners' lungs. The autopsy of Mark Geralds, executed in December 2025, reported "abundant bloody and frothy fluid," including a small amount of white frothy fluid up Geralds' trachea. Fluid is commonly found exuding from lung lobes (Glen Rogers, Thomas Gudinas, David Pittman, Bryan Jennings) and both bronchi (Michael Bell, Victor Jones). The autopsy of Bryan Jennings notes that "the parenchyma of the lungs exudes an abundant amount of foamy fluid." Foamy, frothy fluid in the lungs requires a beating heart to pump blood to the lungs. A beating heart will also pump blood to the brain and raises the real prospect that these prisoners were alive and therefore able to experience awareness as they choked.

The autopsy and toxicology reports of three of the individuals executed in 2026, Ronald Heath, Billy Kearse, and Michael King, reflect similar findings of significant problems. In those cases, the lungs were heavy and congested, with fluid observed within the lungs. Heath's lungs each weighed 800g or more, with "abundant bloody and frothy fluid." Chadwick Willacy's lungs weighed 870 and 900g, and Dusty Spencer's lungs at autopsy weighed 950 and 1090g.

There is a notable, order-of-magnitude difference in post-mortem etomidate levels that raises concerns about the efficacy of the drug as administered. In some instances, the etomidate levels are troublingly low—Samuel Smithers' post-mortem etomidate level was 0.13 mcg/mL. For etomidate to maintain a hypnotic state, blood levels should be equal to or higher than 0.23 mcg/mL. Michael Bell's toxicology report documented an etomidate level ten times higher than Smithers'—1.3 mcg/mL. Postmortem drug redistribution is well known, and postmortem drug concentrations may be unreliable proxies for circulating blood levels while alive. Even so, this disparity does not support the conclusion that the protocol reliably delivers a consistent dose of etomidate to each prisoner. Individual factors like BMI could plausibly account for some variation, but a tenfold difference, especially between men sedated under the same fixed-dose protocol, is difficult to explain by body composition alone. Regardless, the tenfold difference between these two men's post-mortem etomidate levels is consistent with inconsistent administration of the protocol, which increases the risk that a prisoner receives an inadequate dose of etomidate before the subsequent drugs are administered.

This may also raise questions regarding the effective delivery of lethal injection drugs, whether because of a failed or infiltrated intravenous line, an error in preparation or administration, or a

compromised drug. By way of example, the autopsy report produced after the execution of Dusty Ray Spencer revealed that “The left intravascular catheter does not enter the lumen of the median basilic vein and instead terminates within the adipose tissue deep to the vessel.” This suggests that FDOC injected lethal injection drugs directly into Spencer’s arm, rather than a vein.

**FINDINGS AND CONCLUSIONS**

Lethal injection, as administered by FDOC, uses drugs developed for medical purposes but does not replicate the individualized dosing, safeguards, and physiologic monitoring that govern their use in medicine. Florida's protocol has not been revised to address the pharmacological and administrative problems documented in this report, despite repeated evidence of those problems across multiple executions. Based on all the autopsy results, all the toxicology reports, and all the pharmacology and physiology impacts, I conclude that FDOC has approached the administration of its execution protocol negligently, failing to respond to documented and repeated problems. Independent of that negligence, the protocol's underlying design — a fixed, non-weight-based dose of a non-analgesic sedative, followed by a paralytic with no effect on consciousness — creates a foreseeable and substantial risk that a prisoner will experience severe, unrelieved pain during the execution process without the capacity to communicate that experience.

It is important to recognize that etomidate is not, on its own, a fatal drug apart from the risk of respiratory depression, and that it does not reliably provide a sustained state of hypnosis. The experience of awake chemical paralysis caused by the subsequent drug is a well-documented phenomenon in both medical and non-medical settings. When awake paralysis occurs accidentally in an anesthetic setting, it is known as anesthesia awareness. In the aftermath of such episodes, patients typically suffer from long-term psychological trauma with reported feelings of helplessness, terror, and auditory hallucinations. Studies in which healthy volunteers, often the investigators themselves, underwent complete neuromuscular blockade while awake and mechanically ventilated found that the paralysis itself was tolerable when ventilation was adequate, but that raising arterial $CO_2$ produced air hunger, reaching "severe" intensity at only modestly

elevated end-tidal CO2, despite the absence of any respiratory muscle activity.[5] [6] [7] In these experimental cases, the volunteers at least understand that they will not be permitted to die. In the case of lethal injection executions carried out by FDOC, the point of the exercise is to kill the prisoner.

When administering drugs to any person, regardless of the purpose, it is critical to understand the chemical properties of the drug and understand how the drug will work. It is clear to me, upon review of how Florida has approached its lethal injection protocol during the recent 2025 and 2026 executions, that FDOC does not have this understanding.

September 24, 2026

Joel Zivot, M.D., F.R.C.P.(C)., M.A., J.M

---

[5] Banzett RB, Lansing RW, Brown R, Topulos GP, Yager D, Steele SM, Londoño B, Loring SH, Reid MB, Adams L, et al. 'Air hunger' from increased $PCO_2$ persists after complete neuromuscular block in humans. *Respir Physiol.* 1990;81(1):1–17. (Respiration Physiology 81(1): 1-17)

[6] Gandevia SC, Killian K, McKenzie DK, Crawford M, Allen GM, Gorman RB, Hales JP. Respiratory sensations, cardiovascular control, kinaesthesia and transcranial stimulation during paralysis in humans. *J Physiol.* 1993;470:85–107.

[7] Topulos GP, Lansing RW, Banzett RB. The experience of complete neuromuscular blockade in awake humans. *J Clin Anesth.* 1993;5(5):369–374