**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**JESSE GUARDADO,**

Plaintiff,

Case No. 3:26-cv-2596

v.

**CAPITAL CASE**

**RICHARD COMERFORD,** Secretary,
Department of Corrections,
in his official capacity;

**EXECUTION OF STATE DEATH SENTENCE SET: NOVEMBER 5, 2026 AT 6:00 P.M.**

and

**RANDALL POLK,** Warden,
Florida State Prison,
in his official capacity,

Defendants.
_________________________________/

**EMERGENCY MOTION FOR AN INJUNCTION UNDER THE ALL WRITS ACT OR, ALTERNATIVELY, FOR A STAY OF EXECUTION**

## I. Introduction

Plaintiff Jesse Guardado, a Florida prisoner sentenced to death in 2005, filed a 42 U.S.C. § 1983 complaint and accompanying evidentiary proffer in this Court on September 28, 2026. *See* ECF No. 1. Guardado's complaint involves recent revelations about Florida's flawed lethal injection procedures—including its repeated use of expired drugs—and alleges a risk of severe pain if he is executed with those procedures. Guardado's Eighth Amendment claim, supported by Florida

Department of Corrections (FDOC) records and medical expert reports, has never been presented in this Court previously or heard on the merits in any other federal court. And Guardado's complaint noted that, while he was death-warrant eligible, he filed this action "before any death warrant issued to allow for meaningful judicial review" of the issues. *Id.* at 4, 36. But less than a week later, his death warrant was signed, with an execution scheduled for 28 days from now, on November 5, 2026.

Under the circumstances, as described in more detail below, this Court should enjoin Guardado's execution under the All Writs Act, 28 U.S.C. § 1651(a), an avenue approved by the Eleventh Circuit. The State's decision to select Guardado for execution now, despite knowing about this pending proceeding, should not be allowed to truncate these proceedings to just 28 days. The claim Guardado diligently brought in this Court is serious, well-substantiated, and should receive meaningful briefing and review. The Court should temporarily enjoin Florida from executing Guardado in order to preserve its jurisdiction in this federal case and set a briefing schedule commensurate with the importance and complexity of the issues presented in the complaint and evidentiary proffer. Alternatively, the Court can enter a more traditional stay of execution based on the claim's substantial likelihood of success.

## II. Background

Much of the factual underpinnings of Guardado's September 2026 complaint were first made public in November 2025, when Florida prisoner Frank Walls, under

an active death warrant, initiated a § 1983 action in the Northern District of Florida alleging, among other things, that FDOC's repeated failure to adhere to its lethal injection protocol exacerbated the substantial risk of a painful death posed by his underlying medical conditions. *See Walls v. Dixon*, No. 4:25-cv-0488, ECF 1 (N.D. Fla. Nov. 26, 2025). As part of that litigation, Walls presented FDOC's partially redacted internal execution drug logs, which revealed a pattern of maladministration recurring throughout 2025. *Id*. Those records had been produced by FDOC in October 2025 pursuant to a public records request.

Among other violations, the FDOC logs made public in the *Walls* litigation indicated that Defendants had administered expired etomidate—with a January 31, 2025, expiration date—to Kayle Bates, executed on August 19, 2025; Curtis Windom, executed on August 28, 2025; David Pittman, executed on September 17, 2025; and Victor Jones, executed on September 30, 2025. ECF No. 1-5 at 26.

The Defendants in *Walls*—like here, the Secretary of FDOC and the Warden of Florida State Prison—did not acknowledge or explain the records. Instead, they moved to dismiss Walls's complaint on diligence grounds. Regarding the FDOC records showing the administration of expired drugs during recent executions, Defendants portrayed the documented violations as "curious," immediately pivoting to questioning "how Walls obtained this information in the first place" instead of

explaining how such dangerous violations occurred. *See Walls v. Dixon*, No. 4:25-cv-0488, ECF No. 14 at 34-35 (N.D. Fla. Dec. 5, 2025).

Despite the records ultimately evading merits review in *Walls*, which was dismissed on the ground that Walls was not diligent in the post-warrant filing of his as-applied claim, questions regarding FDOC's ability to adhere to the lethal injection protocol remained unanswered. Following *Walls*, and because Defendants offered no explanation for the disturbing violations reflected in their own public records, undersigned counsel sought additional records concerning the lethal injection protocol. The requests were intended to verify whether the violations in the 2025 execution records continued to occur. But Defendants refused this request, claiming entitlement to absolute execution secrecy, despite having produced the *Walls* records in response to a public records request themselves. In the time since *Walls*, Defendants have refused to cooperate with all records requests related to their lethal injection practices, including the documented use of expired drugs.

In a separate action in this Court challenging the constitutionality of Florida's protocol, Defendants railed against the records that surfaced in *Walls* and were referenced in subsequent warrant litigation in state court. In *Brant v. Palmer*, Defendants demanded any communications between plaintiffs' counsel and third parties regarding the documents be produced in discovery. *See Brant v. Palmer*, No. 3:13-cv-412, ECF No. 220 at 7 (M.D. Fla. May 27, 2026). And Defendants expressed

frustration with the continued concerns that were surfacing in state warrant litigation, claiming that the records, and litigation concerning the issues they raised, would "spook" the sources of lethal injection drugs, potentially disrupting the supply chain and slowing the current breakneck pace of executions in Florida. *See Brant*, No. 3:13-cv-412, ECF No. 230 at 16 (M.D. Fla. Jul. 1, 2026). Defendants even threatened to deploy the electric chair if questions about lethal injection persisted.

Against this backdrop, Guardado filed suit in this Court on September 28, 2026. ECF No. 1. The issue of lethal injection irregularities was of particular concern to Guardado given his weakened veins as a result of prior intravenous drug use, and no active death warrant was in place to truncate his litigation. Although FDOC still claimed absolute secrecy regarding its procedures and refused to provide any further information, Guardado sought and relied on the evidence available to him—the FDOC records published in *Walls*, as well as autopsies, toxicology reports, and new opinions of medical experts. Guardado sought, outside of a constricted death-warrant timeline, the opportunity to litigate his Eighth Amendment claim and evidence on the merits. Guardado specifically noted in his complaint that, although he was death-warrant eligible, he filed this action "before any death warrant issued to allow for meaningful judicial review" of the facts and allegations he presented. *Id.* at 4, 36.

On the same day Guardado's action was filed in this Court, September 28, 2026, undersigned counsel sent a copy of the complaint by email to the Office of the

Attorney General to notify it of the action's filing. The undersigned also inquired whether Defendants would waive personal service of the complaint, as the Office of the Attorney General has agreed to do in the past. *See, e.g.*, *Walls v. Dixon*, No. 4:25-cv-00504, ECF No. 10 (N.D. Fla. Dec. 12, 2025). The undersigned received no response that day. The following day, September 29, 2026, Assistant Attorney General Charmaine Millsaps responded that Defendants did not waive personal service on the Defendants. Guardado awaited issuance of the summons for service.

On October 5, 2026, prior to this Court's issuance of the summonses for Defendants, Guardado's death warrant was signed, with an execution date of November 5, 2026. The next day, the Florida Attorney General's Office informed the state courts of this federal proceeding, stating that "[t]he Defendants' joint motion to dismiss the § 1983 suit for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) will be filed shortly." *See State v. Guardado*, "Facts of the Crime and Procedural History of the Case," No. 2004-CF-0903, First Judicial Circuit, Walton County (Oct. 6, 2026). However, as of the date of this filing, Defendants' counsel has neither moved to dismiss nor appeared in this action.

## III. This Court should issue an All Writs Act injunction

To protect this Court's ability to resolve the critical issues raised in Guardado's action, and to avoid mooting a substantial constitutional claim, the Court should grant an injunction under the All Writs Act, 28 U.S.C. § 1651(a), preventing

Defendants from executing Guardado until a reasonable time has been allowed for this litigation to proceed. Guardado does not seek an indefinite stay or drawn-out proceedings in this Court—only the opportunity to litigate the issue he filed before the warrant without a looming and unreasonable 28-day timeframe. After granting the injunction, this Court could still expedite briefing in a way that allows for a meaningful adversarial process and careful judicial review.

Enjoining a state death sentence under similar circumstances has been approved by the Eleventh Circuit. *See, e.g.*, *Borden v. Comm'r, Ala. Dep't of Corr.*, No. 17-11536, 2017 WL 4457572 (11th Cir. Sept. 29, 2017) (issuing All Writs Act injunction preventing petitioner's execution amidst ongoing method-of-execution litigation). Indeed, the All Writs Act vests every federal judge with the power to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). This is not the same as a traditional injunction. Instead, as the Eleventh Circuit has explained, "[a]n injunction under the All Writs Act 'must simply point to some ongoing proceeding, . . . the integrity of which is being threatened by someone else's action or behavior.'" *Hill v. McDonough*, 464 F.3d 1256, 1258 (11th Cir. 2006). *See also Nken v. Holder*, 556 U.S. 418, 428 (2009) (defining an "injunction" as "a means by which a court tells someone what to do or not to do," and a "stay" as "halting or postponing some portion of [a] proceeding, or . . . temporarily divesting an order of enforceability").

The requirements for a traditional injunction "do not apply to injunctions under the All Writs Act." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004). Instead, the Act permits a court to "compel acts necessary to . . . facilitate the court's effort to manage the case to judgment" without respect to the merits. *Id.* at 1102. This Court can issue an injunction if it finds that the State's decision to sign Guardado's death warrant, after being on notice of his federal litigation, would inappropriately deprive this Court of its jurisdiction to decide Guardado's claim for itself, outside of a constricted death-warrant timeline.

Here, Guardado is requesting this injunction solely for the purpose of allowing this Court the ability to meaningfully consider his Eighth Amendment claim, which he timely and diligently filed before a death warrant issued. Given the unique posture of Guardado's litigation—the State's signing of his death warrant just one week after he filed a substantial § 1983 action—and the resulting impact on this Court's ability to analyze the merits of the claim, the Court should enjoin his execution.

### A. An injunction is vital to enable the Court to continue presiding over this important matter

To obtain an injunction under the All Writs Act, Guardado "must simply point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior." *Hill*, 464 F.3d at 1258

(quotation marks omitted). Here, the State is interfering with this Court's resolution of the instant suit by seeking to execute Guardado on November 5, 2026.[1]

The State scheduled this execution just one week after the present action was initiated, directly interfering with this Court's ability to give Guardado's claim the attention required. *Cf. Harris v. Johnson*, 376 F.3d 414, 417 (5th Cir. 2004) (observing it is impracticable "to serve a complaint, conduct discovery, depose experts, and litigate [a method of execution] issue on the merits" within four months). Another federal court tasked with reviewing a § 1983 action concerning a method of execution claim issued an All Writs Act injunction on that basis alone, observing that a method of execution § 1983 action could not be practically or meaningfully resolved in a truncated timeframe. *See McNabb v. Warden*, No. 2:12-cv-316, ECF No. 315 at 10-13 (M.D. Ala. Oct. 16, 2017) (granting injunction under All Writs Act while denying traditional stay). The Eleventh Circuit affirmed, noting that the district court had the authority to issue the writ to preserve its jurisdiction. *See McNabb v. Warden*, No. 17-14612, ECF No. 11 at 8 (11th Cir. Oct. 18, 2017).

---

[1] There are dozens of death-warrant-eligible prisoners in Florida, many of whom have no pending litigation. *See* Pamela Colloff, *Florida Is Executing Prisoners at a Record Pace, Even as Most of the U.S. Abandons the Death Penalty*, PROPUBLICA (Jun. 30, 2026); https://www.propublica.org/article/florida-death-penalty-executions-ron-desantis ("Of the 242 prisoners on death row, roughly half have exhausted their appeals and are eligible for a warrant.").

The timing of the State's decision to set Guardado's execution date just a week after receiving the instant complaint merits this Court's careful scrutiny. Defendants have been explicit in other proceedings both that they are entitled to total secrecy with regard to their lethal injection procedures, even after evidence has surfaced showing their use of expired and unauthorized drugs, and that the State is intent on ensuring that executions continue to be carried out without interruption. The signing of Guardado's death warrant conveniently insulates the State's execution maladministration from receiving the same review as other similar claims.

During a *Brant* hearing, FDOC counsel expressed frustration with the publication of the execution logs like those that Guardado proffered here. FDOC voiced an intent to suppress dissemination of such information, noting that publication of these records would "spook the manufacturers and distributors themselves," putting in jeopardy Florida's intent to issue warrants "every two weeks for the remainder of possibly this year." *Brant*, No. 3:13-cv-412, ECF No. 230 at 16, 39 (M.D. Fla. Jul. 1, 2026). FDOC made clear its view that it was imperative such information be "adequately protected and controlled," *id.* at 39, theorizing that if this information is widely disseminated, it may affect the supply of lethal injection drugs: "the alternative means is electrocution . . . . The executions are not going to stop just because manufacturers are no longer providing drugs to FDC." *Id.* at 16.

To date, the violations contained in the FDOC logs have not yet been heard on the merits by a federal court. *See Walls v. Dixon*, ECF No. 31, No. 4:25-cv-488 (N.D. Fla. Dec. 22, 2025) (closing case and denying Defendants' motion to dismiss as moot upon Walls' execution). After the issues in Defendants' records were revealed in December 2025, subsequent prisoners raised related claims regarding Defendants' ability to carry out the protocol in Florida state courts to no avail.

Justice Sotomayor has expressed concerns with Defendants' records, which had been presented in another death-warrant proceeding originating in state court. *Trotter v. Florida*, No. 25-6853, 2026 WL 504237, at *1 (Feb. 24, 2026) (Sotomayor, J., statement respecting denial of application for stay of execution and certiorari). The Florida Supreme Court has summarily rejected claims based on FDOC records as insufficient under death warrant. *See, e.g.*, *Heath v. State*, 426 So. 3d 1253, 1261 (Fla. 2026) (rejecting claim concerning violations raised in the lethal injection protocol as speculative); *Trotter v. State*, 428 So. 3d 68, 73 (Fla. 2026) (same); *Hitchcock v. State*, 431 So. 3d 514, 527 (Fla. 2026) (same); *Occhicone v. State*, 436 So. 3d 465, 472-73 (Fla. 2026) (same); *Sochor v. State*, 434 So. 3d 1251, 1254 (Fla. 2026) (same). But so far, no federal court has weighed in on the issue.

The State's decision to set Guardado's execution one week after receiving the complaint risks this result once again, leaving the Court unable to review the disturbing facts and allegations surrounding Florida's lethal injection practices. But

this time, the State would achieve this result not in a case filed under warrant, but in a case where a prisoner diligently filed before a death warrant issued, expecting to be able to avail himself of this Court's review. Additionally, here, Guardado commissioned a study related to the autopsy and toxicology reports related to the numerous executions over the past year and a half. The information gleaned from the study independently demonstrates significant problems with FDOC's administration of its lethal injection protocol requiring meaningful consideration by this Court. Thus, under the All Writs Act, this Court can preserve its jurisdiction to hear the case without resorting to an emergency schedule of less than four weeks.

Finally, the Court should note the broader context surrounding the sudden signing of Guardado's death warrant. In between the filing of Guardado's complaint and his death warrant was the unprecedented, failed execution of Christa Pike in Tennessee on September 30, 2026. Pike survived two lethal dosages of pentobarbital and at least seven repeated, failed attempts at establishing vein access. Emergency Motion to Preserve Relevant Evidence at 1, *Pike v. Skrmetti*, No. 26-0027-III, Chancery Court of Tennessee, Twentieth Judicial District, Davidson County (Oct. 2, 2026). While more will be known upon the conclusion of a third-party review

mandated by Tennessee's Governor,[2] it is clear that Pike survived the execution due to an issue with vein access and potentially degraded pentobarbital.

Prior to her attempted execution, Pike had raised claims concerning Tennessee's lethal injection protocol, citing particularized medical vulnerabilities and questioning Tennessee's ability to properly respond in the event of a failing execution. *Id.* at 2-3. These claims were dismissed as speculative. *Id.* at 3. In the aftermath of the failed Pike execution, lethal injection is suddenly, and for the first time in years, under severe public scrutiny.[3] But Florida is undeterred from plowing forward with lethal injections even as evidence of maladministration mounts.

---

[2] Alexis Marshall and Marianna Bacallao, *Gov. Lee Halts Execution, Orders Third-Party Review Following Pike's Failed Lethal Injection,* 90.3 WPLN NEWS (Oct. 1, 2026); https://wpln.org/post/gov-lee-halts-execution-orders-third-party-review-following-pikes-failed-lethal-injection/.

[3] *See, e.g.*, Kimmy Yam, *What Exactly Is a Lethal Injection and How Could the Failed Case Impact Executions?* TODAY (Oct. 3, 2026); https://www.today.com/news/christa-pike-what-is-lethal-injection-botched-rcna601224; Jacob Luthi, *Arizona's History of Botched Executions Resurfaces After Tennessee Lethal Injection Fails*, FOX 10 PHOENIX (Oct. 3, 2026); https://www.msn.com/en-us/news/other/arizonas-history-of-botched-executions-resurfaces-after-tennessee-lethal-injection-fails/ar-AA2dsyNj?ocid=BingNewsVerp ; Tim Spears, *Activists Urge Indiana to Pause Lethal Injections After Tennessee Failures*, WISH-TV (Oct. 3, 2026); https://www.msn.com/en-us/news/other/activists-urge-indiana-to-pause-lethal-injections-after-tennessee-failures/ar-AA2dvE9j?ocid=BingNewsVerp; Karys Belger, *How Texas' Lethal Injection Protocol Compares After Failed Tennessee Execution*, FOX 26 HOUSTON (Oct. 1, 2026); https://www.msn.com/en-us/news/other/how-texas-lethal-injection-protocol-compares-after-failed-tennessee-execution/ar-AA2dmPD8?ocid=BingNewsVerp; Arianna Coghill, *Everything You've Been Told About Lethal Injection Is A*

Though Tennessee's lethal injection protocol is different than Florida's, the issues seen in the Pike execution attempt mirror much of what Guardado alleged in his complaint. Not only is Guardado's claim premised upon proof that Defendants have administered degraded etomidate, but the complaint references the autopsy of Dusty Spencer, which revealed that during his lethal injection execution, Defendants failed to establish IV access into Spencer's vein, implicating delivery of chemicals directly into his arm—similar to what appears to have happened to Pike. ECF No. 1 at ¶ 35. Still, fully aware of Guardado's pending litigation, the State chose him to be Florida's next execution. These circumstances justify a preliminary injunction here.

**B. The balance of equities favors Guardado**

The All Writs Act requires this Court's "independent analysis of the equities" on a case-by-case basis. *Hill*, 464 F.3d at 1258. In *Hill*, the Eleventh Circuit found that the equities weighed against the plaintiff in that case because he "filed his § 1983 complaint four days before his previously scheduled execution date" and "he was aware of the grounds for the claim much earlier than the date on which he actually filed his § 1983 action[.]" *Id.* at 1259. Based on Hill's decision to file a § 1983 action on the eve of his scheduled execution, the Eleventh Circuit found that "Hill unreasonably delayed in filing his federal complaint" and that he continued to

---

*Lie*, MOTHER JONES (Oct. 6, 2026); https://www.motherjones.com/criminal-justice/2026/10/christa-pikes-tennessee-execution-lethal-injection-failed-lain/.

engage in dilatory litigation tactics throughout his warrant proceedings in an effort to manufacture a stay of his execution. *Id.* As such, the court concluded that equitable relief was not warranted. But the balances of equities is much different in this case.

The very same timing considerations that militated against equitable relief in *Hill* show precisely why it is warranted here. Whereas Hill sought a stay by filing a § 1983 complaint on the eve of his previously scheduled execution, Guardado initiated this action before his warrant had been signed, with the express aim of doing so "to allow for meaningful judicial review." ECF No. 1 at 36. The State, not Guardado, manufactured the exigent circumstances here by signing Guardado's warrant and imposing a 31-day timeline after the § 1983 action was already initiated. *See Grayson v. Comm'r, Ala. Dep't Corr.*, No. 17-14612, 2017 WL 4767741, at *2 (11th Cir. 2017) (holding a district court properly issued an All Writs Act injunction where state sought execution after initiation of a § 1983 action, and observing that the State, rather than the plaintiff, created the exigency by issuing a death warrant).

Before the death warrant, this action was timely and properly brought. Guardado initiated this suit within the two-year statute of limitations prescribed by Florida law, within two years of the facts it relies upon, and within two years of the study conducted by his expert of numerous autopsies performed following executions in 2025 and earlier this year. Fla. Stat. § 95.11(5); *see also McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008) (holding that constitutional claims

brought under § 1983 are tort actions subject to the state statute of limitations governing personal injury actions in the state where they are filed).

Guardado does not argue that all litigation filed before a death warrant should act as a shield that prevents the State from scheduling an execution. But the circumstances here are different. Guardado diligently filed a substantial complaint regarding Florida's documented lethal injection irregularities, an issue that so far has evaded review at the State's urging. For the State, with full knowledge of this federal litigation, to select Guardado among all others as next for execution, among dozens of warrant-eligible inmates with no pending litigation, strains the bounds of coincidence. This Court should protect its jurisdiction and enter an All Writs injunction to ensure that Guardado's claim is not simply snuffed out after 28 days. The case can still be expedited, but a more reasonable timeframe is needed.

## IV. Alternatively, the Court can grant a stay of execution based on the complaint's substantial likelihood of success

As noted above, this Court does not need to find that Guardado satisfies the traditional stay factors to grant injunctive relief under the All Writs Act. And the State's questionable conduct makes such relief appropriate here, given that Guardado sought to avail himself of this Court's jurisdiction by diligently filing his challenge prior to the issuance of a death warrant. However, in an abundance of caution and for the sake of judicial efficiency in light of the impending execution date, Guardado will also explain why a stay is warranted under the traditional factors.

A traditional stay of execution can be granted where four factors are satisfied: "(1) [the applicant] has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; and (4) if issued, the injunction would not be adverse to the public interest." *Mann v. Palmer*, 713 F.3d 1306, 1310 (11th Cir. 2013) (quoting *Valle v. Singer*, 655 F.3d 1223, 1225 (11th Cir. 2011)); *see also Barwick v. Governor of Fla.*, 66 F.4th 896, 900 (11th Cir. 2023).

**A. Guardado can demonstrate a substantial likelihood of success**

Guardado has made a strong showing that he is likely to succeed on the merits of his Eighth Amendment maladministration-of-lethal injection claim. To establish that Defendants' implementation of the default method of execution is unconstitutional, Guardado must show that the maladministration is "sure or very likely to cause serious illness and needless suffering" and "give rise to sufficiently imminent dangers." *Glossip*, 576 U.S. at 877 (quoting *Baze*, 553 U.S. at 50).

Guardado's claim is supported by recent Eleventh Circuit precedent concerning conscious suffocation—the natural consequence of Defendants' maladministration of the protocol. Guardado's complaint explains that, due to Defendants' repeated administration of expired etomidate, *see* ECF No. 1-5 at 26, inmates are not rendered sufficiently unconscious and are thus awake and aware during the procedure, experiencing the physical and mental torture inflicted by the

chemical paralytic which immobilizes the diaphragm, and the drowning sensation of pulmonary edema. In the context of a Florida execution which typically lasts 12-15 minutes, should etomidate fail to render a prisoner sedated, he will be subjected to resultant air hunger for a significant amount of time. ECF No. 1 at ¶ 42.

The Eleventh Circuit recently found that "one to three minutes of 'severe air hunger and corresponding emotional stress, anxiety, physiological stress, and physical discomfort'. . . presents a substantial risk of serious harm over and above death itself." *Lee v. Comm'r, Ala. Dep't of Corr.*, No. 26-11864, 2026 WL 1651147, at *7 (11th Cir. Jun. 8, 2026).[4] Guardado has sufficiently alleged that Defendants' defective implementation of the protocol carries a significant risk of the same pain deemed unconstitutional by the Eleventh Circuit in *Lee.*

Because Guardado has raised significant questions regarding the efficacy of the first sedative drug, there is a sufficient likelihood of success on the merits of this Eighth Amendment claim. The Supreme Court has made clear that without a functional sedative drug, awareness during a three-drug lethal injection protocol is unconstitutional. As the Court acknowledged, without sedation, "[i]t is uncontested

---

[4] As discussed in the complaint, though Jeffery Lee was ultimately executed on September 17, 2026, via lethal injection, Alabama's chosen lethal cocktail differs from Florida's, and the issues regarding Florida's method carries risks more analogous to nitrogen hypoxia. ECF No. 1 at 2-3. Further, *Lee* cannot be boiled down to a "nitrogen hypoxia case." *Lee* is a "conscious suffocation" case. *Id.* at ¶ 90.

that" the suffocation and pain inflicted by the second and third drugs would cause a torturous death that would be "constitutionally unacceptable." *Baze*, 553 U.S. at 53.

**1. Guardado demonstrated a significant risk of conscious suffocation**

The complaint sets forth the relevant factual background. Guardado's claim is based, in part, on undisputed records produced by Defendants that reveal the administration of expired etomidate, the chosen sedative drug, during multiple executions in 2025. ECF No. 1-5 at 26. Because expired drugs do not retain the same potency, purity, or quality, pharmaceutical expert Dr. Michaela Almgren concluded that "the administered product will likely not produce the full pharmacological effect expected from the labeled dose." *Id.* at ¶¶ 26-27. This implicates consciousness even in the context of a lethal injection execution because the massive dose of expired etomidate is nonetheless a degraded product, and "the relationship between the dose of etomidate and the duration of unconsciousness is not linear." *Id.* at ¶ 28.

Though Defendants have refused to comply with records requests following their release of the records Guardado has provided, ECF No. 1-5, what can be gleaned from recently produced autopsies and toxicology reports shows ongoing maladministration of the lethal injection protocol that implicates Guardado's impending execution. Toxicology reports produced after more recent executions show unpredictability in the metabolization of the etomidate being administered, as significant as a tenfold disparity among some prisoners. ECF No. 1 at ¶¶ 30-33. This

raises substantial concerns regarding the integrity of the etomidate. These violations have already manifested in anomalous executions, with prisoners laboring long before dying and were observed moving well into the execution when movement is not expected, indicating a problem with the administration of the drugs and distress. *Id.* at ¶¶ 57-63. This is further complicated by the fact that during the June 25, 2026, execution of Dusty Spencer, Defendants failed to establish access into a vein, implicating delivery of chemicals directly into Spencer's arm. *Id.* at ¶ 35.

As discussed above, the gravity of the concerns Guardado raised in his complaint has recently been crystallized during the botched execution of Christa Pike in Tennessee. Pike languished on the gurney for two hours as the State struggled to access a vein, ultimately injecting two lethal dosages of potentially degraded pentobarbital directly into Pike's arm. *Pike v. Skrmetti*, No. 26-0027-III, Chancery Court of Tennessee, Twentieth Judicial District, Davidson County (Oct. 2, 2026). Prior to the attempted execution, Pike had raised specific concerns regarding Tennessee's ability to gain venous access and adequately respond to an emergency. *Id.* at 2-3. Pike's concerns materialized. Should the same happen here, Guardado will experience physical and psychological torture. However, unlike in Tennessee, Florida's protocol would kill Guardado due to the effect of the paralytic drug on his diaphragm—a death that would look outwardly peaceful but be inwardly terrorizing.

Indeed, should Guardado be conscious for the administration of the second or third drugs due to drug degradation or a failed intravenous line, he will experience prolonged and severe pain and suffering beyond what is tolerated by the Eighth Amendment. Guardado will be awake and alert as he is slowly paralyzed to death by the second drug, rocuronium bromide, or induced with the painful heart-stopping third drug, potassium acetate. Because none of the drugs in the protocol have any analgesic effect, Guardado will feel every minute of the psychological and physical agony that the second and third drugs produce. *Id.* at ¶ 37. The paralytic drug rocuronium bromide is associated with severe panic due to the neuromuscular blockade it induces, which not only paralyzes the diaphragm, rendering it impossible to breathe, but also causes the prisoner to be "unable to move, speak…or otherwise communicate their awareness or distress." ECF No. 1-6 at 4. And potassium acetate, the third drug, is known to cause "intense burning pain" often characterized as "feeling hot or searing" as it travels along the vein. *Id.* at 7.

This torture is on top of the near-certain risk of pulmonary edema caused by the large bolus injection of etomidate. ECF No. 1 at ¶ 49-55. While pulmonary edema is a known side effect of Defendants' protocol, this risk must be considered differently in light of the recent developments Guardado has raised, as a prisoner who is awake and conscious as their lungs fill with their own blood will experience torture akin to drowning. The combination of a lack of sedation, paired with

pulmonary edema and the mental and physical torture from the second and third drugs, creates a near-certain risk of death by conscious suffocation. *Id.* at ¶ 95.

Physiologically, this is the precise harm deemed unconstitutional in *Lee.* There, the Eleventh Circuit noted that the "mental distress, physiological suffering, and physical discomfort" caused by one to three minutes of air hunger constituted a substantial risk of serious harm. *Lee*, 2026 WL 1651147, at *7. "Counting to 60 to 180 seconds is not a quick exercise, and constitutionally speaking, that timeframe is intolerable" in light of the suffering that occurs. *Id.* Furthermore, this showing is supported by the Supreme Court's acknowledgement that three-drug protocols are unconstitutional absent a functional sedative. *See Baze*, 553 U.S. at 53.

**2. Guardado proffered a sufficient alternative method of execution**

Furthermore, Guardado has proffered an alternative method—firing squad—that is feasible and readily implemented, and will lessen the risk of pain. A plaintiff in a method of execution case "may point to a well-established protocol in another State as a potentially viable option." *Bucklew v. Precythe*, 587 U.S. 119, 140 (2019). The Eleventh Circuit has already found that the firing squad is a feasible, readily implemented alternative to a protocol that causes conscious suffocation. *Lee*, 2026 WL 1741802, at *5-7. Guardado proffered a nearly identical firing squad protocol to the one accepted in *Lee*. ECF No. 1 at ¶ 101. Moreover, Guardado demonstrated that Florida could reasonably implement this protocol. *Id.* at ¶ 100.

**B. Guardado satisfies the remaining traditional stay factors**

The remaining traditional stay factors also weigh in Guardado's favor. First, Guardado will suffer an irreparable injury absent a stay because, due to the Defendants' persistent maladministration of the protocol, he faces a substantial and imminent risk of being executed in a manner that wantonly inflicts pain and suffering in violation of the Eighth Amendment. Irreparable injury is presumptive under warrant. *See, e.g.*, *Lee*, 2026 WL 1741802, at *7 ("It goes without saying that [a plaintiff] would suffer irreparable harm if he were executed pursuant to a method that the district court has found unconstitutional. To him, loss of life is not compensable by legal remedies like damages."); *Wainwright v. Booker*, 473 U.S. 935, 937 n.1 (1985) (Powell, J., concurring) ("The third requirement that irreparable harm will result if a stay is not granted is necessarily present in capital cases."); *In re Holladay*, 331 F.3d 1169, 1177 (11th Cir. 2003) ("We consider the irreparability of the injury that petitioner will suffer in the absence of a stay to be self-evident."); *Ferguson v. Warden, Fla. State Prison*, 493 F. App'x 22, 26 (11th Cir. 2012) (Wilson, J., concurring) ("As a general rule, in the circumstance of an imminent execution, this court presumes the existence of irreparable injury."); *Tanzi v. Fla. Dep't of Corr.*, No. 4:25-cv-144, ECF No. 24 at 8 n.4 (N.D. Fla. April 3, 2025) ("agree[ing] with Tanzi that he would suffer irreparable injury if he was executed").

The irreparable injury in a case challenging a method of execution is not only the execution itself, but also the superadded pain that would occur during that execution. *See Powell v. Thomas*, 784 F. Supp. 2d 1270, 1283 (M.D. Ala. May 16, 2011) (finding "the alleged irreparable injury is not the fact alone that [plaintiff] will die by execution" but that he may experience superadded pain "under present protocols" during that execution). This is not only because the pain during execution may be torturous, but also because a violation of constitutional rights is presumed to cause irreparable injury. *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

Next, a stay would not substantially harm the State. While the State has an interest in the timely enforcement of valid criminal judgments, it has no legitimate interest in executing Guardado via a method that risks the wanton infliction of pain or suffering in violation of the Eighth Amendment. *See, e.g.*, *In re Holladay*, 331 F.3d at 1177 (finding "no substantial harm that will flow to the State of Alabama or its citizens from postponing petitioner's execution to determine whether that execution would violate the Eighth Amendment"). And, Defendant Comerford's stated "foremost objective of the lethal injection process is a humane and dignified death" that is "compatible" with the Eighth Amendment's "evolving standards of decency that mark the progress of a maturing society." ECF No. 1-4 at 2.

It is the State that created the exigency in this matter by signing Guardado's warrant notwithstanding its knowledge that this action had been filed. Guardado

timely filed his § 1983 action on September 28, 2026, within the two-year statute of limitations. While Guardado acknowledged in the complaint that he was "death-warrant eligible," ECF No. 1 at 4, no death warrant had been signed at that time, and he anticipated that the litigation would play out along a typical schedule "to allow for meaningful judicial review." ECF No. 1 at 36. In Florida, there are dozens of warrant-eligible prisoners, many of whom have no pending litigation. Nonetheless, one week after the State learned of this action, on October 5, 2026, Guardado was selected for a death warrant with a November 5th execution date.

Finally, granting a stay would not be adverse to the public interest, which is served by allowing meaningful judicial review of the significant constitutional concerns Guardado has raised. The public always has an interest in the preservation of constitutional rights and in humane and dignified executions. *See Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986) (The Eighth Amendment seeks "to protect the dignity of society itself from the barbarity of exacting mindless vengeance" when carrying out an execution). Allowing the State to execute Guardado without careful review of whether it will violate the Eighth Amendment is adverse to the public interest—more than any minimal delay that may result from granting a stay.

## V. Conclusion

The Court should grant an injunction under the All Writs Act or, alternatively, grant a stay of execution.

Respectfully submitted,

/s/ Linda McDermott
LINDA MCDERMOTT
Chief, Capital Habeas Unit
/s/ Sean Gunn
SEAN GUNN
Assistant Federal Public Defender
Northern District of Florida
227 North Bronough St., Suite 4200
Tallahassee, Florida 32301
(850) 942-8818
linda_mcdermott@fd.org
sean_gunn@fd.org

*Counsel for Mr. Guardado*

**LOCAL RULE 3.01(g) CERTIFICATE**

On October 8, 2026, undersigned counsel contacted counsel for Defendants, Assistant Attorneys General Charmaine Millsaps and Jason Rodriguez, for their position on this motion. Ms. Millsaps stated that Defendants object and will file a written response.

/s/ Sean Gunn
Sean Gunn

**CERTIFICATE OF SERVICE**

On October 8, 2026, this filing was served by email to Assistant Attorneys General Charmaine Millsaps and Jason Rodriguez, counsel for Defendants.

/s/ Sean Gunn
Sean Gunn