**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**JESSE GUARDADO**

Plaintiff, Case No. 3:16-cv-2596

v. **CAPITAL CASE**

**RICHARD COMERFORD,** Secretary,
Department of Corrections,
in his official capacity;

**EXECUTION OF STATE DEATH SENTENCE SET: NOVEMBER 5, 2026 AT 6:00 P.M.**

and

**RANDALL POLK,** Warden,
Florida State Prison,
in his official capacity,

Defendants.
__________________________________/

## RESPONSE TO DEFENDANTS' MOTION TO DISMISS

On October 9, 2026, Defendants moved to dismiss Guardado's 42 U.S.C. § 1983 complaint, alleging that he failed to state a claim under Federal Rule of Civil Procedure 12(b)(6). ECF No. 13. That motion should be denied.

Defendants seek to frame this suit as an untimely facial challenge concerning pulmonary edema and the protocol generally. But Guardado's challenge concerns Defendants' recurring conduct while carrying out a rash of executions in 2025 and 2026, conduct that was documented in their own records. Those records, which

Defendants have yet to explain, reveal Defendants' inability to follow their own protocol when carrying out executions, resulting in the documented use of expired etomidate on at least four occasions.[1] Those errors, coupled with recently produced autopsies, toxicology reports, and newly generated expert conclusions, support the demonstrated risk that Guardado will be conscious following the injection of a series of drugs that can inflict torturous pain to a conscious recipient—all while he is paralyzed and unable to outwardly evince that pain. In response, Defendants are indifferent to these errors, providing unsubstantiated assurances about the efficacy of etomidate without acknowledging the ongoing maladministration or the fact that "success" is difficult to quantify for a protocol that manufactures tranquility with a chemical paralytic. Taken together, this information supports at least a plausible claim for Eighth Amendment relief.

In their motion to dismiss, Defendants have asserted generalized arguments defending the current protocol and the drugs used in it, without acknowledging the demonstrated maladministration, the data reflected in the autopsy and toxicology

---

[1] Because Defendants refuse to disclose any drug logs since the logs disclosed in October 2025, under a newly asserted exemption of Florida's public records law, Guardado has no way of affirmatively proving whether deviations in the protocol occurred in other executions which were not covered by the records. The proffered logs, ECF No. 1-5, reflect only the first thirteen executions in 2025, through the execution of Victor Jones on September 30. Therefore, the records reflect that Defendants administered expired drugs four out of thirteen times—certainly more than a "one-off mishap." ECF No. 13 at 22.

reports that shows these errors to be recurring, and the well-known consequences of such errors. Contrary to Defendants' attempts to frame it as such, this is not an untimely facial challenge to the protocol or complaint about the fact that pulmonary edema is a known consequence of lethal injection. Rather, Guardado's challenge seeks review and intervention based upon Defendants' documented mishandling of lethal injection drugs and misapplication of the protocol. The Court should deny the motion to dismiss and allow further inquiry into Defendants' conduct.

## I. The complaint should not be dismissed on timeliness grounds

To frame Guardado's complaint as untimely, Defendants attempt to recast his claim as little more than a facial Eighth Amendment challenge to the written protocol's risk of pulmonary edema, *see, e.g.*, ECF No. 13 at 23, sidestepping the specific allegations regarding Defendants' documented use of expired etomidate during multiple executions in 2025, and the data gleaned from a comprehensive review of several autopsy and toxicology reports. Instead, Defendants focus on arguments Guardado has not even asserted, leading them to argue that Guardado's claim based on recent maladministration should have been filed in 2021, before those executions even occurred. ECF No. 13 at 12.

Contrary to Defendants' argument that Guardado is "seeking to start the accrual period based on his own actions," it is Defendants' actions that triggered the statute of limitations because the core of Guardado's claim—the maladministration

of the protocol—was only revealed to Guardado in October 2025. *Id.* at 14. As Guardado made clear in his complaint, while pulmonary edema is a known result of lethal injection, the likelihood that Defendants will administer expired etomidate or a lower dose of the drugs than called for in the protocol implicates his awareness while experiencing pulmonary edema. *See* ECF No. 1 at ¶ 86 ("[W]hile pulmonary edema is a known side effect of Defendants' protocol, Guardado's claim is distinguishable because he provides evidence of the high likelihood of the administration of an expired sedative and resultant awareness.").

This distinction makes a difference both at this stage of the proceedings and for Eighth Amendment purposes. In fact, the difference between Guardado's claim and the Defendants' characterization of his claim was acknowledged in the Supreme Court's opinion—cited by Defendants—which accepted the premise that pulmonary edema occurred "only *after* the prisoner has died or been rendered fully insensate." *Barr v. Lee*, 591 U.S. 979, 981 (2020) (emphasis in original). But, here, Guardado has alleged that the use of expired etomidate, or the incorrect dose of lethal drugs, obviates that premise and implicates the constitutional concern of Guardado's conscious suffering from pulmonary edema.

Defendants' assertion that a claim merely mentioning pulmonary edema as a significant risk of severe harm must be raised within the statute of limitations for the discovery of the phenomenon itself, ECF No. 13 at 13-14, without query into the

consciousness issue, is overly simplistic and would, in effect, foreclose maladministration claims like Guardado's altogether. Moreover, the presumption that Defendants are following the protocol must be rebuttable, and Defendants' own records showing the maladministration of the protocol should be sufficient to overcome such a presumption and call for further inquiry. *See, e.g.*, *State of La. ex rel. Francis v. Resweber*, 329 U.S. 459, 462 (1947) (noting state officials were entitled to the presumption of carrying out executions humanely because "nothing has been brought to our attention to suggest the contrary").

Importantly, Guardado's claim is premised on the discovery of Defendants' maladministration of the lethal injection protocol for a period of time in 2025—the only period of time for which Defendants have disclosed any documents—based on records received in October 2025. ECF No. 1 at ¶ 108. Then, the follow-up review of several autopsy and toxicology reports resulting in a report and declaration by qualified experts further advanced Guardado's claim. ECF No. 1-7. Guardado fully investigated this claim "in order to file a section 1983 lawsuit in good faith." *Hamm v. Comm., Ala. Dept. of Corr.*, No. 18-10473, ECF No. 20-1 at 5 (11th Cir. Feb. 13, 2018); *see also Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987) (observing that, in § 1983 actions, "the statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights"); *Wallace v.*

*Kato*, 549 U.S. 384, 388 (2007) (holding that § 1983 claims accrue when the plaintiff "has a complete and present cause of action," which occurs when the plaintiff can "file suit and obtain relief").

Method-of-execution claims accrue within two years of a "significant change" in the implementation of the method. *McNair v. Allen*, 515 F.3d 1168, 1177 (11th Cir. 2008). As the Eleventh Circuit has observed, "[w]hether a significant change has occurred in a state's method of execution is a fact-dependent inquiry." *Arthur v. Thomas*, 674 F.3d 1257, 1260 (11th Cir. 2012). Such an inquiry will evolve with new information. Indeed, as noted by the Eleventh Circuit, "scientific and medical evidence that exists today may differ from that which new scientific and medical discoveries and research reveal tomorrow." *Id.* Necessary for such an inquiry is "the manner in which [the state] administers its lethal injections" and "whether [the state's] representations are accurate." *Id.* at 1261.

Despite Defendants' attempts to frame Guardado's challenge as a facial challenge, this is a maladministration suit triggered by Defendants' conduct in 2025 and 2026. Guardado has alleged new facts supporting a method-of-execution claim separate from a generalized challenge to the protocol itself. And Guardado filed this action before any death warrant was signed in his case in an effort to litigate his challenge in good faith. Any timeliness concerns in this case should focus not on the timing of Guardado's complaint, but on the timing of the State's death warrant and

attempt to expedite the dismissal of Guardado's claims. The complaint should not be dismissed on timeliness grounds.

## II. The complaint should not be dismissed on exhaustion grounds

Defendants' argument that Guardado's claim must be dismissed on exhaustion grounds was expressly foreclosed by the Supreme Court in *Ross v. Blake*, 578 U.S. 632, 642 (2016). In *Ross*, the Court noted that, "[u]nder § 1997(e)(a), the exhaustion requirement hinges on the 'availability' of administrative remedies." *Id*. That is, an inmate "must exhaust available remedies, but *need not exhaust unavailable ones*." *Id.* (emphasis added). The Court identified "three kinds of circumstances in which an administrative remedy, though officially on the books, is not capable of use to obtain relief." *Id.* at 643. Relevant here, the Court found that "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* For example, "if administrative officials have apparent authority, but decline ever to exercise it." *Id.* In such situations, "the inmate has 'nothing to exhaust.'" *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 736 n.4 (2001)).

Here, Defendants' grievance procedure operates as a dead end. *Id.* at 643. While the FDOC may have "apparent authority" to grant administrative relief, that fact does not change the reality that FDOC "decline[s to] ever exercise" this

authority. *Id*. As this Court has observed, FDOC has never granted relief on any Florida inmate's grievance regarding lethal injection. *See Brant v. Allen, et al.*, No. 3:13-cv-412-MMH-SJH, ECF No. 189 at 39-41 (M.D. Fla. Jun. 16, 2025) (noting that FDOC "decline[s] to ever exercise" its authority to rectify prisoners' administrative grievances regarding Florida's lethal injection protocol).

Additionally, the State's implication that Guardado's inmate grievance would not have been futile is simply not supported. The "facts on the ground" show that the FDOC has not and does not intend to consider a prisoner's administrative grievance challenging lethal injection, so the grievance process is not "'capable of use' for its pertinent purpose." *See Ross*, 578 U.S. at 642-43 (quoting *Booth*, 532 U.S. at 736).

Requiring Guardado to file a futile inmate grievance, particularly now that he has an execution date set for November 5, would not serve the ends of justice or be a faithful application of the PLRA and Supreme Court precedent interpreting the Act. Other federal courts have pretermitted the exhaustion analysis under death warrant altogether, focusing instead on the merits of the underlying claim. *See* Order, *Long v. Inch*, 8:19-cv-1193, ECF No. 21 at 15 n.5 (M.D. Fla. May 19, 2019) (noting that Defendants raised the exhaustion issue in response to inmate's PLRA suit, but foregoing exhaustion analysis and deciding a motion for stay on the merits); *Chavez v. Palmer*, 3:14-cv-110, 2014 WL 521067, at *23 (M.D. Fla. Feb. 10, 2014) (same);

*Muhammad v. Crews*, No. 3:13-cv-1587, 2013 WL 6844489, at *6 n.9 (M.D. Fla. Dec. 27, 2013) (same). This Court should do the same.

### III. Guardado pleaded a facially plausible Eighth Amendment claim that clears Rule 12(b)(6)'s threshold

Guardado will not belabor the threshold standards imposed by Rule 12(b)(6), which are undoubtedly familiar to this Court. Guardado's claim is to be assessed under a low bar, wherein he need only "plead enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *James Rivers Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Factually, "the complaint must be construed in a light most favorable to the plaintiff and the factual allegations taken as true." *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997); *see also M.T.V. v. DeKalb County Sch. Dist.*, 446 F.3d 1153, 1156 (11th Cir. 2006) (same). Guardado is not required to prove his theory at this stage, but only to present factual allegations supporting an Eighth Amendment claim. *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014).

The facts Guardado pleaded, taken as true at the Rule 12(b)(6) stage, state a facially plausible claim for Eighth Amendment relief based on Defendants' documented protocol violations and their demonstrated impact on the executed prisoner's consciousness. *See, e.g.*, *Morales v. Tilton*, 465 F. Supp. 2d 972, 975, 981 (N.D. Cal. 2006) (finding that California's inconsistent and unreliable recordkeeping

that resulted in numerous issues in the implementation of its own lethal injection protocol were "likely to recur with considerable frequency," and "[i]n light of the substantial questions raised by the records of previous executions, Defendants' actions and failures to act have resulted in an undue and unnecessary risk of an Eighth Amendment violation[.]"); *see also Martin v. Dozier*, No. 1:18-cv-04617, ECF No. 21 at 17 (N.D. Ga. Nov. 21, 2019) (denying Defendants' motion to dismiss maladministration-of-lethal-injection claim supported by disparate duration in time of prior executions, noting that at the Rule 12(b)(6) stage, "[a]ccepting that claim as true means the Court accept[s] (for now) that something is wrong with the State's implementation of its lethal injection protocol. The speculation lies in pondering what the wrong is, and that question may be something that Plaintiff can answer through discovery.").

Defendants' argument that Guardado failed to state a claim under *Baze v. Rees*, 553 U.S. 35 (2008), and *Glossip v. Gross*, 576 U.S. 863 (2015), overlooks the context of *Baze* itself and is nonresponsive to what Guardado has presented here. First, Guardado has already pointed out that, unlike the petitioner in *Baze*, he has alleged actual, not merely potential, maladministration by proffering Defendants' own records showing the administration of expired etomidate and lower dosages of drugs than called for by the protocol, as well as other data indicating that the practice has continued. ECF No. 1 at ¶ 94. Moreover, the determination in *Baze*, made after

significant evidentiary development, was specific. The Court held that Kentucky's lethal injection protocol and procedures contained adequate safeguards against the specific "risks of maladministration" identified by the petitioner. 553 U.S. at 62. Such a determination does not preclude relief in Guardado's fact-specific challenge and certainly does not warrant a dismissal in this case under Rule 12(b)(6).

Not only has Guardado sufficiently shown that maladministration occurred during executions in 2025 and 2026, but Defendants provided this Court with no assurances that the maladministration was addressed or will not continue. Indeed, even when Defendants do engage with the issue of expired etomidate, they do so not by acknowledging this allegation comes from their own records, but instead by attempting to distract with straw-man arguments such as that "[a]n unexplained anomaly in the toxicology report of one executed inmate" is an insufficient basis for Guardado's claim. ECF No. 13 at 21. However, that data is a mere fraction of the documentation and data Guardado has presented relevant to his claim. And, while Defendants argue they are entitled to the presumption that they are carrying out executions carefully, ECF No. 13 at 5-6, the information Guardado provided is manifestly sufficient to overcome this presumption. Guardado's proffered evidence shows more than an "isolated mishap"—it shows, among other errors, expired drugs being administered, at the very least, four different times in recent executions, the incorrect dosages of drugs being administered; drugs not called for in the protocol

being administered; and on at least one clear occasion, improper placement of an IV.[2] *See also Louisiana ex. rel. Francis*, 329 U.S. at 462, 464.

Even when Defendants do engage with the records themselves, the lackluster explanation they provide highlights the precise problem with the recurring maladministration of the lethal injection protocol. Defendants try to undermine Guardado's claim by casting doubt on the purpose of the records themselves, stating that the records merely document "the type and amount of drugs that were withdrawn from the inventory of the prison pharmacy on that day." ECF No. 13 at 6-7. According to Defendants, "[a]lthough there certainly may be an overlap of drugs and amounts withdrawn and the drugs used in the execution, there will not necessarily be a one-to-one correlation." *Id.* at 7. In other words, Defendants ask this Court to believe that some of the drugs withdrawn from the pharmacy on the day of executions were coincidentally taken for some other unspecified purpose.

[2] As mentioned above, Defendants' logs only document the first 13 executions of 2025. Among those 13 executions, Defendants recorded deviations in eight. Namely, Defendants prepared only half of the required dosage of rocuronium bromide during the execution of Thomas Gudinas, ECF No. 1-5 at 8; an insufficient dosage of potassium acetate during the execution of Anthony Wainwright, *id.* at 6; and administered lidocaine, a drug not authorized by the protocol, during the executions of Edward James and Michael Tanzi, *id.* at 16. Therefore, in the small sample size covered by the available records, 62% of the time Defendants erred rather than follow the protocol. Significantly, an inadequate dosage of potassium acetate implicates death from the paralytic, which is death by suffocation from a paralyzed diaphragm. ECF No. 1 at ¶ 41.

Defendants' explanation creates a factual dispute that cannot be resolved at this Rule 12(b)(6) stage. As pharmaceutical expert Dr. Michaela Almgren has observed from her review of the records, "[t]he fact that the removals occurred specifically on execution dates, and that no other etomidate was removed on those dates, supports the inference that the 10 vials of expired etomidate were designated for and likely used during the executions." ECF No. 1-6 at 11-12. Thus, Defendants are either incorrect, further implicating what drugs at what dosage were administered on the dates identified in Guardado's complaint, or else they are handling lethal injection drugs far below the pharmaceutical industry standard. As Dr. Almgren noted in her report:

> Accurate and comprehensive recordkeeping is important to ensure that medications records are clear, organized, and readily understandable to an outside reviewer. Records should document storage conditions and medication inventory. Expired products should be clearly identified and promptly removed from storage to prevent confusion with in-date inventory. The Florida Department of Corrections' records lack sufficient detail to verify that the medications were stored adequately. The incomplete nature of the records raises concerns regarding the adequacy of medication storage and handling practices.

ECF No. 1-6 at ¶ 22.

Setting aside the logical gaps of Defendants' explanation, Defendants have failed to reassure this Court that inmates were indeed unconscious during recent executions. Touting the protocol as written, Defendants merely acknowledge "isolated mishaps" in the recent past while simultaneously and voraciously assuring

this Court that Guardado will be unconscious. There is no basis for such an assurance. In the context of this maladministration claim, the accuracy and relevance of the subjective and inexpert assessments of prison staff should not be dispositive under a Rule 12(b)(6) standard. Indeed, Defendants' assurances ring hollow in light of their failure to explain or engage with any allegations regarding the maladministration itself.

Throughout their motion to dismiss, Defendants evince a misunderstanding of the protocol and how it was designed, and a general disregard for the importance of following the protocol as written. For example, Defendants argue in a footnote that "even if half of the massive dose of potassium acetate required by the protocol was used," ECF No. 13 at 22-23, the Supreme Court would not "care[.]" *Id.* at 23. If that is the case, then the protocol as written would have no value. Each step of the protocol was reviewed and certified by Defendant Comerford just this year. ECF No. 1-4. Disregard for a step in as delicate a procedure as a three-drug lethal injection increases the likelihood of a defective product overall: an unconstitutional execution. Florida has an obligation to follow its own protocol to "ensure proper implementation" and comply with state law and the Constitution. ECF No. 1-4 at 2. Brushing off routine mistakes as a "one-off mishap," ECF No. 13 at 22, without

pause for internal review or evaluation can lead to disastrous outcomes, as exemplified by Tennessee's failure to execute Christa Pike on September 30, 2026.[3]

As detailed in the complaint, expired etomidate implicates consciousness because expired drugs do not retain the same potency, purity, or quality. ECF No. 1-6 at ¶¶ 26-27. Even in this instance where Defendants administer a massive bolus dose, efficacy of etomidate matters because "the relationship between the dose of etomidate and the duration of unconsciousness is not linear." *Id.* at ¶ 28. As Defendants themselves acknowledge,[4] anomalies in post-mortem etomidate findings may indicate degradation or unexplained inconsistencies in the amount or quality of etomidate actually administered to the prisoner. ECF No. 13 at 22. Toxicology reports show as high as a tenfold disparity among some prisoners executed in 2025. ECF No. 1 at ¶¶ 30-33. Moreover, the assertion that Florida has carried out "scores" of recent executions without incident ignores the fact that a paralytic drug would mask any of the struggle prisoners endured, despite looking outwardly peaceful.

---

3 *See* Eric Levenson and Ryan Young, *Christa Pike is on a Ventilator and Unconscious After Surviving Lethal Injection. What Happened?*, CNN (Oct. 2, 2026); https://www.cnn.com/2026/10/02/us/christa-pike-execution-whats-next.

4 While recounting recent anomalous executions, Defendants add the possibility of an insufficient dosage of etomidate itself. ECF No. 13 at 22 ("Even if one inmate received less than the required about [sic] of etomidate…"). Defendants' inability to provide a consistent explanation for documented errors in the protocol demonstrates the need for additional factual development. Defendants have administered the incorrect dosage of drugs in the past. ECF No. 1 at 8 n.2.

ECF No. 1 at ¶¶ 47, 82. It also overlooks the fact that on numerous occasions, prisoners have been described as taking deep breaths well after the injection of the etomidate and/or death has not occurred for lengthy periods of time following the administration of the drugs. *See* ECF No. 1 at ¶¶ 56-64 (discussing frequent observations of heavy breathing and heaving chests during recent executions, including descriptions of the executions of Michael Tanzi, Thomas Gudinas, Bryan Jennings, Mark Geralds, Frank Walls, Billy Kearse, and Michael King).

Because expired etomidate has diminished potency, ECF No. 1-6 at ¶¶ 26-27, there is a substantial likelihood Guardado will be conscious at the time of or shortly after the administration of the second or third drugs. This exposes him to prolonged pain and suffering beyond what the Eighth Amendment permits. In addition to pulmonary edema, Guardado will feel the mental and physical agony of being paralyzed by the second drug, rocuronium bromide, which incapacitates the muscles in the diaphragm rendering it impossible to breathe. However, Guardado will also be "unable to move, speak, or otherwise demonstrate awareness," ECF No. 1-6 at ¶ 8, and unable to communicate his distress. *Id.* In a clinical setting, patients who experience this awake paralysis "typically suffer from long-term psychological trauma with reported feelings of helplessness, terror, and auditory hallucinations." ECF No. 1-7 at 11.

This torturous sensation, implicated by expired etomidate, has been deemed unconstitutional in this Circuit. In *Lee v. Commissioner, Alabama Department of Corrections*, the Eleventh Circuit noted that the "mental distress, physiological suffering, and physical discomfort" caused by one to three minutes of air hunger constituted a substantial risk of serious harm. No. 26-11864, 2026 WL 1651147, at *7 (11th Cir. Jun. 8, 2026). "Counting to 60 to 180 seconds is not a quick exercise, and constitutionally speaking, that timeframe is intolerable" in light of the suffering that occurs. *Id.* Guardado has alleged sufficient facts demonstrating that a degraded sedative drug will insufficiently render him unconscious. As Dr. Almgren concludes:

> If the potency of etomidate is reduced due to degradation following expiration, the administered product will likely not produce the full pharmacological effect expected from the labeled dose. As a result, the intended level of unconsciousness may not be achieved or may not be maintained for a sufficient period before subsequent drugs are administered.

ECF No. 1-6 at ¶ 27. After the administration of degraded etomidate, the subsequent paralytic drug will completely immobilize Guardado, causing him to suffocate to death while simultaneously feeling a desperate, but futile, desire to breathe. All the while, the damage the protocol inflicts on lung membranes will cause the prisoner to choke on fluid while remaining paralyzed. This is the category of harm deemed unconstitutional in *Lee.*

As Defendants acknowledge, in *Lee*, "[t]he core of the Eleventh Circuit's objection to the nitrogen hypoxia method of execution was that the condemned

inmate was conscious during the execution." ECF No. 13 at 24. Indeed, there is no dispute that should Guardado be conscious during his execution, what would follow would be unconstitutional. *See, e.g.*, *Baze*, 553 U.S. at 53 (acknowledging that without the anesthetizing effect of the first drug in a three-drug protocol, "[i]t is uncontested that" the suffocation and pain inflicted by the second and third drugs would cause a torturous death that would be "constitutionally unacceptable"). Because Guardado's claim is squarely supported by *Baze* and Defendants have made no attempt at countering the allegation that expired etomidate will likely cause severe harm, he has stated a claim for purposes of Rule 12(b)(6).

To the extent that additional development is needed regarding the relationship between the Defendants' administration of expired etomidate and the infliction of wanton pain, that shows why further evidentiary development is warranted on the claim—it cannot be resolved at the Rule 12(b)(6) stage. Nor was Guardado required to make such a showing at this juncture: "[w]e are aware of no rule that requires a plaintiff to allege evidence in order to survive a motion to dismiss…[Federal Rule of Civil Procedure] 8 does not contain an evidence requirement." *Grayson v. Warden, Comm'r, ADOC*, 869 F.3d 1204, 1216 n.27 (11th Cir. 2017) (vacating district court's grant of summary judgment and remanding for further proceedings).

Defendants' attempt to persuade this Court to dismiss Guardado's claims as speculative requires the Court to ignore the factual basis that support Guardado's

complaint. For example, Defendants' reliance on *Wellons v. Commissioner, Georgia Department of Corrections*, 754 F.3d 1260, 1264-65 (11th Cir. 2014), is misplaced as Guardado's claim is supported by documented proof created by Defendants themselves. *Wellons* was a case concerning the right to obtain documentation similar to what Guardado already provided here—information that merits further inquiry. As Justice Sotomayor has noted, the errors contained in the records Guardado provided reflect "at least the possibility that recent Florida executions have involved—in addition to expired drugs—incorrect drug doses, the use of nonprotocol drugs, and recordkeeping lapses that could mask yet additional failings." *Trotter v. Florida*, 146 S. Ct. 755, 755 (2026) (Sotomayor, J., statement respecting denials of stay and certiorari). Justice Sotomayor noted that "the record to date is troubling," *id.*, and encouraged Florida's courts to inquire further. *Id.* at 56. This Court should do so.

In the end, Defendants' Rule 12(b)(6) motion simply denies Guardado's allegations with no explanation and attempts to distract this Court with generalized defenses of the protocol that do not address the claim. Defendants do not offer any alternative explanation for the logs or the discrepancies noted in the autopsies and toxicology reports. At this stage, Guardado has proffered sufficient evidence that Defendants' maladministration threatens him with a substantial risk of serious pain; it is enough that Guardado has presented that Defendants' maladministration of the

protocol implicates consciousness for the remainder of the procedure. Here, Guardado need only state a claim that is plausible on its face, with this Court drawing all reasonable inferences in his favor. He has done so.

## IV. Conclusion

The Court should deny Defendants' motion to dismiss.

Respectfully submitted,

/s/ Linda McDermott
LINDA MCDERMOTT
Chief, Capital Habeas Unit
/s/ Sean Gunn
SEAN GUNN
Assistant Federal Public Defender
Northern District of Florida
227 North Bronough St., Suite 4200
Tallahassee, Florida 32301
(850) 942-8818
linda_mcdermott@fd.org
sean_gunn@fd.org

*Counsel for Mr. Guardado*

## CERTIFICATE OF SERVICE

On October 14, 2026, this filing was electronically served on all attorneys attached to the CM/ECF docket.

/s/ Sean Gunn
Sean Gunn