IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**EXECUTION SCHEDULED FOR NOVEMBER 5, 2026, @ 6:00 p.m.**

JESSE GUARDADO,

*Plaintiff*,

v. Case No.: 3:26-cv-02596
CAPITAL CASE

RICHARD COMERFORD,
Secretary, Florida Department of Corrections,
in his official capacity

and

RANDALL POLK,
Warden, Florida State Prison,
in his official capacity

*Defendants*.
_______________________________________/

**MOTION TO LIMIT EVIDENTIARY HEARING TO THE ISSUE OF EXPIRED ETOMIDATE**

Defendants file this motion to limit the evidentiary hearing solely to the issue of whether the etomidate used during the four executions at issue was, in fact, expired. The core of Guardado's challenge to Florida's three-drug protocol is that the massive doses of drugs used in the protocol will

cause pulmonary edema in his lungs and, if the etomidate used as the first drug is expired, he will be conscious enough to experience the sensation of suffocating or air hunger in violation of the Eighth Amendment. But his domino effect theory depends entirely on the etomidate being expired and for that reason, the evidentiary hearing should be limited to that critical issue alone.[1] And, once the critical issue of whether the etomidate used in the executions of Kayle Bates, Curtis Windom, David Pittman or Victor Jones was expired is resolved at the evidentiary hearing, the Defendants' pending Rule 12(b)(6) motion to dismiss should be granted.

<u>Short procedural history of the current §1983 litigation</u>

On September 28, 2026, Guardado, represented by the Capital Habeas Unit of the Office of the Federal Public Defender of the Northern District of Florida (CHU-N), filed a 42 U.S.C. § 1983 suit challenging Florida's current lethal injection protocol on Eighth Amendment grounds in this Court. (Doc. #1). He contended that a series of events will cause him to suffer from a sensation of suffocation or "air hunger," relying on the

[1] Defendant categorically deny the use of expired etomidate and intend to prove that at the upcoming evidentiary hearing.

Eleventh Circuit's recent decision in *Lee v. Comm'r, Ala. Dep't of Corr.*, No. 26-11864, 2026 WL 1651147 (11th Cir. June 8, 2026) (unpublished).

On October 8, 2026, CHU-N filed an emergency motion for an All Writs injunction or alternatively, a motion to stay the execution. (Doc. #11).

On October 8, 2026, this Court ordered Defendants to file a response to the motion to stay by Monday, October 12, 2026, at 5:00 p.m. (Doc. #12). On October 9, 2026, this Court ordered Defendants to file a response to the motion to stay specifically addressing "Plaintiff's argument that the FDOC's administration of expired drugs presents a substantial risk of serious harm." (Doc. #15).

On October 9, 2026, Defendants filed a motion to dismiss the § 1983 suit under Federal Rule of Civil Procedure 12(b)(6). (Doc. #13). The motion noted that Florida's current lethal injection protocol consists of three drugs: etomidate, a hypnotic; rocuronium bromide, a paralytic; and potassium acetate, which causes cardiac arrest. (Doc. #13 at 2). The motion argued the suit should be dismissed for three independent reasons: (1) it is untimely under the applicable statute of limitations because Florida's current protocol was adopted in 2017; (2) failure to exhaust the

claim, as required by the Prisoner Litigation Reform Act (PLRA), because Guardado did not file a grievance with the Department of Corrections (FDOC); and (3) for failure to state a valid Eighth Amendment claim under controlling Supreme Court precedent.

On October 12, 2026, Defendants filed a response to the motion to stay pointing out that All Writ injunctions were not proper in capital cases under *Dunn v. McNabb*, 583 U.S. 941 (2017), and asserting that Guardado failed three of the four prongs of the traditional stay standard. (Doc. #16). Defendants distinguished *Lee* by pointing out that Florida inmates are unconscious during the execution as a result of the administration of etomidate and noted the consciousness checks mandated by Florida's protocol. Defendants cited a case from the Sixth Circuit rejecting an Eighth Amendment challenge based on pulmonary edema. (Doc. #16 at 11 citing *In re Ohio Execution Protocol Litig.*, 946 F.3d 287, 289-91 (6th Cir. 2019)). Defendants explained that Guardado was relying on a domino effect that required the "expired" etomidate to be effective enough to render him unconscious during the consciousness check but not effective enough to keep him unconscious for the next few minutes until the third drug is administered. (Doc. #16 at 12).

On October 13, 2026, CHU-N filed a reply to the response to the motion for a stay, basically acknowledging that the All Writs statute did not apply to stays in capital cases. (Doc. #17).

On October 14, 2026, CHU-N filed a response to the Defendants' Rule 12(b)(6) motion to dismiss. (Doc. #18).

On October 16, 2026, this Court ordered a "limited" evidentiary hearing to be held on Thursday, October 22, 2026, at 9:30 a.m. in Courtroom 10B. (Doc. #19).

## ARGUMENT TO LIMIT EVIDENTIARY HEARING

This Court should limit the evidentiary hearing solely to the issue of whether expired etomidate was used in the August 19, 2025 execution of Kayle Bates; the August 28, 2025 execution of Curtis Windom; the September 17, 2025 execution of David Pittman; or the September 30, 2025 execution of Victor Jones. No other matters should be considered by this Court including the toxicology reports on the post-mortem amount of the first drug, etomidate, purporting to establish the amount of etomidate in the bloodstream at the time of the actual execution.

The Supreme Court's plurality opinion in *Baze v. Rees*, 553 U.S. 35

(2008), supports limiting the evidentiary hearing to the alleged use of expired etomidate. In *Baze v. Rees*, 553 U.S. 35, 53-54 (2008), the Supreme Court held the risk of improper administration of the first drug in a three-drug protocol did not render the execution with that protocol cruel and unusual punishment. Baze had filed a § 1983 suit challenging Kentucky's three-drug protocol, which used sodium thiopental as the first drug and potassium chloride as the third drug. He asserted that Kentucky's protocol violated the Eighth Amendment because there were less painful drugs that could substitute for potassium chloride as a heart-stopping agent. *Id.* at 56, n.4. Baze also relied on an article from the Lancet. Leonidas G. Koniaris, et al., *Inadequate Anesthesia in Lethal Injection for Execution*, 365 Lancet 1412 (April 16, 2005), to show there was a risk that he would not be given enough of the first drug to be fully unconscious when the painful third drug was administered. The Lancet article examined thiopental concentrations in toxicology reports based on blood samples drawn from 49 executed inmates from four states that used thiopental in their lethal injection protocols and concluded that "most of the executed inmates had concentrations that would not be expected to produce a surgical plane of anesthesia, and 21 (43%) had concentrations consistent

with consciousness." *Baze*, 553 U.S. at 51, n.2; *id*. at 108–09 (Breyer, J., concurring) (noting the Lancet article examined autopsy toxicology results from 49 executions in Arizona, Georgia, North Carolina, and South Carolina and observed that although the dose of sodium thiopental was several times the dose used in surgical operations, the authors found that the level of the first drug in the bloodstream several hours or more after the inmates' death was lower than the level one might expect to find during an operation).

The *Baze* plurality found that the petitioners had not shown that "the risk of an inadequate dose of the first drug" was "substantial." *Id*. at 53-54. The *Baze* Court rejected any attempt to mandate the safest protocol with the best drugs be used because to do so would transform courts into boards of inquiry tasked with "determining best practices for executions" that "would embroil the courts in ongoing scientific controversies beyond their expertise" to determine which was the safest and best protocol. *Id*. at 51 & n.2; *see also Baze*, 553 U.S. at 106 (Thomas, J., concurring) ("We have neither the authority nor the expertise to micromanage the States' administration of the death penalty in this manner. There is simply no reason to believe that unelected judges without scientific, medical, or

penological training are any better suited to resolve the delicate issues surrounding the administration of the death penalty than are state administrative personnel"). But the plurality noted, "shortly after the Lancet study appeared, peer responses by seven medical researchers criticized the methodology supporting the original conclusions." *Id.* at n.2 (citing Jonathan Groner, *Inadequate Anaesthesia in Lethal Injection for Execution*, 366 Lancet 1073–1074 (Sept. 2005)). These other researchers noted that because the blood samples were taken several hours to days after the inmates' deaths, the postmortem concentrations of thiopental—a fat-soluble compound that passively diffuses from blood into tissue—could not be relied on as accurate indicators for concentrations during the execution itself. *Id.* at n.2 The *Baze* plurality, however, refused to take sides in the scientific debate regarding whether postmortem drug levels reflect the drug level at the time of the actual execution, observing that they only highlighted the debate to confirm that a "best practices" approach to the Eighth Amendment "would involve the courts in debatable matters far exceeding their expertise." *Id.*

Justice Breyer in his concurring opinion opined that the Lancet study may be "seriously flawed," noting that other experts were concerned that

the lower amounts of the first drug in the toxicology reports did not necessarily show the dose of the first drug that was present in the bloodstream at the time of the execution, due to the time lapse between the death of the inmate and the collecting and testing of the blood. *Baze*, 553 U.S. at 109 (Breyer, J., concurring). Justice Alito in his concurring opinion also expressed skepticism and characterized the evidence supporting most challenges to lethal injection protocols as "strikingly haphazard" and "unreliable." *Baze*, 553 U.S. at 67 (Alito, J., concurring).[2]

The domino-effect argument raised in *Baze* asserting that the low dose of the first drug would result in the inmate feeling the pain of the third drug, is similar to the domino-effect argument being raised in this case. Although the allegations regarding the cause of the low dose of the first drug are different, in *Baze* it was simply that the dose in the protocol

---

[2] The Florida Supreme Court had rejected challenges to Florida's previous protocol which used sodium pentothal as the first drug based on the Lancet article before *Baze* was decided in 2008. *Hill v. State*, 921 So. 2d 579, 582-83 (Fla. 2006); *Rutherford v. State*, 926 So. 2d 1100, 1113-114 (Fla. 2006) (rejecting the challenge to Florida's protocol using sodium pentothal as the first drug because the Lancet study by its own admission was "inconclusive," reasoning that the "mere possibility of technical difficulties" during executions does not justify a finding of an Eighth Amendment violation); *Rolling v. State*, 944 So. 2d 176, 179 (Fla. 2006); and *Diaz v. State*, 945 So. 2d 1136 (Fla. 2006).

was not large enough; whereas, in this case it is an allegation that the etomidate was expired, but, in both cases the plaintiff was asserting that the first drug would not be fully effective, which would result in the inmate feeling pain from the third drug in *Baze* or the inmate suffering from air hunger as a result of pulmonary edema in this case. Following the evidentiary hearing, this Court should reject Guardado's domino-effect argument for the same reasons the *Baze* Court did.

The views expressed in the *Baze* plurality as well as those of the two of the concurring opinions naturally raise the issue of whether toxicology reports on the post-mortem amount of the first drug met the standard for scientific evidence established by *Daubert v. Merrell Dow Pharmaceuticals*, *Inc*., 509 U.S. 579 (1993). Defendants object to any evidence or testimony regarding the post-mortem amounts of etomidate establishing the amount of etomidate in the inmates' bloodstream at the time of the execution on *Daubert* grounds.

Autopsies are not conducted in a uniform manner. One autopsy can be conducted within hours of the execution but another autopsy can be conducted days after the execution. Additionally, the blood used to generate the toxicology reports is taken from different parts of the body.

One medical examiner conducting an autopsy can collect the blood from the heart while another medical examiner can collect the blood from other parts of the body. Indeed, there are three common parts of the body where the blood is collected during an autopsy which means this is not comparing apples to oranges; it is comparing apples to oranges to grapefruits. Given these numerous variables in the autopsies from one execution to the next, any conclusions from comparisons across autopsies will be problematic.

And, as a practical matter, this is not the case for a wide-ranging factual development of the details of Florida's lethal-injection protocol. Currently pending before this Court is a similar § 1983 suit challenging the constitutionality of Florida's current protocol. *Brant v. Palmer*, 3:13-cv-00412 (M.D. Fla). Discovery, including depositions of experts, was conducted in *Brant*. Additional matters could be explored by this Court in that case at a normal pace and in greater depth than is feasible in this active warrant case.

Defendants do not agree to the evidentiary hearing including any unpled matters. Fed. R. Civ. P. 15(b)(2) (providing: "when an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings"). Trial of

unpled issues by implied consent is "not lightly to be inferred." *Doe #6 v. Miami-Dade Cnty.*, 974 F.3d 1333, 1339 (11th Cir. 2020) (citing *Jimenez v. Tuna Vessel Granada*, 652 F.2d 415, 422 (5th Cir. 1981)). Defendants object to any unpled matters being tried at the evidentiary hearing.

Opposing counsel, Sean Gunn of CHU-N, was contacted regarding this motion via email and objects to the motion to limit the evidentiary hearing.

Accordingly, this Court should limit the evidentiary hearing in this active warrant case solely to the issue of whether the etomidate used in the executions of Kayle Bates, Curtis Windom, David Pittman, or Victor Jones was expired.

Respectfully submitted,

JAMES UTHMEIER
ATTORNEY GENERAL OF FLORIDA

/s/ *Charmaine Millsaps*
CHARMAINE M. MILLSAPS
SPECIAL COUNSEL,
ASSISTANT ATTORNEY GENERAL
FLORIDA BAR NO. 00989134
OFFICE OF THE ATTORNEY
GENERAL OF FLORIDA
PL-01, THE CAPITOL
TALLAHASSEE, FL 32399-1050
(850) 414-3300

COUNSEL FOR DEFENDANTS

CERTIFICATE OF COMPLAINCE WITH RULE 3.01(b)

I certify that this **MOTION TO LIMIT EVIDENTIARY HEARING TO THE ISSUE OF EXPIRED ETOMIDATE** is within the 25-page limit governing the length and content of a motion under the local rules. M.D. Fla. Loc. R. 3.01(b).

/s/ Charmaine Millsaps
Charmaine M. Millsaps
Special Counsel
Asst. Attorney General

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing **MOTION TO LIMIT EVIDENTIARY HEARING TO THE ISSUE OF EXPIRED ETOMIDATE** has been furnished by CM/ECF to **SEAN GUNN** Assistant Public Defender of CHU-N, 227 N. Bronough Street. Tallahassee, Fl 32301; phone: (850) 942-8818; email: sean-gunn@fd.org this 16th day of October, 2026.

/s/ Charmaine Millsaps
Charmaine M. Millsaps
Special Counsel
Asst. Attorney General