**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**JESSE GUARDADO**

Plaintiff,

Case No. 3:16-cv-2596

v.

**CAPITAL CASE**

**RICHARD COMERFORD,** Secretary,
Department of Corrections,
in his official capacity;

**EXECUTION OF STATE DEATH SENTENCE SET: NOVEMBER 5, 2026 AT 6:00 P.M.**

and

**RANDALL POLK,** Warden,
Florida State Prison,
in his official capacity,

Defendants.
_________________________________/

## RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO LIMIT EVIDENTIARY HEARING

Defendants seek to limit the upcoming evidentiary hearing to one issue: whether the etomidate used during four of the 36 executions conducted by Florida since 2025, which Defendants' own records say was expired, was expired. But this limitation would prevent the Court from fully assessing the merits of Guardado's Eighth Amendment maladministration claim, which includes but is not limited to Defendants' documented administration of expired etomidate during prior executions. At a minimum, the hearing should encompass whether Defendants have

implemented any remedy or have continued to execute prisoners with expired drugs. And as Guardado's complaint describes, the risk of severe pain he faces if executed via Defendants' practices is substantial not only because of Defendants' documented history of failing to sufficiently sedate prisoners with etomidate, but also due to their broader pattern of improvisation and disregard for the protocol. The Court should permit Guardado to present any evidence at the hearing that supports his claim.

## I. Defendants' proposed limitation would impede the Court's assessment of Guardado's constitutional claim

Defendants insist that the evidentiary hearing should be limited to whether expired etomidate was used in four specific executions—those of Kayle Bates, Curtis Windom, David Pittman, and Victor Jones. ECF No. 23 at 2.[1] Defendants argue this is appropriate because "[t]he core of Guardado's challenge to [the] protocol is that the massive doses of drugs used in the protocol will cause pulmonary edema in his lungs," an assertion that Defendants say "depends entirely on the etomidate being expired." ECF No. 23 at 1-2.

However, as in prior filings, Defendants misstate Guardado's Eighth Amendment claim, which is not focused solely on the facial risk of pulmonary edema. While Defendants' documented use of expired etomidate is an important

[1] In their motion, Defendants deny using expired etomidate, apparently for the first time, after passing up numerous prior opportunities to make such a denial in this and other cases. *See* ECF No. 23 at 2 n.1.

component of Guardado's claim, and can involve pulmonary edema, it is not the full extent of maladministration captured in Defendants' records and should not be the sole focus of evidentiary development. The available evidence raises additional questions about Defendants' pattern of maladministration of the protocol.

Guardado's complaint shows that his allegations reach beyond four documented uses of expired etomidate. Guardado alleged that "Defendants' [] records reveal that over the course of an unprecedented number of Florida executions in 2025, corrections officials deviated from the protocol on numerous occasions, using expired drugs, lower dosages of drugs than required, and unauthorized drugs[,]" ECF No. 1 at ¶ 3, "implicat[ing] the level of sedation induced during the execution process," *id.*, and creating the same type and degree of pain that the Eleventh Circuit recently deemed unconstitutional in *Lee v. Commissioner, Alabama Department of Corrections*, No. 26-11864, 2026 WL 1651147, at *7 (11th Cir. Jun. 8, 2026). Guardado further asserted that "Defendants have compounded [the risk of such suffering] by fostering and insulating a culture of noncompliance and nontransparency with their own protocol." ECF No. 1 at ¶ 6.

In other words, contrary to Defendants' framing, Guardado's argument is that the Defendants have routinely failed to comply with their own protocol in multiple respects, implicating their ability to carry out executions in a manner that comports with the Eighth Amendment. The use of expired etomidate in past executions is

emblematic of the Defendants' haphazard compliance with the protocol as a whole, but it is merely one such example of their deviation from the protocol.

As Guardado has previously noted, his complaint relies on certain records that were obtained through a lawsuit filed by another death row inmate, Frank Walls, which "revealed a pattern of maladministration recurring throughout 2025." ECF No. 1 at ¶ 22; *see also Walls v. Dixon*, No. 4:25-cv-0488, ECF No. 1 (N.D. Fla. Nov. 26, 2025). Those records included partially redacted internal execution drug logs that documented the use of expired etomidate in the executions of the four above-named inmates. *Id.* However, "the records published in *Walls* only span through the execution of Jones on September 30, 2025, and Defendants have refused to comply with any additional records requests." ECF No. 1 at ¶ 29. Thus, Guardado's focus on those four executions is entirely due to Defendants' refusal to provide records as to other, more recent executions—not an indication that all other executions proceeded in accordance with the protocol.

Particularly given the pervasive evidence of maladministration in the limited records Defendants *have* provided, there is no suggestion that Defendants' failure to comply with the protocol only occurred in those four executions and was limited to the use of expired etomidate. On the contrary, a review of autopsies and toxicology reports generated after executions in 2025 and 2026—covering other individuals besides the four named above and documenting other issues beyond the use of

expired etomidate—suggests that the maladministration has been pervasive, ongoing, and is highly likely to occur here. *See generally* ECF No. 1 at ¶¶ 30-34.

For example, Defendants' logs documented that only half of the required dosage of rocuronium bromide was prepared in the execution of Thomas Gudinas, and an insufficient dosage of potassium acetate was prepared for the execution of Anthony Wainwright. *See* ECF No. 1 at ¶ 23 n.2. Additionally, lidocaine, a drug not authorized by Defendants' protocol, was administered during the executions of Edward James and Michael Tanzi. *Id.*

Toxicology reports produced after more recent executions show additional problems, including unpredictability in the metabolization of the etomidate being administered. This supports not only that Defendants may have continued using expired etomidate beyond the dates noted in the *Walls* records, but that inconsistent administration of potentially expired etomidate could affect the level of unconsciousness achieved during an execution. The toxicology reports accompanying the autopsies of Michael Bell and Samuel Smithers show that there was a tenfold disparity in the two men's post-mortem etomidate levels, suggesting Defendants' maladministration has persisted. *See* ECF No. 1 at ¶¶ 31-32. While the cause is a matter for further factual development, a tenfold disparity between post-mortem levels is indicative of further maladministration.

Guardado does not seek to present evidence at the hearing that goes beyond the claim he pleaded. But given the multiple significant issues Guardado raised regarding Defendants' failure to adhere to the protocol, this Court should reject Defendants' attempt to curtail the scope of the evidentiary hearing and permit Guardado the opportunity to litigate the claim he actually raised in his complaint: that Defendants' pervasive and continuing maladministration of the protocol is substantially likely to result in a violation of Guardado's Eighth Amendment rights.

## II. Restricting the Court's inquiry is inconsistent with *Baze*

Defendants specifically reference the United States Supreme Court's plurality opinion in *Baze v. Rees*, 553 U.S. 35 (2008), to argue that this Court should limit the scope of the evidentiary hearing to only the issue of the documented use of expired etomidate in four executions. However, restricting the evidence and construing the issue so narrowly is inconsistent with *Baze* and overlooks the multiple documented errors contained in the drug logs and the other areas of evidence—the autopsy and toxicology reports, and the observations of irregularities during previous recent executions—which demonstrate that Defendants' repeated conduct and violation of the protocol create a substantial risk of serious harm if they are permitted to proceed with Guardado's execution.

First, it is noteworthy to recognize that *Baze* was decided in 2008, when lethal injection was used "by every jurisdiction that imposes the death penalty." *Id*. at 41

(plurality opinion). Likewise, of the 36 states using lethal injection, 30 used "the same combination of three drugs in their protocols." *Id.*[2] And, the first drug was sodium thiopental. *Id*. Thus, *Baze*'s comparison to other methods of executions and drug protocols has drastically shifted in the 18 years since that case was decided. Now, Florida's three-drug protocol and its choice of etomidate as the first drug are extreme outliers among the handful of states practicing execution currently. Because so much of a method-of-execution challenge requires a comparison to other methods and trends, *see, e.g.*, *Bucklew v. Precythe*, 567 U.S. 119, 136 (2019) ("Distinguishing between constitutionally permissible and impermissible degrees of pain…is a *necessarily* comparative exercise"), *Baze* arguably supports, and certainly does not refute, Guardado's claim.

Additionally, the challenge lodged in *Baze* was a facial challenge where the petitioners claimed that Kentucky's protocol was unconstitutional. *Id*. at 46. Therefore, while petitioners pointed to potential problems in the administration of the protocol—like obtaining IV access or the absence of a consciousness check—unlike Guardado, that was a case about margin of error, not about documented

---

[2] Currently, 27 states have abolished the death penalty as a punishment, nine more than when *Baze* was decided. *See* Death Penalty Information Center, https://deathpenaltyinfo.org/state-and-federal-info/state-by-state (last visited Oct. 17, 2026). And multiple states have abandoned lethal injection altogether as their primary execution method, or else have adopted a one-drug protocol for lethal injection, a significant change compared to the 30 states using a three-drug protocol at the time the Court considered Baze's challenge. *Id*.

violations. Here, Guardado has pointed to multiple recorded violations in the administration of the protocol—not just the use of expired etomidate on four occasions. The other errors are equally problematic. For example, administering a lower dose of the third drug would prolong the execution risking the etomidate wearing off and Guardado being subjected to death by suffocation due to the paralytic. Thus, Guardado should have an opportunity to present the evidence of maladministration without limitation to the four uses of expired etomidate.

Defendants heavily rely on the Supreme Court's discussion of the scientific debate around the Lancet study proffered in *Baze*, which reviewed post-mortem toxicology results from 49 executions conducted in several states. ECF No. 23 at 6-10. The *Baze* petitioners used the Lancet study to show that there was a risk that they would be given an insufficient dose of the first drug in Kentucky's three-drug protocol, rendering them not fully unconscious by the time the third drug was administered and causing a substantial likelihood of severe pain. Ultimately, the *Baze* plurality found that the petitioners failed to show that the risk of pain from maladministration was substantial.[3] *Baze*, 553 U.S. at 53-54. But Guardado's claim, unlike that of *Baze*, does not rely on a study discussing the theoretical possibility of what *could* happen due to the failure to follow an execution protocol. Rather, his

[3] However, the Supreme Court expressed no definitive opinion regarding the conclusions in the Lancet study. *Baze*, 553 U.S. at 51 n.2 ("We do not purport to take sides in this dispute.").

argument is based on Defendants' own records documenting a demonstrated pattern of persistent maladministration of the protocol. As such, Defendants' extensive discussion of the Supreme Court's views on the Lancet study is of limited relevance here and is another attempt to misconstrue Guardado's claim as a facial challenge to etomidate more generally, instead of the specific maladministration claim he raised.

## III. Post-mortem toxicology reports are valuable, admissible evidence that this Court should consider

Defendants assert that the views expressed in *Baze* regarding the reliability of post-mortem toxicology reports "naturally raise the issue" of whether such reports reflecting varying drug levels in recently executed individuals would meet the standard for admissibility of scientific evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). ECF No. 23 at 10. However, Defendants overlook that the admissibility of post-mortem toxicology assessments based on blood draws is not in question in federal courts in Florida.

*Daubert* provided a non-exhaustive list of factors for courts to consider in determining when expert testimony is reliable, specifically whether (1) "the theory or technique can be tested;" (2) "it has been subjected to peer review;" (3) "the technique has a high known potential rate of error;" and (4) "the theory has attained general acceptance within the scientific community." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citing *Daubert*, 509 U.S. at 593-94). In applying this legal framework to the admissibility of scientific evidence, the

Eleventh Circuit has noted that "proposed expert testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (internal citations omitted) (quoting *Daubert*, 509 U.S. at 590) (cleaned up).

In the last two years alone, case law addressing *Daubert* challenges to the admissibility of scientific testimony based on forensic toxicology, including post-mortem assessments using blood taken from cadavers, has been admitted in Florida federal courts. For instance, the Northern District of Florida in 2024 permitted the scientific testimony of a forensic pathologist when her conclusions were based in part on post-mortem forensic toxicology, *Lugo v. Simmons*, No. 3:23-cv-24517-TKW-HTC, 2024 WL 5508341, at *1-*2 (N.D. Fla. Oct. 30, 2024), noting that any arguments regarding the reliability of the toxicology assessment "went to the weight of the opinion, not its admissibility, because the opinion was based on scientific literature and the toxicologist's experience." *Id*. at *5 (citing *Roberts v. Mitchell*, No. 3:20-cv-751-TKW-ET, 2021 WL 2099306, at *5 (N.D. Fla. Mar. 31, 2021) (noting criticisms of toxicology opinion went to weight, not admissibility)). Additionally, the Southern District of Florida recently permitted the testimony of a forensic toxicologist as to her assessment of whether a death in police custody was resultant from an overdose, so long as the toxicologist kept her testimony within the scope of her expertise. *Acosta v. Miami Dade County*, No. 16-23241-CIV-

CANNON/Sanchez, 2025 WL 3170314, at *5 (S.D. Fla. Jan. 8, 2025), *later clarified in Acosta v. Miami Dade County*, No. 16-23241-CIV-CANNON/Sanchez, 2025 WL 3171748 at *3 (S.D. Fla. Aug. 14, 2025).[4]

The implicit acceptance by the courts of the post-mortem toxicology analysis on which these experts based their opinion is highly significant as, when determining admissibility under *Daubert*, it is required that "conclusions [be] supported by good grounds for each step in the analysis—mean[ing] that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*." *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (internal quotation omitted)) (emphasis in original). Necessarily, in order to have admitted this evidence, these courts must have considered the toxicology analysis to be reliable and sufficient to withstand *Daubert*. Thus, despite Defendants' assertions to the contrary, the admissibility of post-mortem toxicology analysis utilizing blood draws is settled in Florida's federal courts.

---

[4] While one court reached a different conclusion, at issue was an assessment based on two blood draws from the same lab, and the same deceased, where the draw from the heart contained lower THC levels than a peripheral draw from the femoral artery, contrary to what scientific literature and experts could explain. A defense expert posited a hypothesis, with no scientific support or explanation. The court denied admission because caselaw counsels against deeming evidence reliable on an expert's ipse dixit alone. *Battle v. Gold Kist, Inc.*, 3:06-cv-782-J-32TEM, 2008 WL 4097717, at *1 (M.D. Fla. Sept. 2, 2008).

Here, Guardado is proffering relevant toxicology reports in order to question clear, unexplained discrepancies in how Defendants are administering their three-drug protocol. In the context of Defendants' documented maladministration, such disparities are relevant for this Court to consider the weight of the errors and whether they have continued beyond the documented period. Because the continuation of the errors into 2026 is highly relevant to Guardado, and because the toxicology reports offer a meaningful insight into Defendants' behavior beyond the dates captured by the FDOC records, ECF No. 1-5, this Court should consider them.

## IV. Conclusion

The Court should deny Defendants' motion to limit the evidentiary hearing to the issue of expired etomidate during four executions.

Respectfully submitted,

/s/ Linda McDermott
LINDA MCDERMOTT
Chief, Capital Habeas Unit
/s/ Sean Gunn
SEAN GUNN
Assistant Federal Public Defender
Northern District of Florida
227 North Bronough St., Suite 4200
Tallahassee, Florida 32301
(850) 942-8818
linda_mcdermott@fd.org
sean_gunn@fd.org

*Counsel for Mr. Guardado*

**CERTIFICATE OF SERVICE**

On October 18, 2026, this filing was electronically served on all attorneys attached to the CM/ECF docket.

/s/ Sean Gunn
Sean Gunn