**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**JESSE GUARDADO**

Plaintiff,

Case No. 3:26-cv-2596

v.

**CAPITAL CASE**

**RICHARD COMERFORD,** Secretary,
Department of Corrections,
in his official capacity;

**EXECUTION OF STATE DEATH SENTENCE SET: NOVEMBER 5, 2026 AT 6:00 P.M.**

and

**RANDALL POLK,** Warden,
Florida State Prison,
in his official capacity,

Defendants.
________________________________/

# PLAINTIFF'S WRITTEN CLOSING FOLLOWING EVIDENTIARY HEARING

On October 22, 2026, the Court held an evidentiary hearing and directed the parties to file written closing arguments by October 26, 2026. This is Plaintiff Jesse Guardado's closing argument.

The evidence presented at the October 22 hearing regarding Defendants' maladministration of Florida's lethal-injection protocol, much of which Defendants could not explain or rebut, shows that Guardado's claim has at least a substantial likelihood of success on the merits. Further proceedings are needed to address

questions that Defendants have left unanswered, review documentation that Defendants have not provided, and give due consideration to the serious and complex issues in this case. This can happen on an expedited basis, but Guardado's substantial claim should not be rushed to completion in less than 10 days, or allowed to be mooted by his execution, particularly when this exigency was created by the State. The Court should stay Guardado's execution to allow for further proceedings.

## I. Defendants' inability to sufficiently explain or rebut the many documented abnormalities in their execution records, in conjunction with an inherently risky protocol, demonstrates that Guardado's claim has at least a substantial likelihood of success on the merits

Under *Baze v. Rees*, the Eighth Amendment bars Guardado's execution if Florida's implementation of its lethal-injection execution protocol presents a substantial, objectively intolerable risk of serious harm. 553 U.S. 35, 49 (2008) ("[S]ubjecting individuals to a risk of future harm—not simply actually inflicting pain—can qualify as cruel and unusual punishment"). As the Eleventh Circuit has stated, even where a protocol provides sufficient safeguards, "[s]ignificant deviations from a protocol that protects inmates from cruel and unusual punishment can violate the Eighth Amendment." *Arthur v. Thomas*, 674 F.3d 1257, 1263 (11th Cir. 2012). Here, the evidence from the hearing shows both that (1) Defendants' anomalous three-drug protocol is already inherently risky, and (2) Defendants are badly maladministering that protocol, exponentially increasing the overall risk level and creating an imminent danger of severe harm to Guardado.

**A. Defendants' protocol is inherently risky**

The Florida Department of Corrections (FDOC) has clung to a three-drug protocol for more than 25 years, while other states have either abolished the death penalty entirely, moved to a one-drug protocol, or adopted some other method of execution. *See State-by-State Execution Protocols*, Death Penalty Info Ctr., *available at* https://deathpenaltyinfo.org/executions/methods-of-execution/state-by-state execution-protocols (last accessed Oct. 26, 2026). The trend to move away from a three-drug protocol stemmed from numerous botched executions where the use of the paralytic demonstrated severe harm. *See, e.g.*, Stipulated Settlement Agreement and [Proposed] Order for Dismissal of Claims Six and Seven at 5, *First Amendment Coalition v. Ryan*, No. 2:14-cv-1447-NVW-JFM, ECF No. 186 (D. Ariz. Jun. 21, 2017) ("Defendants and the [Arizona Department of Corrections] will never again use a Paralytic in an execution; and…Defendants and the ADC consequently will remove their current three-drug lethal-injection protocol from the current and any future version of the ADC's execution procedures.").

Meanwhile, in Florida, when critical discrepancies about the drugs used in the 2025 execution spree first arose, and numerous times since, FDOC brushed any concerns aside, with attorneys for the State downplaying all claims brought before the courts. *See, e.g.*, Motion to Dismiss, *Walls v. Dixon, et al.*, No. 4:25-cv-00488-MW-MAF, ECF No. 14 at 34-35, n.25 (M.D. Fla. Dec. 5, 2025) (commenting that

"Walls' reliance on the Department's drug log sheets [wa]s curious," arguing that "his vague allegations do not amount to a facially sufficient claim[,]" and "(without conceding) question[ing] how Walls obtained this information in the first place").

In August 2026, without any independent review, acknowledgment of errors, transparency, or provision of additional records or implementation of reforms, Defendant Comerford represented: "The procedure has been reviewed and is compatible with evolving standards of decency that mark the progress of a maturing society, the concepts of the dignity of man, and advances in science, research, pharmacology, and technology. The process will not involve unnecessary lingering or the unnecessary or wanton infliction of pain and suffering." ECF No. 48-1 at 2. Yet the recent disclosure of the drug logs, review of the autopsy and toxicology reports for 30 prisoners, and media accounts about irregularities during executions belie this certification. Based on these developments, considered in the context of an already problematic protocol, Guardado's claim meets the standard for a stay of execution; he has shown a substantial likelihood of success on the merits.

**1. The problematic drugs called for in the protocol**

FDOC's protocol calls for three drugs to be administered: etomidate, rocuronium bromide, and potassium acetate. Etomidate is a short-acting, non-barbiturate hypnotic drug, used for the induction of general anesthesia and sedation. ECF No. 1-7 at 4. Dr. Michaela Almgren, an expert in pharmacology and

pharmaceutical ethics, explained that etomidate induces a short timeframe of unconsciousness, three to five minutes, that is not increased by the massive dose given. EH Tr. 21. There are no applicable studies for this dosage of etomidate and its impact on consciousness. EH Tr. 49, 107. Dr. Almgren testified that, at most, the large dose of etomidate may impact the *depth* of unconsciousness, but not the duration of time. EH Tr. 21-22. Dr. Joel Zivot, a practicing anesthesiologist and intensive care physician and professor of anesthesiology and surgery at Emory Medical School, EH Tr. 83-84, concurred and explained that due to the way etomidate works—saturating the GABA-A receptors—"simply adding more" provides no effect. In other words, the dose does not increase the length of time in which the drug induces hypnosis. EH Tr. 90. Moreover, Dr. Zivot, speaking from experience as a practicing anesthesiologist tasked with maintaining unconsciousness and managing pain, EH Tr. 83, clarified that etomidate is not an analgesic and therefore has "no capacity at any dose to relieve anything that is pain." EH Tr. 91.

Rocuronium bromide is a "long-acting" drug, EH Tr. 124, that specifically paralyzes the skeletal muscles, including the diaphragm, making it impossible to move or breathe. EH Tr. 93-94. Dr. Zivot explained that if a prisoner were to "find themselves paralyzed and unable to move and be fully awake, it would be a terrifying experience. It would be suffocation. And, you know, death in this way, death by suffocation, is an easily relatable and terrifying experience for people." EH Tr. 94;

*see also* EH Tr. 75 (Dr. Antognini testifying that when an individual has been given anesthesia, given a paralytic, and then regains consciousness, he or she "would be unable to move, unable to breathe. And when that has happened, it has been, for quite a number of people, a terrifying experience.").

The third drug, potassium acetate, is used to stop the heart. EH Tr. 19. It is "quite painful" upon injection. EH Tr. 95. "It burns the vein, it burns the tissue. You know, it's very noxious. So to give 240 milliequivalents of potassium in one shot would be extremely, extremely painful, you know, for anyone." EH Tr. 96.

Both doctors indicated that the selection of drugs was concerning. *See* EH Tr. 19 (Dr. Almgren explaining that the drug combination was concerning because "the protocol does not really have any type of pain-relieving medication on board, so there's really no analgesic protocol," in addition to issues with the drugs individually); EH Tr. 90-96 (Dr. Zivot discussing issues with each drug).

**2. The protocol's ineffective consciousness checks**

Compounding the already substantial risk of serious pain, Defendants record a consciousness check taking just one minute or less by a non-medical execution team member. ECF Nos. 33-1 at 9; 33-2 at 6; 33-3 at 12; 33-4 at 8; 33-5 at 7. Without a potent dose of etomidate, there is an increased likelihood that prisoners will feel the sensations of the paralytic drug and potassium acetate. The "consciousness check is a singular and ineffective method to determine what it sets out to determine." EH

Tr. 130. This is in part because "the consciousness check is done as a single moment, not in a continuous way." EH Tr. 124; *see, e.g.*, ECF No. 33-1 at 6.

According to Dr. Zivot, non-responsiveness when someone calls an inmate's name and touches their shoulders "in no way . . . can be used to assume that . . . they would not have any sense of the pain as they died." EH Tr. 124. "[A]nesthesiology . . . is not . . . simple and singular." EH Tr. 105. In using any anesthetic, "there are standard monitors that are applied. There are actually seven standard monitors that are applied. That's the minimum. And that could be for the simplest of cases. And it only goes up from there." EH Tr. 105.

In addition to the minimum of seven monitors, Dr. Zivot explained that there is someone constantly checking the monitors to see what is happening and looking at the patient. EH Tr. 105. For example, "[o]ne of the standard monitors of anesthesia is an exposed piece of skin[.]" EH Tr. 105. It is standard and necessary to "be able to put my hand on the patient, touch their skin, feel the way their skin feels, examine their intravenouses." EH Tr. 106. But in FDOC's protocol, there is no anesthesia, no visible monitoring, nothing "that describes any kind of ongoing monitoring." EH Tr. 106; *see* ECF No. 48-1 at 13. Even the electrocardiogram appears to be used only to tell when someone has died. EH Tr. 106. "The only intervention[s] are injections and then this[,] what's, you know, called - - and I would use it in quotations - - the consciousness check. And that's it." EH Tr. 106.

"[O]nce [FDOC has] given the paralytic, of course, you have no way of knowing whether or not they are aware or not." EH Tr. 107. "And there's no investigation of that. . . . [T]here is no way to know, to guarantee, that at all times -- and certainly you can't ask someone, or they can't move to indicate that they're distressed because they're paralyzed now. So, you know, it creates this serious opportunity for a situation where there could very well be some awareness and there would be no way of knowing it." EH Tr. 107.

The record reflects that Defendants' anomalous three-drug protocol, and flawed consciousness checks, already place prisoners at a substantial risk of serious pain. On top of that, the evidence Guardado presented, and that Defendants could not sufficiently explain or rebut, demonstrates that Defendants are maladministering the protocol in serious ways, increasing the overall risk to Guardado exponentially.

**3. The known risk of pulmonary edema**

A review of the autopsy reports submitted during the hearing shows that pulmonary edema occurs, "almost always," in lethal injection. *See* ECF No. 48-7; EH Tr. 111 ("Pulmonary edema is basically fluid in the lungs outside of blood vessels. It starts to be in tissues, and then eventually it works its way into the airways, into the little air sacs, the alveoli.") This is not a surprise. Pulmonary edema is a known risk factor in lethal injection. EH Tr. 111. And, if prisoners are aware, then they feel like they are drowning. EH Tr. 125.

Additionally, autopsies show that heavy lung weights, pulmonary congestion, and pulmonary edema are sometimes accompanied by fluid or froth. *See, e.g.,* ECF No. 48-7 at 125 (autopsy of Dusty Spencer, executed on June 25, 2026, recording a 950g right lung and 1090g left lung); *id.* at 221 (autopsy of Bryan Jennings, executed November 13, 2025, recording a 980g right lung and 1140g left lung); *id.* at 212 (autopsy of Edward James, executed March 20, 2025, recording a 1000g right lung and 730g left lung). For example, the autopsy of Mark Geralds revealed froth extending up through the trachea. ECF No. 48-5 at 33. This amount of froth is indicative of struggle while Geralds was still alive: "[y]ou need to have a beating heart and working lungs to create that kind of froth within the airway itself." EH Tr. 122. The question of whether etomidate is being administered properly implicates issues of the risk of torture from the paralytic drug, the painful injection of potassium acetate, and the near-certain likelihood of pulmonary edema while still alive.

Defendants presented nothing to counter the evidence of pulmonary edema and Dr. Zivot's testimony. Due to its prevalence in the autopsy reports and implications, given the risks already inherent in the choice of drugs in the protocol, it adds additional context to the substantial likelihood of success at issue here.

### B. Defendants' maladministration of the already risky protocol

At the evidentiary hearing, Defendants failed to sufficiently explain or rebut the many alarming abnormalities that Guardado raised regarding their execution

records. And Guardado presented credible medical-expert testimony about the torturous consequences, including those addressed by the Eleventh Circuit in *Lee v. Commissioner, Alabama Department of Corrections*, No. 26-11864, 2026 WL 1651147 (11th Cir. Jun. 8, 2026), and *West v. Warden, Commissioner Alabama DOC*, 869 F.3d 1289 (11th Cir. 2017), that he could face if Defendants are indeed committing such serious violations as administering expired drugs, dosing drugs improperly, using drugs not in the protocol, or using only some of the drugs in the protocol. *See West*, 869 F.3d at 1298 (citing *Baze*, 553 U.S. at 53) (noting "[i]t is uncontested that" failure to "render the prisoner unconscious" would create "a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and the pain from the injection of potassium chloride").

Given Defendants' failure to present credible evidence at the hearing to dispel any of these concerns, these alarming occurrences cannot be dismissed as isolated mishaps or mere speculation at this point. The evidence now shows a consistent pattern of maladministration, and systemic failure, that elevates the risk posed to Guardado from a mere possibility to a strong probability.

**1. Defendants' drug logs and use of expired etomidate**

Dr. Almgren testified regarding the ethical and necessary requirements for accurate recordkeeping for the handling of drugs. She stated: "[r]ecords should reflect your practice." EH Tr. 42. What was revealed at the evidentiary hearing was

that Defendants' records actually do reflect their practice—obscurity, lack of transparency, and a "trust us" approach, notwithstanding mounting evidence that rebuts any such presumption they are due. When questioned about the multitude of discrepancies in the drug logs, FDOC pharmacist Dr. Renea Marcano provided no insight, deflecting responsibility even though she was Bureau Chief of Pharmacy Services during the time when a substantial amount of the maladministration occurred, and for most of the series of documented use of expired etomidate. *See* EH Tr. 220 (Dr. Marcano testifying she took over as Bureau Chief on July 4, 2025). Despite her oversight of the pharmacy at this time, she was also tasked with conducting an internal investigation into the errors. EH Tr. 221. She was in her position in July 2025, when the logs did not accurately reflect the removal of etomidate for multiple executions.[1]

Defendants' response to the discovery of the potential use of expired etomidate is not reassuring. Following the investigation, Defendants simply used Wite-Out to alter the six consecutive entries of expired etomidate spanning from mid-August to the end of October—changing the expiration date from 1/31/2025 to 1/31/2027 without providing any explanation as to why the incorrect date had been

---

[1] The log is missing any entry for the etomidate used during the Michael Bell execution on July 15, 2025; appears, at best, to reflect the withdrawal of etomidate three days *before* the execution of Edward Zakrzewski on July 31; and reflects the withdrawal of etomidate one day *after* Curtis Windom's execution on August 28. ECF No. 48-8 at 8.

logged originally. ECF No. 48-8 at 8. When asked to explain why expired dates had been repeatedly logged, Dr. Marcano could only point to the fact that the person working in the pharmacy at the time did not speak English as their first language. EH Tr. 233. However, she did not explain why such an error was never identified or addressed by the other individual working in the pharmacy, or by her predecessor.

As Dr. Almgren noted, what was "particularly disturbing" was that these incorrect entries occurred on six separate occasions, and that it was not sufficiently explained when or why the dates were changed. EH Tr. 39. Dr. Almgren stated, "if . . . there was only one [erroneous] entry . . ., then you would think that when [FDOC] made the next entry on August 29" that they would notice [the logging of expired drugs]. EH Tr. 39. "But this kept on going and it did not seem to catch anybody's attention." EH Tr. 39. This is contrary to pharmacy practice. "Recordkeeping is one of the major responsibilities for a pharmacist," including tracking "when [medications] came in, when they were received," how much was received, "when do they expire, what's the lot number." EH Tr. 28. "[Y]ou [can't] just come and Wite-Out random data and input whatever looks better." EH Tr. 41-42.

Further, Dr. Marcano's solution to the expired drugs did not meet the severity of the error. Wite-Out is "completely inappropriate in proper recordkeeping." EH Tr. 40. Dr. Almgren testified this practice implicates the reliability of Defendants' recordkeeping as a whole: "I would be very wary and concerned with these records

because there are a number of corrections. And, in particular, that Wite-Out practice is just absolutely terrible." EH Tr. 44. Defendants' practice of simply erasing evidence of discrepancies in their drug logs, without providing an explanation as to why those errors occurred or assurances that they will not happen again, raises fundamental concerns about competence and oversight within the FDOC pharmacy.

As to the fact that the logs reflect that six prisoners were administered expired etomidate, Dr. Almgren explained that this is problematic because expired etomidate "can lose potency," meaning it "may not be at the strength" contemplated for use in the protocol. EH Tr. 27. The drug may begin to operate as a different drug altogether: "[i]t may change pH, so it will become more acidic or it may become more basic. And that, of course, will impact how it will be absorbed and how it will react within [a prisoner's] body. It can precipitate . . . . Sometimes the molecule itself, the active ingredient, will degrade." EH Tr. 27. Witnesses that testified to their knowledge of preparations before the executions had no records that the drugs were not expired, testifying instead from their own memory, but being unable to recall the expiration date of the drugs used in any of the executions they were asked about. EH Tr. 159, 166, 207 (Graff, in response to question as to whether he remembered the expiration dates of drugs used in executions, merely stating that he "remembered that they were all within expiration [date]"). Those witnesses never provided insight into what would actually happen if the drugs were discovered to be expired at the time of an

execution. The best they could suggest was that "we'd let the team warden know and he'd make a determination" about changing out the drugs. EH Tr. 150.

Additionally, despite Dr. Marcano's conclusory assurances that there was "no chance," EH Tr. 219, that expired drugs comingle with drugs deemed appropriate for execution, she was unable to show that such commingling had never occurred, even though there is a high possibility of such commingling because expired drugs are not logged by FDOC "until they actually leave the facility." EH Tr. 237.

For example, when pressed on the issue of etomidate used during the execution of Thomas Gudinas on June 24, 2025, Dr. Marcano was unable to verify which vials of etomidate were actually used during the execution and which were being disposed of as expired. EH Tr. 257-58. While Defendants' updated logs document a removal of 50 vials of etomidate on June 25, 2025, the date after Gudinas's execution, those vials were set to expire on June 30. ECF No. 48-8 at 8. Due to the practice of comingling expired drugs with those set to be used for an execution, Dr. Marcano was unable to read the drug logs and verify precisely which vials of etomidate or in what amount were used for Gudinas, noting that while she believed the drugs for that execution were taken from "that pile [of unexpired drugs]," "I don't know to what degree of certainty." EH Tr. 258.

In the short time since Guardado received updated drug logs, more questions have arisen regarding Defendants' recording of expiration dates. For example, no

evidence was presented—through testimony or exhibits—that Norman Grim received unexpired etomidate. Also, the records reveal large quantities of etomidate received on June 24, 2026. ECF No. 48-8 at 4, 5. But notations of later executions, carried out from June to October 2026, continue to indicate that the etomidate with the January 2027 expiration date was still being used, even though the amount that FDOC had was far below the amount conceivably administered.[2]

These continued errors mean that there should be no confidence that Defendants have sufficiently solved these issues—particularly where it is clear from the timeframe of Dr. Marcano's inquiry into the violations that the scope of her "investigation" was limited to what had been raised in *Walls* in late November and December 2025, and which only covered a limited timeframe up to September 30, 2025. EH Tr. 221 (Dr. Marcano explaining the errors came to her attention in December or January). She apparently did not investigate what occurred in executions after that date, beyond applying Wite-Out to the previous entries of

2 Defendants' updated logs reflect that executions carried out from June to October 2026, using 40mg/20ml potency of etomidate, are recorded as having a January 31, 2027, expiration date. ECF No. 48-8 at 4, 6. Yet, while the logs reflect that FDOC used 210 vials of etomidate (40mg/20mL) with the expiration date of "1/31/2027" over the course of several executions, they only reflect the addition of 100 vials on May 23, 2025. ECF No. 48-8 at 6, 8. Thus, there is simply no evidence of where the additional 110 vials came from. Rather than quell any concerns about the maladministration of the protocol, these discrepancies only add further alarming problems, including, most significantly, whether the lot numbers or other data is erroneous or being improperly tracked. Further inquiry into this issue is needed.

expired etomidate corresponding with the execution of Samuel Smithers and Norman Grim. ECF No. 48-8 at 8.

The evidence at the hearing, far from dispelling the notion that FDOC has administered expired etomidate, only raises more questions about Defendants' practices and their lack of a coherent explanation for their own records. Due to the extent of the errors, more time is warranted to fully investigate such gaps in Defendants' recordkeeping.

### 2. Evidence that Defendants improperly dose drugs

In addition to documenting expired etomidate on six consecutive occasions, Defendants' logs show inappropriate dosages of drugs administered during multiple other executions which are inconsistent with the protocol, including removing only 7 of the required 12 vials of potassium acetate for the execution of Anthony Wainwright on June 10, 2025, ECF No. 48-8 at 22, and only half of the required 20 vials of rocuronium bromide for the execution of Thomas Gudinas on June 24, 2025. ECF No. 48-8 at 13. This was never explained by Defendants at the hearing.

Defendants' records also show that seven vials of potassium acetate were removed on June 12, 2025, two days after the Wainwright execution. EH Tr. 32. When questioned about this discrepancy, Dr. Marcano "wasn't able to resolve why that says negative 7" instead of the appropriate removal of 12 vials. EH Tr. 239. Gudinas was then executed on June 24, 2025. EH Tr. 246. The logs do not reflect

any removal of potassium acetate on June 24, instead showing a withdrawal of 17 vials on June 25. ECF No. 48-8 at 22. No investigation was conducted into this issue, and Dr. Marcano did not provide a written memo or any proof that the correct dosage was given to Wainwright or Gudinas. EH Tr. 261-62. Dr. Marcano only expressed her personal belief that, "I do not feel like that drug could have been shorted or over—or there could have been an overage. So I don't know." EH Tr. 240.

Further acknowledging that only half of the required dosage for rocuronium bromide was withdrawn for the execution of Thomas Gudinas on June 24, EH Tr. 245, Dr. Marcano could only answer that "[i]t is not clear to me what happened on that entry." EH Tr. 246. Dr. Marcano cited the fact that she had not yet taken over as Bureau Chief to explain her lack of knowledge behind what happened before her tenure. But as Dr. Almgren pointed out, that is precisely the issue with Defendants' recordkeeping system. Dr. Marcano should be able to explain exactly what happened on each execution date, even those before her tenure, based on a reading of the records: "this way, whoever comes after you, anybody who's auditing the records can say, oh, I see you made a correction; you wrote the wrong date." EH Tr. 41.

Instead, Dr. Marcano testified she felt confident the accurate dosage was given because "I know the process. I know the transporters." EH Tr. 240. She credited her personal knowledge of the execution team members but admitted that conclusion was not based on any kind of objective investigation. EH Tr. 240. "Maybe they got

the day wrong. Maybe they just accidentally wrote the wrong date. I don't know." EH Tr. 241. Dr. Marcano repeatedly credited a personal belief that inmates were receiving the right dosage, but this was not supported by documentation of independent investigation. "I can only speculate. I don't know." EH Tr. 242.

**3. Evidence that Defendants do not use all drugs in the protocol**

Largely due to Defendants' lack of contemporaneous recordkeeping, EH Tr. 36, it is clear records are not kept showing what was happening in real time before an execution, but rather what might have happened, or what should have happened. But that defeats the purpose of keeping records in the first place. According to Dr. Almgren, "the point is when you write down you retrieved the vials, how many you retrieved, the expiration date, the lot number, who retrieved it, all that would be recorded. So, of course, again, in the spirit of the good documentation practices, you would make the note in the records contemporaneously, meaning when it's happening." EH Tr. 36. That did not happen here.

For example, the logs indicate the etomidate used during the August 28, 2025, execution of Curtis Windom was actually removed on August 29. ECF No. 48-2 at 26. And the rocuronium bromide presumably used in the execution of Anthony Wainwright on June 10, 2025, was not logged until June 12. ECF No. 48-2 at 8; EH Tr. 243-44. Dr. Marcano assumed that the rocuronium logged on June 12 was used in the Wainwright execution after piecing together information from other records,

ultimately concluding the June 12 entry corresponded to Wainwright's execution because "that's what it appeared like to me." EH Tr. 245. Dr. Marcano had no explanation for why the entry appeared two days later. EH Tr. 247.

Dr. Marcano was similarly unable to confirm whether the documented removal of potassium acetate on July 16, 2025—a date seemingly corresponding with the July 15, 2025, execution of Michael Bell—was indeed used during that execution. Dr. Marcano could only offer that "there's a lot of people involved in these events. I believe these inmates are receiving the correct dose." EH Tr. 242. But this assurance was not supported by any investigation. "I can't speak for them. I don't know." EH Tr. 241. Similarly, there was no documented removal of etomidate for Michael Bell's execution at all. ECF No. 48-2 at 26; EH Tr. 258.[3]

For the June 24, 2025, execution of Thomas Gudinas, there is also no documented removal of etomidate. Instead, there is a documented removal of 50 vials of etomidate with a June 30, 2025, expiration date on June 25—seemingly, the removal of drugs set to expire. ECF No. 48-8 at 8. Dr. Marcano could only assume that etomidate was used during Gudinas's execution because "I know the workings

---

[3] While FDLE Agent Graff testified that he was present for the execution of Bell, he provided no specific testimony about Bell and instead relied on a description of a check-the-box procedure, which appears to take a matter of moments when, considering the numerous vials and the requirement that the name and dosage of drugs, and expiration dates need to be checked, would surely require additional time. EH Tr. 152, 162.

of the process. I know the right amount of drug arrived there." EH Tr. 255. But Dr. Marcano had no proof aside from "the execution could not have occurred without it," and the fact that "the folks that are involved with the team at that site, they're very methodical." EH Tr. 255. Despite testifying in a deposition a week earlier that part of the dosage potentially used during the execution of Gudinas was taken from the large quantity set to expire, Dr. Marcano stated at the evidentiary hearing that, "I don't know to what degree of certainty," whether that was the case. EH Tr. 258.

Defendants' logs also do not reflect a documented removal of etomidate corresponding with the July 31, 2025, execution of Edward Zakrzewski. EH Tr. 40. The logs instead contain two entries, one documenting the removal of 10 vials on July 28, 2025, and one documenting the removal of 20 vials with an expiration date of July 31, 2025, on August 1, 2025. ECF No. 48-8 at 8. At best, the logs indicate the drugs were removed three days *before* the execution of Zakrzewski, whose execution was scheduled on the date of expiration for the etomidate. However, such speculation contradicts Dr. Marcano's testimony about how and when the drug logs are updated. ECF No. 48-8 at 8. As Dr. Marcano explained, the subsequent removal of 20 vials of etomidate on August 1, 2025, was the removal of expired drugs. EH Tr. 252. Dr. Marcano could only observe that "there is nuances here where it was written early, slightly early, or it was a day late. There is nuances in these logs before that change was made." EH Tr. 252.

Contributing to the inability to explain the discrepancies in the records, was the description of a "worksheet" that is prepared when removing drugs but that is later destroyed and would have reflected the actual dosages and drugs removed for use in executions. "I'm not sure why," Dr. Marcano explained, "we just don't keep the worksheet." EH Tr. 231. "[W]e destroy it." EH Tr. 229. Without the worksheet, there is no contemporaneous paper trail providing the actual dates, quantity, and lot information for each vial removed from the pharmacy for an execution, and no way to conduct an audit for that information later. Dr. Marcano explained that when she asked the execution team about the discrepancies in the logs, "they did not refer to notes," EH Tr. 259, but rather answered her questions from memory. This further erodes confidence in the reliability of Dr. Marcano's findings that resulted from her internal investigation into FDOC's practices.

At a minimum, there were three executions where, according to the logs, no etomidate was removed for use. This is a significant error that should not be resolved based simply upon speculation that drugs may have been removed early or included in subsequent entries. In and of itself, these problems are sufficient to provide a basis for a stay in order to permit further inquiry.

**4. Evidence that Defendants dispense drugs not in the protocol**

Though lidocaine is not mentioned in the protocol, ECF No. 48-1, Defendants' records demonstrate that injectable lidocaine was removed from the

pharmacy and taken to FSP on a few occasions. ECF Nos. 48-2 at 16; 48-8 at 27. Defendants failed to adequately explain when, and why, they include drugs not specified in the written protocol, instead raising additional questions. While Dr. Marcano stated that the lidocaine was kept on a cart at FSP in case the need for a cutdown procedure arises, EH Tr. 247, her explanation was not due to personal knowledge of how lidocaine was handled at FSP. EH Tr. 249.

The evidence presented during the evidentiary hearing, through Dr. Almgren, established that the use of drugs not provided for in the protocol "could lead to medication error" because there is simply no guidance on "how much you would use, how would you use [it]," or "when do you use it." EH Tr. 35. This should be written in the protocol because, without that guidance, "[t]here's just no information." EH Tr. 35. Dr. Zivot testified that liquid lidocaine could be potentially dangerous because the drug "can actually cause a seizure sometimes, depending on how much is given and where it's given." EH Tr. 102. An ad hoc addition of liquid lidocaine to the wrong prisoner could be "life-threatening" if it caused an allergic reaction, for example. EH Tr. 103.

Dr. Marcano offered generalized insight that lidocaine is kept on a cart for executioners at FSP in the event that a venous cutdown procedure must be performed. EH Tr. 248. The lidocaine is purportedly replenished when the drug expires "in case it's needed." EH Tr. 248. But this explanation contradicts the

records, which reveal the transportation of lidocaine to FSP before the previous dose expired. ECF No. 48-8 at 27. The records indicate that two vials of lidocaine, with expiration dates of September 30, 2026, were brought to FSP on March 20, 2025, a date corresponding to the execution of Edward James. EH Tr. 248; ECF No. 48-8 at 27. Dr. Marcano did not know whether lidocaine was administered to James. EH Tr. 248. Two more vials were brought to FSP on April 8, 2025, a date corresponding to the execution of Michael Tanzi. ECF No. 48-8 at 27. To Dr. Marcano's knowledge, lidocaine had not been used during an execution. EH Tr. 249.

Upon expiration of the vials on September 30, 2026, only two more vials were brought to FSP on September 29, 2026. ECF No. 48-8 at 27. Dr. Marcano's justification that, "maybe they were keeping four on the cart . . . maybe they just took two extra, maybe," EH Tr. 249, contravenes the most recent log indicating that Defendants most likely fill the cart with two vials of lidocaine. More investigation is required to determine whether, and the extent to which, lidocaine has been administered in executions despite its absence from the protocol.

The discussion of lidocaine at the evidentiary hearing revealed yet another dangerous blind spot in Defendants' compliance with their own lethal injection protocol: there is no oversight to how drugs are stored or administered at FSP. For an unexplained reason, Defendants' updated records removed a prior entry from May 1, 2025, a date corresponding with the execution of Jeffrey Hutchinson,

indicating some sort of movement of lidocaine. EH Tr. 248 (Dr. Marcano: "My log doesn't have a May 1st on it."); ECF No. 48-8 at 27. This not only raises questions regarding when and why Defendants continue to improperly alter their drug logs, but revealed that Dr. Marcano—who is the Bureau Chief tasked with overseeing FDOC's pharmacy and who handled the internal investigation into the errors found in the logs—has no knowledge of how drugs are stored and handled at FSP beyond what is documented in the faulty logs. EH Tr. 210, 249-50. For example, Dr. Marcano has no knowledge of how lidocaine is tracked. EH Tr. 249 ("[Y]ou would have to ask the execution team members on that because that cart is at their site."). Her testimony revealed she does not know anything about Defendants' use of lidocaine. EH Tr. 249. In light of the testimony presented describing the dangerous effects lidocaine can have, and the uncertainty regarding the extent to which it has been used in executions, Guardado has further shown a substantial likelihood of prevailing on the merits of his claim.

#### 5. Other evidence of Defendants' recklessness with an already risky protocol

Dr. Marcano's explanations, or lack thereof, were grounded in an appeal to trust that FDOC officials are following the protocol, even though the numerous faulty entries contained in their own records profoundly undermine any reason for such trust. At the evidentiary hearing, FDOC officials continued to be unable to adequately explain why such errors occurred or provide reassurances that they would

not happen again in the future. There is no indication of an objective or thorough investigation beyond internal discussions with execution team members. As Dr. Almgren testified, the lack of transparency makes it "difficult . . . to trace back . . . who made the correction or who made the note, who actually received the drugs and who wrote them in." EH Tr. 29. A touch of Wite-out and a shrug of the shoulders are insufficient remedies given the risk involved here.

In addition to what is set out in sections 1-4 above, the evidence presented during the hearing made clear that Defendants' protocol has minimal specifications for how lethal injection drugs must be stored or handled. EH Tr. 25. Thorough guidelines are important to "assure that the medication[s] are stored properly and that the records are kept properly." EH Tr. 26. Instead, the evidence revealed an unprofessional and lackadaisical approach to the drugs and protocol, fostered by a culture of prison officials protected by secrecy.

Despite FDLE monitor Graff testifying that Defendants' approach to executions was "one of the most professional operations I've seen," EH Tr. 148, the record reveals the opposite. FDLE monitors are not chosen for medical expertise, but rather for their proximity to FSP. EH Tr. 155. As FDLE monitor Kevin James revealed, those tasked with ensuring that an execution complies with the protocol receive training simply by serving on an execution team and reading the protocol. EH Tr. 203. And when the team does practice executions, those exercises do not

simulate filling syringes or checking expiration dates. ECF Nos. 33-1 at 17; 33-2 at 16; 33-3 at 17; 33-4 at 16; 33-5 at 17.

Dr. Marcano, tasked with ensuring the lethal injection drugs are safely complying with the protocol, had no sufficient answers, seemingly trusting executions are occurring properly not because she has proof, but because she knows the members of the team. But her conclusory reassurances that FDOC staff have been following the protocol, made several months after the fact and after this lawsuit had been initiated, are at odds with FDOC's own record-keeping, which was made closer in time and is more likely to reflect their actual practices. This Court should not credit Dr. Marcano's unsupported vouching for FDOC staff, but rather the record provided, which shows a lack of investigation, lack of explanation, and a reckless disregard for established pharmaceutical standards.

**6. Autopsy and toxicology reports lend further support to a stay**

At the evidentiary hearing, Guardado introduced autopsy and toxicology reports from 30 prisoners executed in 2025 and 2026 showing a wide disparity in postmortem etomidate levels, even in the samples that taken from similar areas of the body. *See* ECF No. 48-7. Dr. Zivot concluded, among the sample size of 30 executions reviewed in the report he prepared, that there should be much more consistency among postmortem levels drawn from the same location. EH Tr. 141. And while medical examiner Dr. Milad Webb testified that peripheral sites are the

"gold standard" for postmortem testing, EH Tr. 171, and a "more reliable number[] in terms of what is accurate to life, or at the time of death," EH Tr. 182-83, nothing was explained regarding the wide disparities in those levels. In Defendants' own exhibits, Kayle Bates' postmortem etomidate level, drawn from the femoral vein, was just 0.22 mcg/mL, which is below the level recommended by the manufacturer to induce "basic entry-level hypnosis." ECF No. 33-6 at 6; EH Tr. 115. Samuel Smithers' postmortem etomidate level, drawn from the peripheral iliac vein, was only 0.13 mcg/mL. ECF No. 33-10 at 8. Conversely, Curtis Windom's postmortem level, drawn from heart blood, was 0.62 mcg/mL, ECF No. 33-7 at 7, while Victor Jones', from the same source, was nearly double—1.2 mcg/mL. ECF No. 33-9 at 7.

Based on the reports, Dr. Zivot explained two important concepts related to etomidate: First, etomidate's "pathway of metabolism" "is hepatic based," meaning liver function is needed to metabolize it. EH Tr. 140. According to Dr. Zivot, once a prisoner has died, one could reliably draw conclusions based on the toxicology of the blood taken postmortem, due to the stability of the drug. EH Tr. 140-41.

Second, Dr. Zivot testified that the manufacturer recommends a level of etomidate in the plasm of 0.23 and that such a level "should be exceeded to create kind of the basic entry-level hypnosis." EH Tr. 115.[4] In fact, the manufacturer's

4 Dr. Zivot also stated: "the practice is to look at femoral blood as a better . . . proximate indicator of what plasma levels would be in a living person." EH Tr. 117.

information is included in the postmortem toxicology report itself. *See, e.g.*, ECF No. 48-7 at 57, 146, 167, 175. Thus, implicit in the toxicology reports is the expectation that a postmortem level should still be greater than 0.23 to sufficiently induce hypnosis. In the set of toxicology reports reviewed by Dr. Zivot, at least 10 prisoners showed levels below 0.23. EH Tr. 120. Dr Zivot testified:

> [T]he thing I want to say about the [0].23 also is that remember that [0].23, as in the autopsy here, is talking about to achieve this state of hypnosis. There's nothing in here that says this is the quantity of etomidate that you need so when you execute a person with this drug, it's creating, you know, kind of a pain-free and awareness-free experience. I don't know what that dose is. I would think it would be higher than [0].23 because [0].23 is just basic hypnosis, you know.

EH Tr. 120.

Faced with this disparate data, Defendants opted to simply disregard the manufacturers' information accompanying their own drug. Dr. Almgren, who worked in manufacturing and has prepared such studies herself, EH Tr. 16, testified that manufacturers' stability studies, for example, are "extensive," "large-scale," and "very specific." EH Tr. 56. By contrast, Dr. Milad Webb viewed manufacturers' studies as "completely inconsequential," EH Tr. 191, because a manufacturer would not have "some secret recipe to know exactly when consciousness is going to be lost," EH Tr. 187. Dr. Webb instead credited his review of an anesthesia textbook over the manufacturers' own warnings. Thus, Dr. Webb's opinion, which downplays

the significance of the postmortem toxicology results and conflicts with the manufacturers' own research and information, lacks strength.

And, though Dr. Webb acknowledged that the level of etomidate in a prisoner's system at the time of execution would be most reliable if from a peripheral sample, contrary to Dr. Zivot, he believed that metabolism could continue to occur until the body cooled to a degree where liver function would cease. EH Tr. 174-75. But he also said he would continue to send blood samples to the lab to determine the amount of etomidate in the system: "[A]s long as there is interest in -- and it provides value to those who are ensuring that the process is done in the manner that it was supposed to be and based on this proceeding here, it seems that there is some interest and value to the quantification of etomidate, I will continue to do so." EH Tr. 196.

At a minimum, the levels of etomidate obtained from each prisoner and the wide variance among them collectively provide additional evidence of the maladministration of FDOC's protocol and support that there is a substantial likelihood of success on Guardado's claim.

**7. There is a substantial likelihood of success on the merits**

Although important questions remain, the evidence introduced at the evidentiary hearing reflects that Guardado is at significant risk of serious harm from Defendants' documented recklessness with an already risky protocol. The strength of all the evidence demonstrating the Defendants' routine maladministration of the

protocol, including the drug logs, autopsy and toxicology reports, and media accounts,[5] creates a substantial likelihood of success on the merits. The Court can therefore stay Guardado's execution to allow for further proceedings and prevent his death from mooting this litigation. As Guardado discussed previously, he also meets the other criteria for a stay of execution. ECF No. 11 at 23-25.

## II. A stay for further proceedings is needed to address questions Defendants have left unanswered, review documentation Defendants have not provided, and give due consideration to the serious, complex issues raised

It was only a few weeks ago that Guardado filed his complaint alleging FDOC's maladministration of the lethal injection protocol. Guardado's claim pointed to a fraction of FDOC's own drug records showing multiple serious problems with using expired drugs, failing to document use of drugs at all, improper dosing of drugs, use of drugs not set forth in the protocol, and failing to follow basic and necessary standards for handling, storing, and documenting the drugs used in the protocol. None of these problems presented an "if-then" scenario or were speculative, but instead demonstrated concrete evidence of an objectively intolerable risk of harm. *See Ferguson v. Warden, Fla. St. Prison*, 493 F. App'x 22, 25 (11th Cir. 2012). And the evidence in the records indicating that systemic deviations from the protocol were occurring was further supported by the alarming conclusions and

---

[5] Dr. Zivot also testified that he spoke with witnesses who attended the executions to confirm media accounts that he reviewed. EH Tr. 123.

disparities set forth in the autopsy and toxicology records of 30 individuals executed in 2025 into 2026. In response to Guardado filing his complaint, the State scheduled his execution for November 5, 2026.

Based on the evidence presented to this Court at the October 22 hearing, along with the circumstances leading to Guardado's execution being scheduled, this Court should enter a stay to permit Guardado to expeditiously amend his complaint, conduct discovery as contemplated by Federal Rule of Civil Procedure 26, and hold a trial at which Guardado can holistically and comprehensively address FDOC's maladministration of its lethal-injection protocol. A stay for such further proceedings is needed to address questions Defendants have left unanswered, review documentation Defendants have not provided, and give due consideration to the serious, complex issues raised here.

As noted previously, in *Baze*, the Supreme Court addressed petitioners' claim concerning the risk of harm associated with Kentucky's lethal injection protocol if not properly followed. 553 U.S. at 41, 49. In addressing the claim, the plurality made clear that "subjecting individuals to a risk of future harm—not simply actually inflicting pain—can qualify as cruel and unusual punishment." *Id*. at 49. Further, in formulating the standard for such a claim, the Supreme Court stated:

> We have explained that to prevail on such a claim there must be a "substantial risk of serious harm," an "objectively intolerable risk of harm" that prevents prison officials from pleading that they were "subjectively blameless for purposes of the Eighth Amendment."

> *Farmer v. Brennan,* 511 U.S. 825, 842, 846, and n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

*Id*. at 50; *see also Valle v. Singer*, 655 F.3d 1223, 1225 (11th Cir. 2011) (quoting *DeYoung v. Owens*, 646 F.3d 1319, 1325 (11th Cir. 2011) ("To state an Eighth Amendment claim, [one] must demonstrate that (1) the State is being deliberately indifferent (2) to a condition that poses a substantial risk of serious harm to him.")).

Thus, *Baze* informs the standard Guardado must establish to ultimately prevail on his claim while also supporting his request for a stay. Even under the accelerated and truncated proceedings that have occurred thus far, he has shown a substantial likelihood of success on the merits by demonstrating both deliberate indifference and the condition that poses a substantial risk of serious harm. This is so because Guardado has conclusively established Defendants' repeated maladministration of the lethal-injection protocol. Therefore, unlike the petitioners in *Baze* who showed nothing more than a possible risk of serious harm, Guardado has established a real probability of a substantial risk of such harm.

Though Guardado's factual development has been stymied by FDOC's "secrecy surrounding every aspect of its three-drug execution method," *Arthur*, 674 F.3d at 1261, and the setting of his execution date after instituting this proceeding, the fraction of discovery he has obtained thus far amplifies his substantial likelihood of success on the merits and supports his request for a stay in order to seek discovery.

Guardado recognizes that the facial constitutionality of Florida's protocol has been pending before this Court in *Brant* for some time. He does not seek a stay now to put his litigation on the same track as *Brant* or delay this litigation indefinitely. These proceedings can be expedited. But given the disturbing evidence of Defendants' maladministration of a protocol whose constitutionality is already the subject of significant litigation in this Court, it would be unjust to allow Defendants to execute Guardado at this juncture, after he has supplemented the already existing doubts about the protocol with documentation of Defendants' systemic recklessness.

Guardado's execution is only 10 days from now. Defendants created this exigency by signing his death warrant with full knowledge of this pending action. The Court is justified in entering a stay, ordering discovery, and allowing this case to expeditiously proceed to trial. *See Hamm v. Comm'r, Ala. Dep't of Corr.*, 725 F. App'x 836 (11th Cir. 2018).[6]

---

[6] In *Hamm*, the Eleventh Circuit vacated a stay of execution due to the fact that the district court had not "made sufficient findings showing a substantial likelihood" of success on the merits, but noted that this was because "[Defendants] had to that point restricted Hamm's access to a full medical examination." 725 F. App'x 836, 838 (11th Cir. 2018). However, the court directed the district court to order a full medical examination of Hamm and to make findings thereafter. *Id.* Guardado submits that he has met his burden for a stay on the existing evidentiary record. However, in light of the circumstances and Defendants' refusal to provide even basic discovery, a stay is more than appropriate so that Guardado may obtain access to the documents and information which would further support his claim.

## III. Conclusion

The Court should grant a stay of execution.

Respectfully submitted,

/s/ Linda McDermott
LINDA MCDERMOTT
Chief, Capital Habeas Unit
/s/ Sean Gunn
SEAN GUNN
Assistant Federal Public Defender
Northern District of Florida
227 North Bronough St., Suite 4200
Tallahassee, Florida 32301
(850) 942-8818
linda_mcdermott@fd.org
sean_gunn@fd.org

*Counsel for Mr. Guardado*

## CERTIFICATE OF SERVICE

On October 26, 2026, this filing was electronically served on all attorneys attached to the CM/ECF docket.

/s/ Sean Gunn
Sean Gunn