IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**EXECUTION SCHEDULED FOR NOVEMBER 5, 2026, @ 6:00 p.m.**

JESSE GUARDADO,

*Plaintiff,*

v. Case No.: 3:26-cv-02596
CAPITAL CASE

RICHARD COMERFORD,
Secretary, Florida Department of Corrections,
in his official capacity

and

RANDALL POLK,
Warden, Florida State Prison,
in his official capacity

*Defendants.*
_____________________________________________/

**DEFENDANTS' WRITTEN CLOSING ARGUMENT**

On Thursday, October 22, 2026, this Court conducted an evidentiary hearing in this 42 U.S.C. § 1983 suit challenging Florida's current three-drug lethal injection protocol on Eighth Amendment grounds. At the close of the evidentiary hearing, this Court ordered written closing arguments

to be filed by Monday, October 26, 2026, at 5:00 p.m. EST.

Plaintiff contends in the § 1983 complaint that a series of events will cause him to suffer from a sensation of suffocation or "air hunger," relying on the Eleventh Circuit's recent decision in *Lee v. Comm'r, Ala. Dep't of Corr.*, No. 26-11864, 2026 WL 1651147 (11th Cir. June 8, 2026) (unpublished), holding that Alabama's nitrogen hypoxia gas protocol, administered while the inmate was conscious, was a violation of the Eighth Amendment. (Doc. #1). Guardado asserted that Florida's three-drug protocol, which uses massive doses of drugs, will cause pulmonary edema in his lungs and, if the etomidate used as the first drug is expired, he could be unconscious enough to pass the consciousness check but conscious enough to experience the sensation of suffocating in violation of the Eighth Amendment. The linchpin of the challenge is the assertion that the etomidate may be expired which is based on records from an off-site pharmacy purporting to show expired etomidate was used in six consecutive executions, specifically the August 19, 2025 execution of Bates, the August 28, 2025 execution of Windom, the September 17, 2025 execution of Pittman, the September 30, 2025 execution of Jones, the October 14, 2025 execution of Smithers, and the October 28, 2025

execution of Grim.

But the evidence at the evidentiary hearing affirmatively established that the etomidate used in these six executions was not expired. The on-site and contemporaneous checklists from the actual executions established that all the drugs used in the six executions were verified by both the execution team and investigators from Florida Department of Law Enforcement to be within the expiration date, including the etomidate. The testimony of two FDLE agents, who were eyewitnesses to five of the six executions at issue, established that the three drugs, including the etomidate, were not expired. The two agents testified that a few hours before the execution, the transport pharmacy detail, the FDLE agents, and then other execution team members all verified that all of the drugs to be used in the execution, including the etomidate, were not expired. The checklists and testimony of the FDLE agents definitely established that the etomidate used in the executions of Bates, Windom, Pittman, Jones, Smithers, and Grim was not expired.

Summary of testimony at the evidentiary hearing

Dr. Michaela Almgren, an associate professor at the University of South Carolina College of Pharmacy, who specializes in drugs that are injected, testified for the Plaintiff. (T. 12–57). Dr. Almgren stated that she did not know how long a 200-milligram dose of etomidate would last. (T. 49). She didn't think anybody could know because there have been no studies involving such a large dose. (T. 49).

Dr. Joseph Antognini, a board-certified anesthesiologist, who is currently a chief scientific officer for a pharmaceutical company, testified for Defendants. (T. 59–81). Dr. Antognini was a clinical professor at UC Davis, which is a Level 1 trauma center, and, in that position, he used etomidate "quite often" for patients with blood pressure problems. (T. 60).

Dr. Antognini explained consciousness is the ability to have perceptions and unconsciousness is the inability to have perceptions. (T. 62). Unconsciousness is a disconnect where the person gets stimuli but cannot integrate those stimuli into perceptions. (T. 62). So, an unconscious person would get a noxious stimuli but would not feel pain because "pain is the conscious awareness of the noxious stimuli." (T. 62). A person "cannot experience pain when they are unconscious." (T. 63).

Dr. Antognini reviewed the etomidate in Florida's three-drug protocol and noted that the 200 milligrams of etomidate used in the protocol was a "massive overdose" that is seven to ten times the normal clinical dose. (T. 64). He testified that the first syringe of etomidate "would be sufficient to make that person unconscious" within "15 to 30 seconds." (T. 64). The massive dose of etomidate used as the first drug in the protocol lasts "a lot longer" than a normal dose of etomidate. (T. 64). The 200-milligram dose of etomidate would last a "minimum of 30 minutes." (T. 64, 67). He explained that the figure of etomidate lasting for only "three to five minutes" was for the "clinical dose," not for the massive dose of etomidate used in the protocol. (T. 65). For comparison, he testified that the normal clinical dose of etomidate is 20 or 30 milligrams. (T. 66). He testified that within a reasonable degree of medical certainty, a 200-milligram dose of etomidate would result in unconsciousness for "30 minutes or longer" and the person would be unaware of pain for at least 30 minutes. (T. 67).

Dr. Antognini explained the concepts of drug redistribution versus metabolization. (T. 65-66). He explained that the etomidate does not metabolize within three to five minutes rather the etomidate redistributes from the bloodstream into the vascular-rich organs, such as the brain,

heart, kidneys, and to a lesser extent, the liver. (T. 65). The blood flow to vascular-rich organs is higher than other organs. (T. 65). So, the etomidate redistributes from the blood vessels into the brain. (T. 65). But at higher doses, it takes "longer" for the concentration of the etomidate to fall off. (T. 66). He agreed that a clinical dose of etomidate would wear off after three to five minutes, but that is not the dose used in Florida's protocol. (T. 66).

On cross-examination, Dr. Antognini acknowledged that he was unaware of any studies showing a massive dose of etomidate would result in unconsciousness for 30 minutes. (T. 68). He was aware of studies showing a correlation between larger doses of etomidate affecting the depth of consciousness rather than the length of unconsciousness. (T. 68). He acknowledged the ceiling principle but stated that at "some point you're going to be giving more etomidate and you're not going to get a deeper level of anesthesia because of it, rather, the larger dose will "prolong the effect." (T. 68-69, 70). He explained that redistribution was the primary factor in breaking down etomidate, but that massive doses involve both redistribution and metabolism. (T. 71). Once the heart stops the metabolizing of the etomidate stops as well. (T. 71). He testified that etomidate, while not technically classified as an analgesic, prevents pain

by rendering a person unconscious and therefore insensate to pain. (T. 76-78).

Dr. Joel Zivot, an anesthesiologist, testified for the Plaintiff. (T. 81–141).

Florida Department of Law Enforcement (FDLE) Agent Adam Graff testified for Defendants. (T. 142-167). Special Agent Supervisor Graff is one of the supervisors with the Office of Executive Investigations and one of the duties of that Office is to act as observers for each execution. (T. 143-44). He has observed executions since March of 2025 and has observed 13 executions. (T. 143). He received training to be an observer including attending time-scaled practices of executions that are conducted the day before the execution but most of his training was on the job training. (T. 144, 157). Typically, three FDLE agents attend an execution, one of whom observes in the execution chamber and two agents are in the injection room who keep eyes on the drugs that will be used in the upcoming execution. (T. 145).

FDLE Agent Graff observed the August 19, 2025 execution of Bates, acting as one of the agents in the injection room. (T. 145). He personally verified that etomidate used in the Bates execution was not expired. (T.

150). He also observed the September 17, 2025 execution of Pittman, acting as one of the agents in the injection room. (T. 146). He personally verified that etomidate used in the Pittman execution was not expired. (T. 152). He additionally observed the September 30, 2025 execution of Jones, acting again as one of the agents in the injection room. (T. 146). He personally verified that etomidate used in the Jones execution was not expired. (T. 151-52). He also observed the October 28, 2025 execution of Grim, acting again as one of the agents in the injection room. (T. 146). He personally verified that etomidate used in the Grim execution was not expired. (T. 152-53). He did not observe the August 28, 2025 execution of Windom. (T. 154). While Agent Graff had an independent memory of verifying that drugs used in the executions he participated in were not expired, he did not write down the expiration dates of drugs used in those executions, and could not testify as to the exact expirations dates of the etomidate used in those executions. (T. 158-59)

He explained that the FDLE observers typically arrive at Florida State Prison at 1:30 p.m. on the day of the execution. (T. 147). The two FDLE agents go into a room along with the execution team warden; two DOC employees who keep the logs, including the checklists; two

pharmacists; and three to five medical professionals, who are paramedics, nurses, or doctors. (T. 147, 158, 160). Starting around 3:00 p.m., they all go into the room, where he sits next to the pharmacists, who remove the drugs and show the drugs, starting with the etomidate, to the others. (T. 148). The pharmacists show the name of the drug and the expiration date of the drugs, including the expiration date of the etomidate, vial by vial, to the others. (T. 148, 163, 166). The pharmacists then will hand the vials to the medic who draws the drugs out of the vials into the syringes. (T. 148-49, 163). There are four syringes for the etomidate. (T. 149). A second medic verifies the dose in the syringes. (T. 149). A third medic places the drugs on a tray to be taken to the execution room later. (T. 149). All of them look at every vial. (T. 163). But no one records the exact expiration dates of all the vials or drugs. (T. 164). The entire process takes anywhere from 20 to 25 minutes. (T. 162, 166-67). His own notes document the start and stop times for the syringe times. (T. 167).

The FDLE agents stay with the drug trays until it is time for the execution. (T. 149). There are two FDLE observers to keep eyes on the drugs at all times to prevent tampering with the drugs. (T. 149). The FLDE agents watch the actual executions. (T. 150). If one of the drugs was

expired, the FDLE agents would inform the team warden that the drug was expired and the team warden would make the determination to replace it. (T. 150, 164-65).

FDLE Agent Graff testified that he became aware of the allegations that expired etomidate had been used in prior executions from the news. (T. 165). But he did not inform anyone of those allegations because he knew the news reports were inaccurate and he had no concern that he had participated in executions in which expired drugs were used. (T. 1165-66). No one from the State came to speak with him about the allegations of the use of expired etomidate at the time of the news reports. (T. 165). He "independently remembered" that they were all within the proper expiration dates. (T. 166).

FDLE Agent Graff testified that the executions were one of the "most professional operations" he has seen. (T. 148). He testified that he would inform the team warden, regardless of whether it would cause a delay in the execution, because he wanted to make sure the condemned is able to have a "decent, humane execution." (T. 165).

Dr. Milad Webb, the Chief Medical Examiner for the Eighth District of Florida, testified for Defendants. (T. 169–197). Because Florida State

Prison is within that district, his office conducts all the autopsies of the executed inmates. (T. 170). He has been the Chief Medical Examiner (ME) for the district since March of 2026, and has conducted approximately a dozen autopsies of executed inmates. (T. 170).

Dr. Webb explained that post-mortem blood samples are taken from inmates and later tested for etomidate levels. (T. 170). Once he became the Chief ME, all the blood samples were taken from the iliac veins which is a peripheral source. (T. 170). But before he became Chief ME, the blood samples were taken from the heart, which is a central source. (T. 170-71). Since becoming Chief ME he has adopted a standard practice of taking blood samples for testing, including testing for etomidate levels, from a "peripheral source," such as the iliac veins which is the "gold standard," endorsed by the National Association of Medical Examiners. (T. 171). Test results from blood taken from central sources as opposed to from peripheral sources vary and those from central sources are "predictably higher," anywhere from four to ten times higher because of the postmortem redistribution of drugs. (T. 171). Test results from central sources are "artificially increased." (T. 173). He explained that the post-mortem etomidate levels will be lower in blood from peripheral sources

compared to that from central sources. (T. 172). When you die, the drugs in central organs can be released. (T. 172).

Chief ME Webb explained the concept of drug redistribution. (T. 171-72). Drugs distribute in the body from the blood vessels into the organs and tissues. (T. 171).

Dr. Webb explained the differences in testing whole blood versus blood plasma. (T. 173). Testing in the context of autopsies is performed using whole blood whereas most testing, such as in hospitals with live patients, is performed using blood plasma. So, the testing results of whole blood versus plasma yields "completely different numbers." (T. 173). Medical examiners use whole blood, not plasma. (T. 173-74).

Dr. Webb explained the way etomidate breaks down. (T. 174). Etomidate breaks down primarily via the liver but other organs, such as the brain and lungs, contain esterases that also break down etomidate. (T. 174). Provided the body's temperature remains above a cool temperature, those organs continue to break down etomidate after death. (T. 174). Metabolism does not stop at the time of death, it continues despite the lack of circulation. (T. 174). "We know" that there is "some appreciable rate of degradation" of drugs after death but there are no studies of the rate. (T.

175).

Dr. Webb testified that the best time to obtain the most accurate etomidate levels in an inmate's body would be immediately after the execution from a peripheral source, which would give you a "circulating concentration" of the etomidate. (T. 175). Another means of obtaining a more accurate measurement of the etomidate levels in the inmate's blood during the execution is to perform the autopsy within two hours of the execution because the half-life of etomidate is "approximately two-and-a-half hours." (T. 175). He reviewed the etomidate levels from the toxicology reports of the autopsies of Smithers and Bell and testified that the disparity in the results was largely a consequence of the fact that Smithers' blood was from a peripheral source whereas Bell's blood was from a central source. (T. 176-77).

On cross-examination, Dr. Webb testified that even after circulation has stopped, metabolism in the liver will continue for "quite" awhile because the cellular mechanisms will continue until all energy is depleted. (T. 179). While general metabolism stops after death because circulation stops, cellular metabolism does not stop. (T. 179). The body's temperature has to remain above 90 degrees or the high 80's for the cellular metabolism

to continue. (T. 179).

The inmates' bodies are transported from FSP to his office by a transport service that is commonly used by medical examiners and generally takes two hours for transportation. (T. 179-80). The inmate's body is placed in a refrigerator but their body temperatures will not drop below 90 degrees instantaneously and the time it takes to drop below 90 degrees depends mainly on their weight and BMI. (T. 180). The autopsy is normally performed the next morning. (T. 180).

The former Chief ME, Dr. Thogmartin, first started the practice of testing executed inmates for etomidate levels. (T. 181-82). Dr. Webb again testified that, due to the post-mortem redistribution of the etomidate, the test results from peripheral sources are more accurate than the results from central sources for determining the actual etomidate level at the time of the execution. (T. 182-83). Once the inmate's body temperature drops to a certain temperature, all metabolism of the etomidate will cease. (T. 183).

On redirect, Dr. Webb testified that Smithers having an etomidate level of .13 does not mean that he did not receive the 200-milligram dose of etomidate. (T. 184). He testified that none of the etomidate levels in any of the toxicology reports he reviewed, indicated to him that any of the

inmates had regained consciousness during the execution. (T. 186).

On recross-examination, Chief ME Webb testified that he did not agree with the figure of the etomidate having to be .23 to remain unconscious. (T. 186-87). Dr. Webb stated that that figure from anesthesia textbooks is between .2 and .6 and he doubted etomidate manufacturers set the standards for determining the amount of etomidate necessary to maintain unconsciousness. (T. 187). Dr. Webb also pointed out it is difficult to know even exactly what unconsciousness is, much less when it is lost or regained. (T. 187). But he acknowledged that he was not an anesthesiologist. (T. 187). He did not consult with an anesthesiologist. (T. 190). Dr. Webb consulted a post-mortem toxicology textbook by Besalt as well as *Clinical Anesthesiology* for his testimony. (T. 188-89). He believes the textbooks are more accurate than the drug manufacturer's information. (T. 196).

Dr. Webb testified as the .22 etomidate level from Bates from the toxicology laboratory, pointing out that the figure the lab used of .23 is for plasma blood, not whole blood from an autopsy. (T. 190-91). He stated that the proper way to test for consciousness is not post-mortem etomidate levels but to perform consciousness checks, such as touching, and

responses to pain stimuli. (T. 192).

Dr. Webb again testified that the tenfold difference in post-mortem etomidate levels between Smithers and Bell was not surprising because the blood was from "two completely different sites." (T. 195).

FDLE Agent Kevin James testified for Defendants. (T. 197–207). He is an inspector assigned to the Office of Executive Investigations. (T. 197). Part of his duties is to observe executions which he has done for two years. (T. 198). FDLE Agent James has observed seven executions. (T. 198). He observed the October 14, 2025 execution of Smithers and has an independent recollection of that execution. (T. 198, 199). He testified that the etomidate used in the Smithers execution was not expired. (T. 200). But he was not sure of the exact expiration date of the etomidate just that the expiration date was not before October of 2025. (T. 206). He did not record the exact expiration date and was unaware of anyone else recording the exact expiration date. (T. 206). He testified that he would have notified the team leader if the etomidate was expired and he would not hesitate to do so if the etomidate was expired. (T. 206).

At 3:00 p.m., on the day of the Smithers execution, Agent James testified that he was in the injection room where the drugs were prepared

for the execution along with other FDLE agents and two pharmacists; three DOC employees; and three to five medical professionals. (T. 198-99). The pharmacist presented the drugs to be used to him to verify the name of the drug and the expirations date of the drug. (T. 199). Each vial is presented to him to verify the name of the drug and the expiration date of the drug. (T. 199). The name of the drug and the expiration date of the drug is then verified by a DOC employee. (T. 200, 201). The FDLE agents monitored the drug trays from that point on for approximately three hours until the execution starts. (T. 201). The drugs, including the etomidate syringes, always remain within their line of sight. (T. 202). He did not think that he had observed the Windom execution. (T. 202-03).

Dr. Renea Marcano, Bureau Chief of Pharmacy Services at the Department of Corrections, testified for Defendants. (T. 208–T. Vol. II 14). She has a doctorate in pharmacy from the University of Florida and has been licensed to practice pharmacy in Florida since 2009. (T. 209). She worked as a pharmacist at DOC's regional pharmacy in Raiford since 2010 and she became Bureau Chief in July of 2025. (T. 210).

Dr. Marcano testified that every drug comes with a lot number and that is associated with an expiration date. (T. 211).

The etomidate is stored in a secure room in separate containers. (T. 212). One of the containers is for the expired, damaged or altered etomidate and the other container is for the unexpired etomidate. (T. 212). The etomidate in the container that holds the expired or damaged etomidate is never used in an execution. (T. 214).

She testified that the drugs used in the execution are transported by two execution members from the pharmacy to Florida State Prison. (T. 215). The two team members that transport the drugs check the expiration date of the drugs before transporting the drugs to FSP. (T. 215). They are transported in a locked box with a code. (T. 216).

The pharmacy keeps logs of the drugs that are purchased for, and used in, the executions. (T. 216). Dr. Marcano testified that she used the logs to investigate the purported use of expired etomidate. (T. 217). She investigated using certain dates. (T. 216-17). She looked at the lot numbers of the six executions where the expired etomidate was purportedly used and tracked the three invoices for that etomidate. (T. 217). Each of the three invoices listed the true expiration date of that etomidate as being January 2027, not January 2025. (T. 217). She then looked for the etomidate at issue using the National Drug Code (NDC)

number (T. 217, 230). No etomidate received by DOC had an expiration date of January 31, 2025. (T. 218). She also spoke with the team members who transport the drugs for the executions and they told her that they always checked the expiration dates of the drugs before transporting them and that no expired drugs were ever transported. (T. 218). She testified that the pharmacy logs listing the expiration date as 2025 were inaccurate as a result of "human error." (T. 218). She then corrected the pharmacy logs to reflect the accurate expiration date of the etomidate used in the six executions to be 2027. (T. 218-19). To prevent errors in the pharmacy logs from occurring, she assigned a different team of four people, two caretakers and two transporters, to keep the pharmacy logs and review them with her for accuracy. (T. 219).

On cross-examination, Dr. Marcano testified that she investigated the issue of expired etomidate after discussing the matter with the Director of Health Services. (T. 222). She testified that the Inspector General's Office was not contacted regarding the matter. (T. 223). She testified that DOC retains every drug invoice. (T. 223). The pharmacy is not located within FSP; it is offsite. (T. 227). The pharmacy prepares a "spare set" of drugs that are also transported to FSP. The spare set is

bagged up with staples and is returned to the pharmacy after the execution later that same night. (T. 227-28, 229). The drugs that are to be used in the execution are bagged for easy access. (T. 228). There is a worksheet that contains the same information as the pharmacy logs including the lot numbers and the NDC numbers which identifies the manufacturer. (T. 229-30). The worksheet also identifies which drugs are in the spare set but the worksheet is destroyed. (T. 229-30, 231). The worksheet is on the table along with the drugs for the transporters. (T. 231).

She could not resolve the discrepancy in the amounts of vials in the pharmacy logs. (T. 239-40). She thought the correct doses were used in the executions, despite the errors in the pharmacy logs regarding the vials because she did not think that transporters would have left the pharmacy without the required number of vials. (T. 242).

The district judge then asked Dr. Marcano if the lot numbers or invoices would identify the manufacturer and she responded that they both could reveal the vendor. (T. Vol. II 14). The judge stated that based on Dr. Marcano's testimony that "at a minimum, the Court should review the etomidate logs without the lot number and invoice number redacted"

but it would be an in camera review. (T. Vol. II 14). The Court ordered written closing arguments be filed. (T. Vol. II 16).

## ARGUMENT

This Court should find that expired etomidate was not used in the six prior executions at issue based on the evidence presented at the evidentiary hearing. Additionally, this Court should find that because no post-mortem retrograde extrapolations from the autopsy blood to determine the amount of etomidate present at the time of the administration of the potassium acetate were presented at the hearing, there is no support for any assertions regarding etomidate levels based on the toxicology reports. There is no support for the allegation that Guardado could regain consciousness during the execution. This Court should then grant the pending Rule 12(b)(6) motion to dismiss.

### The *Baze/Glossip* Test and the Burden of Proof

The Supreme Court has established a test for all Eighth Amendment method of execution challenges whether classified as facial or as-applied challenges. *Bucklew v. Precythe*, 587 U.S. 119, 135-36 (2019) (holding that

*Baze v. Rees*, 553 U.S. 35 (2008), and *Glossip v. Gross*, 576 U.S. 863 (2015) "supply the controlling test"). The *Baze/Glossip* test requires that the inmate show that the method is "sure or very likely to cause serious illness and needless suffering, amounting to an objectively intolerable risk of harm." *Glossip*, 576 U.S. at 875 (quoting *Baze*, 553 U.S. at 50); *see also Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 898 (11th Cir. 2024) (noting an inmate "cannot succeed on a method-of-execution claim unless they can establish that the method challenged presents a risk that is sure or very likely to cause serious illness and needless suffering" quoting *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1325–26 (11th Cir. 2019)) (emphasis in the original), *cert. denied*, *Grayson v. Hamm*, 145 S. Ct. 586 (2024). There must be a "substantial" risk of "serious harm" or "severe pain." *Nance v. Ward*, 597 U.S. 159, 164 (2022) (quoting *Glossip*, 576 U.S. at 877).

Although the typical burden in a § 1983 suit is the preponderance standard of proof, in an Eighth Amendment method-of-execution challenge, the standard of proof is higher. *Baze*, 553 U.S. at 53 (referring to the burden on plaintiffs to show a protocol is "cruelly inhumane" as "heavy"). Under the *Baze/Glossip* test, a method of execution must be "sure

or very likely" to cause serious illness or needless pain but "sure or very likely" is higher than a preponderance and is more akin to a clear and convincing standard of proof. The Supreme Court takes the burden of proof seriously and has denied relief on an Eighth Amendment lethal injection challenge based in part on the failure to meet that burden of proof. *Baze*, 553 U.S. at 41 (holding that the inmates had "not carried their burden of showing that the risk of pain from maladministration of a concededly humane lethal injection protocol").

The burden was on Guardado to prove both that expired etomidate was used in a prior execution and that the expired etomidate was not effective enough to keep the inmate unconscious for the duration of the execution by clear and convincing evidence. But he established neither.[1] Guardado did not meet his "heavy" burden under *Baze/Glossip*.

Indeed, to the contrary, the evidence at the hearing clearly established that expired etomidate was <u>not</u> used in any of the six

---

[1] The defense expert, Dr. Almgren, testified that she could not say that a 200-milligram dose of etomidate, even if expired for several months, would not be sufficient to keep the inmate unconscious for the duration of the execution and may even have 100% potency, despite being expired. (T. 52-53).

executions at issue. The contemporaneous checklists from the executions of Bates, Windom, Pittman, Jones, Smithers, and Grim established that the etomidate used in all six executions was not expired and the testimony from the Bureau Chief of Pharmacy Services at the Florida Department of Corrections (FDOC) established that the correct expiration date for etomidate used in all six of those executions was January of 2027. Guardado, despite being granted an evidentiary hearing, failed to prove that expired etomidate was ever used in any Florida execution, much less that expired etomidate would be used in his execution.

**_Baze/Glossip_ and Recordkeeping**

Poor recordkeeping is <u>not</u> a violation of the Eighth Amendment. Recordkeeping is not a violation of the *Baze/Glossip* test because inaccurate documentation does not result in <u>any</u> illness or needless suffering. *Glossip*, 576 U.S. at 875 (quoting *Baze*, 553 U.S. at 50). Indeed, the accuracy of the recordkeeping of an execution is a non-sequitur under the *Baze/Glossip* test.

Plaintiff seeks for federal courts to become boards of inquiry for determining best practices for executions, which the Supreme Court has

stated federal courts should not become. *Baze*, 553 U.S. at 51 (observing that permitting an Eighth Amendment violation to be established on a showing of a risk that the protocol will not be followed, particularly regarding the administration of the first drug, "would threaten to transform courts into boards of inquiry charged with determining 'best practices' for executions . . ."). Guardado seeks to force federal courts not only to become boards of inquiry into best practices inside the execution chambers but inside the prison's pharmacy as well. He seeks for this Court to mandate that Florida amend its protocol to adopt the standards of recordkeeping required by pharmacy associations, such as the USP compendium, chapter 1029. (T. 16-17, 26-27). But *Baze* prohibits such a path.

Furthermore, unlike the pharmacy logs, the recordkeeping in real time from the actual executions was accurate. The checklists submitted by the Defendants are significantly more reliable than the pharmacy records based on timing and the number of persons involved. The contemporaneous nature of the checklists, made as part of the execution, makes the checklists more reliable than the pharmacy records. The checklists verifying that the drugs are not expired are documented

approximately three hours before the execution. Members of the execution team and FDLE agents verify that all drugs to be used during the execution are not expired and a DOC employee notes the time that the verification of the expiration date of the drug was done on the checklist. In contrast, the pharmacy records were not made contemporaneously but were made a day before and on one occasion three days before the execution. The plaintiff's own expert, Dr. Almgren, testified that a "key element of appropriate recordkeeping in a pharmacy" is that the documentation be made contemporaneously with the event. (T. 33).

Additionally, multiple people from different organizations verified that the drugs used in the protocol were not expired. The transporters first verify the expiration dates before driving the drugs to Florida State Prison. Then at FSP, three hours before the execution, the pharmacists along with the FDLE agents verify that the drugs, including the etomidate, are not expired and then the FDLE agents again verify that the drugs are not expired with the medical personnel. So, the expiration date of the etomidate was checked multiple times on the day of the executions including by FDLE agents employed by a different agency than DOC.

The testimony from the hearing also established the checklists accurately reflected that the etomidate was not expired. Both FDLE agent Graff and FDLE agent James testified that they personally verified that the etomidate was not expired. In contrast, the only testimony regarding the accuracy of the pharmacy logs was that of Dr. Marcano who testified that her investigation of the pharmacy logs from the executions of Bates, Windom, Pittman, Jones, Smithers, and Grim revealed that the pharmacy logs were inaccurate. Dr. Marcano testified that the correct expiration date for the etomidate used in those six executions was January of 2027, not January of 2025 as stated in the pharmacy logs. Based on the checklists that were contemporaneously generated during the executions, as well as the testimony of the two FDLE agents and Dr. Marcano, this Court should find that the etomidate used in the six executions at issue was not expired.

### ***Baze/Glossip* and Deviations from Protocols**

There is no such Eighth Amendment claim as deviations from a protocol unless the deviation results in a violation of the *Baze/Glossip* test. Provided the deviation does not increase the risk of serious illness

and needless suffering, it is of no moment constitutionally. *Glossip*, 576 U.S. at 875 (quoting *Baze*, 553 U.S. at 50); *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 898 (11th Cir. 2024) (noting an inmate "cannot succeed on a method-of-execution claim unless they can establish that the method challenged presents a risk that is sure or very likely to cause serious illness and needless suffering" quoting *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1325–26 (11th Cir. 2019)) (emphasis in the original), *cert. denied*, *Grayson v. Hamm*, 145 S. Ct. 586 (2024). Deviations from a protocol, in and of themselves, are not a violation of the Eighth Amendment and especially not in a protocol that permits authorized deviations, which Florida's protocol does. *Jordan v. Mississippi State Executioner*, No. 25-70013, 2025 WL 1752391, at *2, n.2 & *3 (5th Cir. June 24, 2025) (denying a stay of execution to litigate a deviation from the protocol claim in an Eighth Amendment challenge to Mississippi's three-drug protocol where prison officials admitted they did not strictly follow the protocol regarding the consciousness checks); *Cooey v. Strickland*, 589 F.3d 210, 225 (6th Cir. 2009) (stating that even proof of medical negligence in past executions is "not sufficient to render a facially constitutionally sound protocol unconstitutional").

There is yet another problem with Guardado's maladministration claim which is that he does not explain what the appropriate remedy would be for such a claim. The remedy is not, and could not be, to prohibit all future executions, as Guardado seems to be seeking to do. And the remedy dilemma is particularly prominent in this case where the Bureau Chief of FDOC's pharmacy will be filing an affidavit with this Court swearing that etomidate she has set aside for Guardado's execution is not expired. *Cf. Smith v. Comm'r, Ala. Dep't of Corr.*, No. 22-13846-P, 2022 WL 19831029, at *1 (11th Cir. Nov. 17, 2022) (Grant, J., concurring) (expressing the view that the district court's order requiring strict adherence to the protocol rendered the Eighth Amendment claim moot), *stay vacated by*, *Hamm v. Smith*, 143 S. Ct. 440 (2022).[2]

The Eighth Amendment challenge to Florida's protocol based on maladministration of the protocol is not a valid Eighth Amendment claim.

---

[2] The Bureau Chief of Pharmacy at FDOC, Dr. Renea Marcano, will be submitting an affidavit under oath to this Court stating that she has personally set aside the drugs, in the proper dose required by the protocol, that will be used in Guardado's execution and personally verified that all of those drugs, including the etomidate, are not expired. 28 U.S.C. § 1746(2).

## Post-mortem Retrograde Extrapolations

Guardado relies heavily on the toxicology report from the execution of Smithers in an attempt to establish his claim that the etomidate level whether due to use of expired etomidate or a lower dose will allow him to regain consciousness during the execution. He points to the Smithers' etomidate level at the time of the autopsy being .13 milligrams which is below the level required to maintain unconsciousness of .23 milligrams.[3] But such post-mortem retrograde extrapolations from the autopsy blood to determine the amount of etomidate present during the execution and specifically at the time of the administration of the potassium acetate, which stops the heart, are difficult. Both redistribution and metabolism of the etomidate continue after death, as the medical examiner, Dr. Webb, explained. So, the amount of etomidate at the time of the execution is necessarily higher than the amount reflected in the autopsy blood. To obtain accurate etomidate levels at the time of the execution, the blood would have to be taken immediately after the execution, as Dr. Webb

[3] The figure of .23 milligrams of etomidate to remain unconscious seems to be based on plasma blood. (T. 186). But Smithers' etomidate level was based on whole blood from the autopsy.

testified.

The inmate's body is still metabolizing the etomidate after death and continues to do so until the body's core temperature drops below approximately 90 degrees. The testimony established that the inmate's body after the execution is transported from the FSP to the ME's office, which takes approximately two hours. And then, although the body is refrigerated after being transported to the ME's office, the body continues metabolizing the etomidate until the core temperature of the body drops below 90 degrees, which could take some time depending mainly on the inmate's weight and BMI. Retrograde extrapolations made after two and a half hours are less reliable than extrapolations made within two and a half hours of the event and the timeframe when the body is continuing to break down the etomidate is typically longer than that time frame. For these reasons, post-mortem retrograde extrapolations are not accurate.

Furthermore, even accepting Smithers' etomidate level as being approximately accurate at the time of the execution, it does is not establish that he regained consciousness to the point of being able to feel pain, due to the short timeframe of that execution. From the checklist of Smithers' execution, the administration of the etomidate started at 6:02 p.m., the

potassium acetate was administered starting at 6:10 p.m. and the flatline occurred at 6:14, so the execution took a total of 12 minutes. (Doc. #33-5 at 6). The Supreme Court has noted that "some risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required procedure." *Baze v. Rees*, 553 U.S. 35, 47 (2008). But the *Baze* Court then stated that "the Constitution does not demand the avoidance of all risk of pain in carrying out executions." *Id*.

But the testimony at the evidentiary hearing does not support even that alternative scenario of regaining consciousness. The defense expert Dr. Zivot did not begin to establish that Smithers' etomidate level in the toxicology report was even approximately the same level as that at the time of the execution. Rather, Dr. Zivot openly admitted that redistribution of the etomidate continues after death which necessarily means that Smither's etomidate level was higher at the time of the execution. (T. 127). Indeed, the defense expert did not venture even an educated guess as to a retrograde extrapolation of the etomidate in Smithers' system at the time the potassium acetate was administered.

Plaintiff's own expert did not show the risk of an inmate regaining

consciousness to the point they could experience pain during the execution was even a preponderance. Dr. Zivot originally testified, based mainly on the tenfold difference in the post-mortem etomidate levels between the Smither's execution and the Bell execution,[4] that the risk of an inmate experiencing pain was comparable to the odds of winning the lottery, he clarified, on redirect, that the prevalence of regaining consciousness was perhaps one in five executions. (T. 130, 141). That testimony does not establish a "substantial" risk of regaining consciousness during the execution. *Nance*, 597 U.S. at 164 (quoting *Glossip*, 576 U.S. at 877). Guardado did not meet his burden of proof or rise to the standard of proof required to show the risk of regaining consciousness.

The Supreme Court in *Glossip* rejected a similar challenge to Oklahoma's three-drug protocol. The Plaintiffs asserted that the first drug in that protocol would wear off during the execution and they could regain consciousness. They contended that the first drug in the protocol midazolam "was too weak to maintain unconsciousness and insensitivity

---

[4] Dr. Zivot, who is not a medical examiner, seemed to be unaware that the autopsy blood from Smithers was taken from the iliac; whereas, the autopsy blood taken from Bell was taken from the heart and that blood from central sources is typically significantly higher in drug concentration than blood taken from periphery sources.

to pain" during the execution. *Glossip*, 576 U.S. at 883. They argued, just as Guardado does in this case, that the massive dose of first drug, which was "much higher than the normal therapeutic dose," was irrelevant because the first drug had "a ceiling effect—that is, at a certain point, an increase in the dose administered will not have any greater effect on the inmate. *Id*. at 883. The Supreme Court concluded that neither argument succeeded. *Id*. The Court noted that the plaintiff's "experts acknowledged that they had no contrary scientific proof" which is equally true of this case. *Id*. The Court reasoned that the "party contending that this method violates the Eighth Amendment bears the burden of showing that the method creates an unacceptable risk of pain" but the plaintiff's "own experts effectively conceded that they lacked evidence to prove their case" *Id*. at 884. The *Glossip* Court's reasoning and conclusion applies equally here.

Guardado failed to prove that his Goldilocks speculation regarding the etomidate wearing off sufficiently for him to regain consciousness to the point of being able to feel pain occurred in even a single Florida execution, much less that it was "sure or very likely" to occur in his own execution. Guardado failed to meet his burden to prove it was "sure or

very likely" that he would even partially regain consciousness during the execution from the massive dose of etomidate used in Florida's protocol.

**Speculative Theories Versus a Track-record of Successful Executions**

The Supreme Court has condemned § 1983 suits raising Eighth Amendment challenge to protocols based on speculative theories, such as the one Guardado is raising in his § 1983 suit. *Bucklew v. Precythe*, 587 U.S. 119, 144 (2019) (noting the "problem with all of these contentions is that they rest on speculation unsupported, if not affirmatively contradicted, by the evidence"). The Court urged the federal courts to protect settled state judgments from undue interference by invoking their equitable powers to dismiss suits based on "speculative theories." *Id*. at 151. The Court should do just that and dismiss this suit.

And the Supreme Court rejected an Eighth Amendment challenge to the federal lethal-injection protocol based on a very similar speculative theory and did so, in part, due to the successful track-record of federal executions using that protocol. In *Barr v. Lee*, 591 U.S. 979 (2020), the Supreme Court, in a § 1983 suit, rejected an Eighth Amendment challenge to the federal lethal injection protocol of a single dose of pentobarbital.

Federal inmates asserted that the protocol would cause flash pulmonary edema which would temporarily produce the sensation of drowning or asphyxiation. *Barr*, 591 U.S. at 981. The district court enjoined the federal executions but the Supreme Court vacated the stays finding that the plaintiffs had not established that they are likely to succeed on the merits of their Eighth Amendment claim. *Id.* at 980. The Court noted that the protocol had been used "to carry out over 100 executions without incident." *Id.* The High Court then vacated the stay, reasoning that conflicting expert testimony on consciousness does not merit a stay. *Id.* at 981.

Florida adopted its current etomidate protocol in 2017. *Long v. Sec'y, Dep't of Corr.*, 924 F.3d 1171, 1177 (11th Cir. 2019). Since 2017, there have been 51 executions carried out in Florida using the current etomidate protocol "without incident." *Lee*, 591 U.S. at 981. Florida's proven track-record of successful executions trumps Guardado's speculation regarding the massive dose of etomidate wearing off during the execution that was rebutted by the evidence presented by the Defendants at the evidentiary hearing.

In sum, the only fact that Plaintiff established at the evidentiary hearing is that a pharmacy technician kept poor records of the execution

drugs that were being transported to Florida State Prison. But the on-site and contemporaneous checklists of the actual executions in the in addition to the eyewitness testimony of two FDLE agents, affirmatively established that the etomidate used in the six executions was not, in fact, expired. And Dr. Marcano, the Bureau Chief of Pharmacy Services at the Department of Corrections, testified that her investigation of the pharmacy logs determined that the correct expiration date for the etomidate used in the six executions at issue was, in fact, 2027, not 2025, as stated in the pharmacy logs. Plaintiff did not rebut any of that evidence at the evidentiary hearing.[5]

[5] The Defendants object to the expansion of the allegations to include consideration of numerous other executions requiring the disclosure to the Court of the lot numbers and invoices of those additional executions because there was no allegations regarding the use of expired etomidate in those executions made in the complaint. *Cf. Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1141, 1147, 1148- (11th Cir. 2017) (disapproving of the district court granting habeas relief on a claim of cumulative ineffectiveness that was not raised in the petition because district courts cannot concoct arguments not made by the parties citing cases including a § 1983 case, *Fils v. City of Aventura*, 647 F.3d 1272, 1284-85 (11th Cir. 2011), which stated that the district court should not have pled her case for her). The record in this case should have been limited to the evidence regarding the six executions presented during the evidentiary hearing. Dr. Marcano's testimony, which was corroborated by the checklists and two FDLE eyewitnesses' testimony, was sufficient to establish the correct expiration date for the etomidate used in the six executions was 2027 without further corroboration. Requiring disclosure of any of the lot

Accordingly, this Court should find that expired etomidate was not used in the six prior executions at issue and grant the pending Rule 12(b)(6) motion to dismiss for failure to state a claim because the Eighth Amendment challenge fails as a matter of law and is now implausible as a matter of fact after the recent evidentiary hearing.

Respectfully submitted,

JAMES UTHMEIER
ATTORNEY GENERAL OF FLORIDA

/s/ *Charmaine Millsaps*
CHARMAINE M. MILLSAPS
SPECIAL COUNSEL,
ASSISTANT ATTORNEY GENERAL
FLORIDA BAR NO. 0989134
OFFICE OF THE ATTORNEY
GENERAL OF FLORIDA
PL-01, THE CAPITOL
TALLAHASSEE, FL 32399-1050
(850) 414-3300

---

numbers or invoices, even on an in camera basis, risks identifying the supplier of the etomidate. Both the Supreme Court and the Eleventh Circuit have observed that strict secrecy regarding the manufacturers and suppliers of the lethal injection drugs is necessary because the disclosure of the drug companies have caused States to have to change their previously successful protocols due to pressure from anti-death penalty groups on the drug companies to stop supplying the drugs. *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1331 (11th Cir. 2020) (relying on the Supreme Court's similar observations in *Glossip v. Gross*, 576 U.S. 863, 870 (2015)). Florida could be forced to change its successful, decade-old protocol due to such disclosures.

Email: capapp@myfloridalegal.com
Charmaine.millsaps@myfloridalegal.com

/s/ *Jason W. Rodriguez*
JASON W. RODRIGUEZ
SPECIAL COUNSEL,
ASSISTANT ATTORNEY GENERAL
FLORIDA BAR NO. 125285
OFFICE OF THE ATTORNEY
GENERAL OF FLORIDA
PL-01, THE CAPITOL
TALLAHASSEE, FL 32399-1050
(850) 414-3300
Email: capapp@myfloridalegal.com
Jason.Rodiguez@myfloridalegal.com

/s/ *Michael Mervine*
MICHAEL W. MERVINE
SPECIAL COUNSEL,
ASSISTANT ATTORNEY GENERAL
FLORIDA BAR NO. 692131
OFFICE OF THE ATTORNEY
GENERAL OF FLORIDA
3507 E. FRONTAGE RD., SUITE 200,
TAMPA, FL 33607
Email: capapp@myfloridalegal.com
Michael.Mervine@myfloridalegal.com

COUNSEL FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing **DEFENDANTS' WRITTEN CLOSING ARGUMENT** has been furnished by CM/ECF to **SEAN GUNN** Assistant Public Defender of CHU-N, 227 N. Bronough Street.

Tallahassee, Fl 32301; phone: (850) 942-8818; email: sean-gunn@fd.org this 26th day of October, 2026.

/s/ Charmaine Millsaps
Charmaine M. Millsaps
Special Counsel
Asst. Attorney General