APPEAL,DEATH,JaxP−7

# U.S. District Court
# Middle District of Florida (Jacksonville)
# CIVIL DOCKET FOR CASE #: 3:26−cv−02596−MMH−SJH

Guardado v. Secretary, Department of Corrections et al
Assigned to: Judge Marcia Morales Howard
Referred to: Magistrate Judge Samuel J. Horovitz
Cause: 42:1983 Civil Rights Act

Date Filed: 09/28/2026
Jury Demand: None
Nature of Suit: 550 Prisoner: Civil Rights
Jurisdiction: Federal Question

**Plaintiff**

**Jesse Guardado** represented by **Linda McDermott**
Assistant Federal Defender
Office of the Federal Defender
227 N. Bronough St., Suite 4200
Tallahassee, FL 32301
850/942−8818
Email: linda_mcdermott@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bailey Ellicott**
227 North Bronough Street
Suite 4200
Tallahassee, FL 32301
850−942−8818
Email: bailey_ellicott@fd.org
*ATTORNEY TO BE NOTICED*

**Sean Talmage Gunn**
Federal Public Defender for the Northern District of Florida
Capital Habeas Unit
227 N. Bronough St.
Suite 4200
Tallahassee, FL 32301
850−942−8818
Email: sean_gunn@fd.org
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Plaintiff**

**William Reaves** represented by **Brittney Lacy**
Capital Collateral Regional Counsel − South Office
110 SE 6th St., Ste. 701
Ft. Lauderdale, FL 33301
954/713−1284

Fax: 954/713−1299
Email: lacyb@ccsr.state.fl.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Secretary, Department of Corrections** represented by

**Charmaine M. Millsaps**
Office of the Attorney General
PL−01, The Capitol
107 W Gaines St Ste 543
Tallahassee, FL 32399−1050
850/414−3300
Email: charmaine.millsaps@myfloridalegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason William Rodriguez**
Florida Attorney General's Office
PL−01 The Capitol
Tallahassee, FL 32399
850/414−3661
Email: jason.rodriguez@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**Lisa−Marie Krause Lerner**
Office of the Attorney General
Suite 900
1515 N Flagler Dr
West Palm Beach, FL 33401
561/837−5000
Fax: 561/837−5108
Email: Lisamarie.Lerner@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**Michael William Mervine**
Office of the Attorney General
Legal Affairs
3507 E. Frontage Rd.
Suite 200
Tampa, FL 33607
786−657−9219
Email: michael.mervine@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Warden, Florida State Prison**

| Date Filed | # | Docket Text |
|---|---|---|

| | | |
|---|---|---|
| 09/28/2026 | 1 | COMPLAINT for Declaratory and Injunctive Relief against All Defendants filed by Jesse Guardado. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons, # 3 Proposed Summons, # 4 Appendix A (FDOC Lethal Injection Protocol, # 5 Appendix B (FDOC Drug Inventory Logs), # 6 Appendix C (Declaration of Dr. Michaela Almgren), # 7 Appendix D (Report of Dr. Joel Zivot), # 8 Appendix E (Toxicology Reports), # 9 Appendix F (Redacted Autopsies))(Gunn, Sean) Modified text, chambers notified on 9/29/2026 (JDR). (Entered: 09/28/2026) |
| 09/28/2026 | 2 | MOTION to Proceed In Forma Pauperis / Affidavit of Indigency by Jesse Guardado. (Gunn, Sean) (Entered: 09/28/2026) |
| 09/29/2026 | 3 | NEW CASE ASSIGNED to Judge Marcia Morales Howard and Magistrate Judge Samuel J. Horovitz. New case number: 3:26−cv−2596−MMH−SJH. (JDR) (Entered: 09/29/2026) |
| 09/29/2026 | 4 | NOTICE of Local Rule 2.02(a), which states, "The first paper filed on behalf of a party must designate only one lead counsel who − unless the party changes the designation − remains lead counsel throughout the action." Counsel must file a **Notice of Lead Counsel Designation** identifying lead counsel. (Signed by Deputy Clerk). (JDR) (Entered: 09/29/2026) |
| 09/29/2026 | 5 | NOTICE of Appearance by Linda McDermott on behalf of Jesse Guardado (McDermott, Linda) (Entered: 09/29/2026) |
| 10/05/2026 | 6 | **ENDORSED ORDER. Plaintiff's Motion to Proceed In Forma Pauperis (Doc. 2) is DENIED. The records in this case show that Plaintiff has more than $1,361 in his account (Doc. 2). Thus, Plaintiff must pay $405.00 to the Clerk of the Court by October 6, 2026. The following information must either be included on the face of the check from the institution, cashier's check, or money order or attached to it: (1) Plaintiff's full name (Jesse Guardado); (2) Plaintiff's identification number (#324342); and (3) Middle District of Florida Case Number (3:26−cv−2596−MMH−SJH). Checks or money orders that do not have this information will be returned. Failure to tender the appropriate amount of payment or failure to explain noncompliance by the designated due date may result in the dismissal of this action. Due to the exigent circumstance of Plaintiff's pending death warrant, the Clerk is DIRECTED to issue the proposed summonses attached to the Complaint (Docs. [1−2], [1−3]). Signed by Judge Marcia Morales Howard on 10/5/2026. (JND)** (Entered: 10/05/2026) |
| 10/06/2026 | 7 | SUMMONS issued as to Secretary, Department of Corrections, Warden, Florida State Prison. (MDC) (Entered: 10/06/2026) |
| 10/06/2026 | | FEES Paid by Jesse Guardado (Filing fee $405.00, Receipt Number 39551). (JVC) (Entered: 10/06/2026) |
| 10/06/2026 | 8 | NOTICE of Lead Counsel Designation by Linda McDermott on behalf of Jesse Guardado. Lead Counsel: Linda McDermott. (McDermott, Linda) (Entered: 10/06/2026) |
| 10/06/2026 | 9 | RETURN of service executed on 10/06/2026 by Jesse Guardado as to Secretary, Department of Corrections. (Gunn, Sean) (Entered: 10/06/2026) |
| 10/06/2026 | 10 | RETURN of service executed on 10/06/2026 by Jesse Guardado as to Warden, Florida State Prison. (Gunn, Sean) (Entered: 10/06/2026) |
| 10/08/2026 | 11 | |

| | | |
|---|---|---|
| | | Emergency MOTION for Miscellaneous Relief, specifically Injunction Under the All Writs Act by Jesse Guardado. (Gunn, Sean) (Entered: 10/08/2026) |
| 10/08/2026 | 12 | **ENDORSED ORDER. Defendants must file a response to Plaintiff's "Emergency Motion for an Injunction Under the All Writs Act or, Alternatively, for a Stay of Execution" (Doc. 11) by Monday, October 12, 2026 at 5:00 p.m. Plaintiff must file a reply to the response by Tuesday, October 13, 2026 at 5:00 p.m. The Clerk is DIRECTED to IMMEDIATELY email Defendants a copy of this Endorsed Order at capapp@myfloridalegal.com. Signed by Judge Marcia Morales Howard on 10/8/2026. (JND)** (Entered: 10/08/2026) |
| 10/09/2026 | 13 | First MOTION to Dismiss for Failure to State a Claim *Under Rule12(b)(6)* by Secretary, Department of Corrections. (Millsaps, Charmaine) (Entered: 10/09/2026) |
| 10/09/2026 | 14 | MOTION to File Excess Pages by Secretary, Department of Corrections. (Millsaps, Charmaine) (Entered: 10/09/2026) |
| 10/09/2026 | 15 | **ENDORSED ORDER. The Court previously ordered a response to Plaintiff's Motion for Stay of Execution. See Order (Doc. 12). In their forthcoming response, Defendants must address Plaintiff's argument that the FDOC's administration of expired drugs presents a substantial risk of serious harm. Defendants' unopposed Motion to File Slightly−Enlarged Motion to Dismiss (Doc. 14) is GRANTED, and Defendants' Motion to Dismiss (Doc. 13) is accepted as filed. Plaintiff must file a response to Defendants' Motion to Dismiss (Doc. 13) by Wednesday, October 14, 2026, at 12:00 p.m. If the Court determines that an evidentiary hearing is warranted after reviewing the parties' filings, the Court will hold an in−person evidentiary hearing on Thursday, October 22, 2026 at 9:30 a.m. in Jacksonville, Florida. Signed by Judge Marcia Morales Howard on 10/9/2026. (JND)** (Entered: 10/09/2026) |
| 10/12/2026 | 16 | RESPONSE to Motion re 11 Emergency MOTION for Miscellaneous Relief, specifically Injunction Under the All Writs Act filed by Secretary, Department of Corrections. (Millsaps, Charmaine) (Entered: 10/12/2026) |
| 10/13/2026 | 17 | REPLY to Response to Motion re 11 Emergency MOTION for Miscellaneous Relief, specifically Injunction Under the All Writs Act *or Stay of Execution* filed by Jesse Guardado. (Gunn, Sean) (Entered: 10/13/2026) |
| 10/14/2026 | 18 | RESPONSE in Opposition re 13 First MOTION to Dismiss for Failure to State a Claim *Under Rule12(b)(6)* filed by Jesse Guardado. (Gunn, Sean) (Entered: 10/14/2026) |
| 10/16/2026 | 19 | **ORDER setting evidentiary hearing for 10/22/2026 at 09:30 AM in Jacksonville Courtroom 10B before Judge Marcia Morales Howard; directions to the Florida Department of Corrections; directions to the Clerk. Signed by Judge Marcia Morales Howard on 10/16/2026. (CAW)** (Entered: 10/16/2026) |
| 10/16/2026 | 20 | **ORDER allowing members of the press to enter the courthouse with electronic equipment on October 22, 2026. Signed by Judge Marcia Morales Howard on 10/16/2026. (JW)** (Entered: 10/16/2026) |
| 10/16/2026 | 21 | NOTICE of Appearance by Jason William Rodriguez on behalf of Secretary, Department of Corrections (Rodriguez, Jason) (Entered: 10/16/2026) |
| 10/16/2026 | 22 | NOTICE by Secretary, Department of Corrections, Warden, Florida State Prison *of Appearance* (Mervine, Michael) (Entered: 10/16/2026) |

| | | |
|---|---|---|
| 10/16/2026 | 23 | MOTION In Limine regarding Limiting the Evidentiary Hearing Solely to the Issue of Expired Etomidate by Secretary, Department of Corrections. (Millsaps, Charmaine) (Entered: 10/16/2026) |
| 10/16/2026 | 24 | Emergency MOTION to Intervene by William Reaves. (Lacy, Brittney) (Entered: 10/16/2026) |
| 10/16/2026 | 25 | Emergency MOTION to Stay by William Reaves. (Lacy, Brittney) (Entered: 10/16/2026) |
| 10/17/2026 | 26 | **ENDORSED ORDER. By Monday, October 19, 2026 at 10:00 a.m., Defendants must file a response to William Reaves's Emergency Motion for Permissive Intervention (Doc. 24) and Emergency Motion for Stay of Execution (Doc. 25). Signed by Judge Marcia Morales Howard on 10/17/2026. (JND)** (Entered: 10/17/2026) |
| 10/18/2026 | 27 | RESPONSE in Opposition re 23 MOTION In Limine regarding Limiting the Evidentiary Hearing Solely to the Issue of Expired Etomidate filed by Jesse Guardado. (Gunn, Sean) (Entered: 10/18/2026) |
| 10/19/2026 | 28 | NOTICE of Appearance by Lisa−Marie Krause Lerner on behalf of Secretary, Department of Corrections (Lerner, Lisa−Marie) (Entered: 10/19/2026) |
| 10/19/2026 | 29 | RESPONSE re 25 Emergency MOTION to Stay filed by Secretary, Department of Corrections. (Lerner, Lisa−Marie) (Entered: 10/19/2026) |
| 10/19/2026 | 30 | MOTION for Miscellaneous Relief, specifically Expedited Scheduling and Discovery Order by Jesse Guardado. (Gunn, Sean) (Entered: 10/19/2026) |
| 10/19/2026 | 31 | MOTION for Leave to File Reply to Defendants Response to Reaves Emergency Motion for Stay of Execution by William Reaves. (Lacy, Brittney) (Entered: 10/19/2026) |
| 10/19/2026 | 32 | Unopposed MOTION for Miscellaneous Relief, specifically Authorize Remote Testimony (Dr. Almgren) by Jesse Guardado. (Gunn, Sean) (Entered: 10/19/2026) |
| 10/19/2026 | 33 | Exhibit List by Secretary, Department of Corrections. (Attachments: # 1 Exhibit 1. Redacted FDC Execution Checklist for Kayle Bates, # 2 Exhibit 2. Redacted FDC Execution Checklist for Curtis Windom, # 3 Exhibit 3. Redacted FDC Execution Checklist for David Pittman, # 4 Exhibit 4. Redacted FDC Execution Checklist for Victor Jones, # 5 Exhibit 5. Redacted FDC Execution Checklist for Samuel Smithers, # 6 Exhibit 6. Redacted Autopsy/Toxicology Packet for Kayle Bates, # 7 Exhibit 7. Redacted Autopsy/Toxicology Packet for Curtis Windom, # 8 Exhibit 8. Redacted Autopsy/Toxicology Packet for David Pittman, # 9 Exhibit 9. Redacted Autopsy/Toxicology Packet for Victor Jones, # 10 Exhibit 10. Redacted Autopsy/Toxicology Packet for Samuel Smithers)(Rodriguez, Jason) (Entered: 10/19/2026) |
| 10/19/2026 | 34 | NOTICE of supplemental authority by Secretary, Department of Corrections. (Millsaps, Charmaine) (Entered: 10/19/2026) |
| 10/19/2026 | 35 | Witness List by Secretary, Department of Corrections. (Rodriguez, Jason) (Entered: 10/19/2026) |
| 10/19/2026 | 36 | Supplemental Witness List by Secretary, Department of Corrections. (Rodriguez, Jason) Modified on 10/20/2026 to edit the docket text (RPB). (Entered: 10/19/2026) |

| | | |
|---|---|---|
| 10/19/2026 | 37 | **ORDER granting 32 Motion to the extent that Dr. Michaela Almgren, Pharm. D., M.S., may testify via video during the October 22, 2026 evidentiary hearing, in compliance with the directives stated herein. Signed by Judge Marcia Morales Howard on 10/19/2026. (JND)** (Entered: 10/19/2026) |
| 10/19/2026 | 38 | **ORDER granting Plaintiff's Motion 30 to the extent that by October 20, 2026 at 3:00 p.m., Defendants must provide Guardado's counsel with updated drug inventory logs as described herein. The Motion 30 is moot as to execution logs for the four executions specified, and otherwise denied without prejudice. Signed by Judge Marcia Morales Howard on 10/19/2026. (JND)** (Entered: 10/19/2026) |
| 10/19/2026 | 39 | MOTION for Defendants' Experts: Dr. Joseph Antognini and Dr. Milad Webb to appear by video by Secretary, Department of Corrections. (Millsaps, Charmaine) Motions referred to Magistrate Judge Samuel J. Horovitz. (Entered: 10/19/2026) |
| 10/19/2026 | 40 | **ORDER granting Willaim Reaves's 31 Motion for Leave to File Document; denying Reaves's 24 Motion to Intervene; denying Reaves's 25 Motion to Stay. Signed by Judge Marcia Morales Howard on 10/19/2026. (JND)** (Entered: 10/19/2026) |
| 10/20/2026 | 41 | RESPONSE to Motion re 30 MOTION for Miscellaneous Relief, specifically Expedited Scheduling and Discovery Order filed by Secretary, Department of Corrections. (Millsaps, Charmaine) (Entered: 10/20/2026) |
| 10/20/2026 | 42 | Amended MOTION for Defendants' Experts: Dr. Joseph Antognini and Dr. Milad Webb to appear by video by Secretary, Department of Corrections. (Millsaps, Charmaine) Motions referred to Magistrate Judge Samuel J. Horovitz. (Entered: 10/20/2026) |
| 10/20/2026 | 43 | **ORDER denying without prejudice 23 Motion in Limine. Signed by Judge Marcia Morales Howard on 10/20/2026. (JND)** (Entered: 10/20/2026) |
| 10/20/2026 | 44 | **ENDORSED ORDER. Defendants' "Amended Unopposed Motion to Permit Two Experts to Testify via Videoconferencing" (Doc. 42) is GRANTED to the extent that Defendants' expert witnesses may testify via video during the October 22, 2026 evidentiary hearing; however, the Court will determine the order in which the witnesses will testify. In order to facilitate this request, all counsel are required to bring a laptop or iPad to the hearing. A person authorized to administer oaths in the location where the witnesses are located must swear in the witnesses from that location, the witnesses must be alone in the room when presenting his or her testimony, the witnesses must be provided with any relevant documentary evidence in advance. The Courtroom Deputy Clerk will separately send participants the Zoom link. Counsel for Defendants shall provide the Zoom link to the witnesses. Defendants' Motion (Doc. 39) is DENIED as moot. Signed by Judge Marcia Morales Howard on 10/20/2026. (JND)** (Entered: 10/20/2026) |
| 10/20/2026 | 45 | NOTICE of Intent by Secretary, Department of Corrections (Attachments: # 1 Appendix FDOC Public Records Certification)(Rodriguez, Jason) Modified on 10/21/2026 to edit the docket text (MLB). (Entered: 10/20/2026) |
| 10/20/2026 | 46 | **ENDORSED ORDER: Final witness lists and exhibit lists shall be filed no later than 5:00 p.m. on October 21, 2026. The exhibit lists must be on the form required by this Court, and all exhibits are to be pre−marked in accordance with the Court's instructions set forth on the website at www.flmd.uscourts.gov. Two extra copies of the exhibits must be provided to the Court. Signed by Judge** |

| | | |
|---|---|---|
| | | **Marcia Morales Howard on 10/20/2026. (JW)** (Entered: 10/20/2026) |
| 10/21/2026 | 47 | Witness List by Jesse Guardado. (Gunn, Sean) (Entered: 10/21/2026) |
| 10/21/2026 | 48 | Exhibit List by Jesse Guardado. (Attachments: # 1 Exhibit FDOC Lethal Injection Protocol, # 2 Exhibit FDOC Drug Inventory Logs, # 3 Exhibit CV of Dr. Michaela Almgren, # 4 Exhibit Toxicology Reports, # 5 Exhibit Redacted Autopsies, # 6 Exhibit CV of Dr. Joel Zivot, # 7 Exhibit Combined Autopsies & Toxicology Reports, # 8 Exhibit Updated FDOC Drug Inventory Logs)(Gunn, Sean) (Entered: 10/21/2026) |
| 10/21/2026 | 49 | NOTICE of Appearance by Bailey Ellicott on behalf of Jesse Guardado (Ellicott, Bailey) (Entered: 10/21/2026) |
| 10/21/2026 | 50 | Exhibit List by Secretary, Department of Corrections. (Rodriguez, Jason) (Entered: 10/21/2026) |
| 10/22/2026 | 51 | **ENDORSED ORDER: By the close of business tomorrow (5:00 p.m.), counsel for Defendants shall submit unredacted Etomidate logs showing Invoice Numbers and Lot Numbers to the undersigned's chambers for in camera review. Signed by Judge Marcia Morales Howard on 10/22/2026. (JW)** (Entered: 10/22/2026) |
| 10/22/2026 | 52 | Minute Entry. In Person Proceedings held before Judge Marcia Morales Howard: EVIDENTIARY HEARING held on 10/22/2026. Court Reporters: Katharine Healey and Heather Randall (JW) (Entered: 10/22/2026) |
| 10/22/2026 | 55 | Plaintiff's Exhibit List (FILED IN OPEN COURT). (Attachments: # 1 Plaintiff's Exhibit 1, # 2 Plaintiff's Exhibit 2, # 3 Plaintiff's Exhibit 3, # 4 Plaintiff's Exhibit 4, # 5 Plaintiff's Exhibit 5, # 6 Plaintiff's Exhibit 6, # 7 Plaintiff's Exhibit 7, # 8 Plaintiff's Exhibit 8)(JW) (Entered: 10/26/2026) |
| 10/22/2026 | 56 | Defendants' Exhibit List (FILED IN OPEN COURT). (Attachments: # 1 Defendants' Exhibit 1, # 2 Defendants' Exhibit 2, # 3 Defendants' Exhibit 3, # 4 Defendants' Exhibit 4, # 5 Defendants' Exhibit 5, # 6 Defendants' Exhibit 6, # 7 Defendants' Exhibit 7, # 8 Defendants' Exhibit 8, # 9 Defendants' Exhibit 9, # 10 Defendants' Exhibit 10)(JW) (Entered: 10/26/2026) |
| 10/23/2026 | 53 | **ENDORSED ORDER: On October 22, 2026, the Court ordered Defendants to provide "unredacted Etomidate logs showing Invoice Numbers and Lot Numbers" for in camera review. Defendants partially complied with the Court's Order (Doc. 51) by submitting a page of an Etomidate log but failed to submit the full Etomidate logs as directed. By 5:00 p.m. Sunday, October 25, 2026, Defendants must submit to the Court, for in camera review, copies of all pages of the Etomidate logs in evidence showing the Invoice Numbers and Lot Numbers. Signed by Judge Marcia Morales Howard on 10/23/2026. (JND)** (Entered: 10/23/2026) |
| 10/26/2026 | 54 | TRANSCRIPT of Evidentiary Hearing held on 10/22/2026 before Judge Marcia Morales Howard. Court Reporter/Transcriber: Katharine M. Healey, RPR, RMR, CRR, FPR−C. Email address: Katharinehealey@bellsouth.net. Telephone number: (904) 301−6843.<br><br>NOTICE TO THE PARTIES − The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal |

| | | |
|---|---|---|
| | | or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 11/16/2026. Redacted Transcript Deadline set for 11/27/2026. Release of Transcript Restriction set for 1/25/2027. (KMH) (Entered: 10/26/2026) |
| 10/26/2026 | 57 | MEMORANDUM in support re 54 Transcript *(Written Closing Argument)* filed by Jesse Guardado. (Gunn, Sean) (Entered: 10/26/2026) |
| 10/26/2026 | 58 | MEMORANDUM in opposition re 57 Memorandum in support *of Defendants' Written Closing Arguments* filed by Secretary, Department of Corrections. (Millsaps, Charmaine) (Entered: 10/26/2026) |
| 10/27/2026 | 59 | AFFIDAVIT of Dr. Renea Marcano *Declaration under §1746(2)* by Secretary, Department of Corrections. (Millsaps, Charmaine) (Entered: 10/27/2026) |
| 10/28/2026 | 60 | Unopposed MOTION to Redact 54 Transcript (electronic notification sent to Court Reporter Katharine Healey) by Secretary, Department of Corrections. (Rodriguez, Jason) (Entered: 10/28/2026) |
| 10/29/2026 | 61 | **ENDORSED ORDER granting 60 Defendants' Unopposed Motion to Redact Evidentiary Hearing Transcript. The Court Report is directed to redact Page 234, Lines 4 through 9, of the October 22, 2026, evidentiary hearing transcript (electronic notification sent to Court Reporter Katharine Healey). Signed by Judge Marcia Morales Howard on 10/29/2026. (JW)** (Entered: 10/29/2026) |
| 10/29/2026 | 62 | REDACTED TRANSCRIPT of Evidentiary Hearing held on 10/22/2026 before Judge Marcia Morales Howard, re 54 Transcript. Court Reporter/Transcriber: Katharine M. Healey, RPR, RMR, CRR, FPR−C. Email address: Katharinehealey@bellsouth.net. Telephone number: (904) 301−6843. (KMH) (Entered: 10/29/2026) |
| 10/30/2026 | 63 | **ORDER denying 11 Guardado's "Emergency Motion for an Injunction under the All Writs Act or, Alternatively, For a Stay of Execution." Signed by Judge Marcia Morales Howard on 10/30/2026. (JND)** (Entered: 10/30/2026) |
| 10/30/2026 | 64 | NOTICE OF APPEAL as to 63 Order on Motion for Miscellaneous Relief by Jesse Guardado. Filing fee not paid. (Gunn, Sean) (Entered: 10/30/2026) |

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JESSE GUARDADO,

Plaintiff,

v. Case No. 3:26-cv-2596-MMH-SJH

RICHARD COMERFORD, in his official capacity as the Secretary, Florida Department of Corrections, and RANDALL POLK, in his official capacity as the Warden of Florida State Prison,

Defendants.

---

**ORDER**

**I. Status**

Plaintiff, Jesse Guardado, a death row inmate of the Florida penal system, filed, through counsel on September 28, 2026, a Complaint under 42 U.S.C. § 1983 alleging, inter alia, that during executions carried out in 2025 and 2026 via Florida's lethal injection protocol, corrections officials used expired drugs, lower dosages of the drugs than required, and unauthorized drugs. See generally Doc. 1 (Complaint). As Defendants, Guardado names the Secretary of the Florida Department of Corrections (FDOC) (Richard Comerford) in his official capacity, and the Warden of Florida State Prison (Randall Polk) in his official capacity. Id. ¶¶ 10-12. On October 5, 2026, seven

days after Guardado filed his Complaint, Governor Ron DeSantis signed a death warrant to carry out the death sentence. The FDOC then scheduled Guardado's execution for November 5, 2026.

Before the Court is Guardado's "Emergency Motion for an Injunction Under the All Writs Act or, Alternatively, for a Stay of Execution." See Doc. 11 (Motion to Stay). Defendants filed a Response to the Motion to Stay. See Doc. 16 (Response Motion to Stay). And, with the Court's permission, Guardado filed a Reply. See Doc. 17 (Reply). On October 22, 2026, the Court conducted a limited evidentiary hearing on Guardado's Motion to Stay. See Doc. 52 (Minute Entry); Doc. 54 (E.H. Transcript). The parties filed their written closing arguments following the evidentiary hearing on October 26, 2026. See Docs. 57; 58. Guardado's Motion to Stay is ripe for review.

## II. Guardado's Allegations

In the Complaint, Guardado alleges that FDOC's routine maladministration of critical phases of Florida's written lethal injection protocol renders it unconstitutional. See generally Complaint. According to Guardado, records and documents he recently obtained show that throughout the 34 executions that FDOC has carried out since February 2025, "corrections officials deviated from the protocol on numerous occasions, using expired drugs, lower dosages of the drugs than required, and unauthorized drugs." Id. ¶¶ 2-3. Guardado asserts that etomidate, the first drug administered in

Florida's lethal injection protocol, is known to have a "short duration of action," and the use of expired drugs exacerbates the chance that a prisoner will awaken before the administration of the paralytic second drug, rocuronium bromide. Id. ¶¶ 37, 41-42, 66. According to Guardado, "[a]bsent a ventilator, a conscious prisoner will be fully awake and aware as they experience a slow suffocation, struggling for air as the diaphragm becomes paralyzed." Id. ¶ 41. He also contends the prisoner will then, while paralyzed and suffocating, experience the well-known intense burning, pain, and irritation of the third drug, potassium acetate. Id. ¶¶ 43-45.

Guardado also asserts that "etomidate is known to cause pulmonary edema," because its acidic properties burn and cause the lungs to "fill with blood as the heart continues to circulate blood." Id. ¶¶ 49-50. He contends the presence of such lung injuries and documentation of prisoners "gasping" and breathing heavily during an execution is "death by choking and drowning in one's own blood." Id. ¶¶ 63-64. And he notes that the Eleventh Circuit recently found one-to-three minutes of conscious suffocation violates the Eighth Amendment. Id. ¶ 42. (citing Lee v. Comm'r, Ala. Dep't of Corr., No. 26-11864, 2026 WL 1651147 (11th Cir. June 8, 2026)). Guardado acknowledges that while pulmonary edema is a known side effect of FDOC's protocol, his claim here "is distinguishable because he provides evidence of the high likelihood of the

administration of an expired sedative and resultant awareness" of experiencing that pulmonary edema. Id. ¶ 86.

In support of his allegations, Guardado provides redacted FDOC drug inventory logs (Doc. 1-5; Redacted FDOC Drug Logs), that, according to Guardado, show FDOC used etomidate that expired on January 31, 2025, during the August 19, 2025 execution of Kayle Bates; the August 28, 2025 execution of Curtis Windom; the September 17, 2025 execution of David Pittman; and the September 30, 2025 execution of Victor Jones. Id. ¶ 23; see also Redacted FDOC Drug Log at 25.[1] Guardado also provides the toxicology reports for Michael Bell and Samuel Smithers (Doc. 1-8; Toxicology Reports); eleven autopsy reports (Doc. 1-9; Autopsy Reports); the written expert Declaration of Dr. Michaela Almgren (Doc. 1-6; Almgren Declaration); and the written expert Report of Dr. Joel Zivot (Doc. 1-7; Zivot Report).

According to the Declaration of Dr. Almgren, the expiration date of a drug "represents the point beyond which the manufacturer no longer guarantees that the product will continue to meet its established specifications for potency, purity, and quality." Almgren Declaration at 12. She explains that "[e]xpiration dates are established [ ] based on extensive stability studies, and products used beyond their expiration dates may no longer meet established

[1] For purposes of reference to documents in the Court record, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

quality specifications, including those for strength, purity, and other critical quality attributes." Id. And "[a]n expiration date established by the manufacturer cannot simply be extended through additional testing; extending the expiration date requires supporting stability studies conducted by the manufacturer in accordance with applicable regulatory requirements." Id. at 12-13. Dr. Almgren asserts that she reviewed the Redacted FDOC Drug Logs that Guardado had provided and found the logs for etomidate "identified 10 vials of etomidate that had expired on January 31, 2025, and were subsequently removed from inventory on each date corresponding to execution dates: August 19, 2025 (Kayle Bates), August 29, 2025 (Curtis Windom), September 17, 2025 (David Pittman), and September 30, 2025 (Victor Jones)" Id. at 11. According to Dr. Almgren, because no other etomidate vials were documented as being removed from inventory on those dates, "[th]e timing and quantity of these removals (10 vials for each execution) therefore appear consistent with the use of these vials in the respective executions." Id.

Similar to Dr. Almgren's assessment, in his unverified Report, Dr. Zivot states that Redacted FDOC Drug Logs "reflect that drugs were used beyond their expiration dates in the executions of Victor Jones, David Pittman, Curtis Windom, and Kayle Bates; [and] that doses were not consistently prepared and documented as the protocol specifies in the executions of Anthony Wainwright and Thomas Gudinas . . . ." Zivot Report at 4. Dr. Zivot also reviewed the

toxicology reports generated after the July 2025 execution of Michael Bell and the October 2025 execution of Samuel Smithers and found that the difference in their postmortem etomidate levels "raises concerns about the efficacy of the drug as administered." Id. at 10-11. According to Dr. Zivot's observations, "Samuel Smithers' postmortem etomidate level was 0.13 mcg/mL. For etomidate to maintain a hypnotic state, blood levels should be equal to or higher than 0.23 mcg/mL. Michael Bell's postmortem toxicology report documented an etomidate level ten times higher than Smithers'—1.3 mcg/mL." Id. at 11.[2] Dr. Zivot explains that while "[p]ostmortem drug redistribution is well known, and postmortem drug concentrations may be unreliable proxies for circulating blood levels while alive[,] this disparity does not support the conclusion that the protocol reliably delivers a consistent dose of etomidate to each prisoner." Id. He states that "[i]ndividual factors like BMI could plausibly account for some variation, but a tenfold difference, especially between men sedated under the same fixed-dose protocol, is difficult to explain by body composition alone." Id.

---

[2] Guardado's exhibits reflect that Bell was executed in July of 2025, see Toxicology Reports at 3, before the Redacted FDOC Drug Logs show Defendants had begun using expired etomidate, see Redacted FDOC Drug Logs at 26. And Smithers was executed in October of 2025, see Toxicology Reports at 5-6, after the Redacted FDOC Drug Logs show Defendants had been using expired etomidate, see Redacted FDOC Drug Logs at 26.

Based on these facts and evidence, Guardado contends Defendants' lethal injection protocol creates a substantial risk of severe pain and suffering in violation of his Eighth Amendment rights. Complaint ¶¶ 81-83. He submits that "the firing squad is a reasonable, readily available alternative to the current iteration . . . ." Id. ¶ 96. He asserts that states are now employing this alternative, and he proposes that FDOC could easily implement Utah's four-step firing squad procedure. Id. ¶¶ 99-101. As relief, he requests, inter alia, declaratory and injunctive relief preventing Defendants from executing him using the current lethal injection procedure. Id. ¶ 111(a).

## III. Evidentiary Hearing and In Camera Review of Drug Logs

Upon review of Guardado's allegations regarding FDOC's use of expired etomidate, the Redacted FDOC Drug Logs reflecting when FDOC purportedly began using the expired drug and its repeated use of it, and the tenfold discrepancy in the etomidate levels reflected in the Toxicology Reports of Bell and Smithers with Bell having been executed before the logs reflected the use of expired etomidate and Smithers having been executed after the use of the expired etomidate began, the Court ordered a limited evidentiary hearing on Guardado's Motion to Stay. See Doc. 19. Prior to the hearing, the Court ordered Defendants to provide Guardado's counsel with updated redacted drug logs for executions from September 30, 2025 to the present. See Doc. 38 at 3.

At the start of the evidentiary hearing, pursuant to a stipulation, the Court admitted into evidence all of the parties' exhibits and permitted them to publish the exhibits or use them in any manner. See E.H. Transcript at 6-7.

Guardado submitted the following exhibits: FDOC's written lethal injection protocol (Doc. 55-1; Pl. Ex. 1); a copy of the Redacted FDOC Drug Logs (Doc. 55-2; Pl. Ex. 2; Dr. Almgren's CV (Doc. 55-3; Pl. Ex. 3); Michael Bell's and Samuel Smithers's toxicology reports (Doc. 55-4; Pl. Ex. 4); redacted autopsy reports (Doc. 55-5; Pl. Ex. 5); Dr. Zivot's CV (Doc. 55-6; Pl. Ex. 6); 30 combined autopsies and toxicology reports (Doc. 55-7; Pl. Ex. 7); and FDOC's updated redacted drug inventory logs (Doc. 55-8; Pl. Ex. 8; the Updated Redacted FDOC Drug Logs). Defendants submitted the following exhibits: the redacted FDOC execution checklists for – Kayle Bates (Doc. 56-1; Def. Ex. 1); Curtis Windom (Doc. 56-2; Def. Ex. 2); David Pittman (Doc. 56-3; Def. Ex. 3); Victor Jones (Doc. 56-4; Def. Ex. 4); and Samuel Smithers (Doc. 56-5; Def. Ex. 5); and the redacted autopsy/toxicology packets for – Kayle Bates (Doc. 56-6; Def. Ex. 6); Curtis Windom (Doc. 56-7; Def. Ex. 7); David Pittman (Doc. 56-8; Def. Ex. 8); Victor Jones (Doc. 56-9; Def. Ex. 9); and Samuel Smithers (Doc. 56-10; Def. Ex. 10).

Guardado presented the testimony of two witnesses – Dr. Almgren and Dr. Zivot – who both largely testified to the statements made in their Declaration and Report, respectively. See generally E.H. Transcript at 13-57, 81-141. Dr Almgren, who testified as an expert in pharmacy, pharmaceutical

manufacturing, and ethics, explained that etomidate is a fast-acting hypnotic that typically peaks within a minute and lasts three-to-five minutes when given in clinical doses. Id. at 18, 20-22. She explained that etomidate "does not have a linear relationship between the level of the drug [dose] and the length of how long the patient is asleep"; meaning "if you give ten times the dose, it does not mean that the patient . . . . will be unconscious for 30 to 50 minutes." Id. at 21. Dr. Almgren stated that instead, literature about etomidate suggests that the depth of sleep can increase with a higher dose, but the patient will "not necessarily" remain unconscious for a longer time. Id. at 22. She gave no opinion as to how long a patient given a 200 milligram dose of etomidate would remain sedated.

Dr. Almgren reviewed the Redacted FDOC Drug Logs and noted that the Exhibit (Pl. Ex. 2 at 26) shows etomidate used during executions in August and September 2025 had an expiration date of January 31, 2025. E.H. Transcript at 35-37. She then explained the importance of an expiration date, stating the manufacturer establishes an expiration date after performing several stability tests, and up until that expiration date, the manufacturer of that drug can guarantee it is meeting all quality standards. Id. at 37. She asserted "[s]o the expiration date really just tells you: Up to this date we know all of the vials that were made on this date with this lot number are good, and you should not be using them past that date." Id. at 38. According to Dr. Almgren, once you

reach that expiration date, the medication may degrade and even become dangerous. Id. at 37-38. She testified that it is very important that Defendants' drug inventory logs be correct, and what she found "particularly disturbing" with the Redacted FDOC Drug Logs is that the use of expired drugs is documented multiple times, rather than something that should have been caught and corrected after one documented use. Id. at 39 (discussing Pl. Ex. 2 at 26).

Dr. Almgren then reviewed the Updated Redacted FDOC Drug Logs. Id. (discussing Pl. Ex. 8 at 8). She found the updated logs to be "really interesting" because the same entries in the expiration date column, which previously read "January 31, 2025," had now been corrected to "2027" and this correction appeared to be made using "Wite-Out" or "a heavy-handed correction" on those numbers. Id. at 40 (discussing Pl. Ex. 8 at 8). Dr. Almgren stated that using "Wite-Out" to make corrections is completely inappropriate in pharmacy recordkeeping, and instead the best practice would be to mark over "2025" and write "wrong date" before writing the correct date and initialing the correction. Id. at 41. Dr. Almgren was then directed to page 12 of the Updated Redacted FDOC Drug Logs, which shows what she found to be "a prime example" of how to make a proper correction as someone marked over a line, wrote "error," and initialed it. Id. at 42 (discussing Pl. Ex 8 at 12). According to Dr. Almgren, she cannot imagine why they would apply this correction practice inconsistently,

and she stated that if these were pharmacy records she was auditing, she would initiate an investigation into the changing of "2025" to "2027." Id. at 42-43. With that said, Dr. Almgren testified that she has no personal knowledge about whether FDOC used expired etomidate during any execution, and she does not know which version of the FDOC drug logs is correct. Id. at 51.

Dr. Zivot, who testified as an expert in anesthesiology, stated that he had no disagreements with Dr. Almgren's testimony about the use of expired drugs. Id. at 98-99. He also testified that based on his review of the Redacted FDOC Drug Logs, it appeared that expired etomidate was used during executions in August and September 2025. Id. at 103 (discussing Pl. Ex. 2 at 26). Dr. Zivot stated that he is familiar with toxicology generally and routinely draws blood to be sent to the lab and makes medical decisions based on toxicology reports. Id. at 112. He explained that he reviewed the thirty toxicology reports in Plaintiff's Exhibit 7 and noted that the "reference comments" in the reports mirror the package insert for etomidate, which "specifies a plasma level of 0.23" is needed to reach "basic entry-level hypnosis." Id. at 115-16. He further testified that the manufacturer's 0.23 mcg/mL plasma level is the threshold for both living-people and postmortem tests, though he acknowledged that drug levels will move after death. Id. at 116-17. According to Dr. Zivot, blood drawn from a femoral source is better than heart blood to determine plasma levels in a living person, but femoral blood can sometimes be difficult to obtain after

death. Id. at 117. Dr. Zivot testified that there is also a difference between plasma and whole blood and since he works with live patients, he mostly works with plasma. Id. at 119. When asked about etomidate's postmortem stability, Dr. Zivot opined that etomidate is fairly stable, and while it does undergo some metabolism during circulation, it can sit in a tube for up to a week without changing much. Id. at 119-20. He stated that one-third of the thirty toxicology reports he reviewed showed postmortem etomidate levels below the manufacturer's 0.23 mcg/mL plasma level. Id. at 120. According to Dr. Zivot, he believes the postmortem etomidate levels shown in those toxicology reports would be close to the blood-plasma levels of etomidate circulating at the time of execution. Id. at 133. He explained that he believes he can reliably draw conclusions based on these toxicology reports because while there is some redistribution after death, if femoral blood is used, the lack of plasma-based metabolism will mean the level is fixed at the time of death. Id. at 140-41. Dr. Zivot further testified that he would expect to see much less variation in etomidate levels in thirty toxicology reports and seeing so much variation in just thirty reports, "was quite surprising and quite disturbing . . . ." Id. at 141.

Defendants presented testimony from Dr. Joseph Antognini, Dr. Milad Webb, Florida Department of Law Enforcement (FDLE) Agents Adam Graff and Kevin James, and Dr. Renea Marcano. Dr. Antognini testified that the dose of etomidate called for in FDOC's lethal injection protocol is "a massive

overdose" that is "between about 7 to 10 times the dose that you would give in the clinical situation." Id. at 64. When asked how a dose like that affects a person once it reaches circulation, Dr. Antognini explained:

> Well, the etomidate as it first goes in, it starts entering into the circulation, just the very first part of that dose would be sufficient to make that person unconscious because that's a -- the first part is what we would give anyway.
>
> And then, you know, you continue to push that drug more and more until you get to the 200 milligrams. You're pushing that overdose. And so the person would be unconscious within 15 to 20, 30 seconds. And then you continue to give more etomidate per the protocol, and then that just builds up the concentration, basically, of etomidate in the bloodstream. So it's going to last a lot longer because of that.

Id. at 64. According to Dr. Antognini, based upon that dosage, it is his opinion that the individual would be in a state of unconsciousness for at least 30 minutes. Id. Dr. Antognini testified that the estimate that an individual will only remain unconscious for three to five minutes is true for clinical doses because of etomidate's redistribution. Id. at 65-66. But Dr. Antognini explained that with the massive overdose FDOC provides, "it takes longer for that drug['s] [ ] concentration to fall off because it's such a high dose." Id. at 66.

Dr. Webb became the District Eight Chief Medical Examiner for North Central Florida in March 2026, and his office conducts all postmortem reports for inmates executed in Florida. Id. at 170. Dr. Webb testified that under his leadership, his office takes postmortem blood samples from the iliac veins, or

a peripheral source. Id. He explained that before taking his current role, the office would draw postmortem blood samples from central sources, "particularly, the heart." Id. at 171. But because Dr. Webb was trained that the "gold standard for postmortem toxicology testing," and the site endorsed by the National Association of Medical Examiners, is peripheral blood or iliac, that is the blood source his office uses unless the body has significant trauma and there are no other options. Id.

According to Dr. Webb, postmortem etomidate levels vary based on the location from which the blood sample is taken. Id. If the sample is heart blood, the etomidate level "is going to be predictably higher . . . multiple-fold higher, maybe four to tenfold higher," compared to iliac, "because of the postmortem redistribution of the drug." Id. Dr. Webb further explained that the volume of distribution depends on your individual tissue composition, or how heavy you might be. Id. at 171-72. When asked why, if FDOC administers 200 milligrams (mg) of etomidate, the postmortem levels are so low in the autopsies, Dr. Webb explained:

> So you would have to first establish what would be the expected concentration. So to say something is low is to say that you know what it should be. So I would ask, well, . . . -- once you give 200 milligrams of etomidate [ ] to a human and you expect distribution, you expect plasma redistribution, postmortem redistribution, what do you expect that number to be? And then why . . . do you think it's high or low? We know that peripheral blood concentrations are going to be lower than central blood concentrations because of the way the drug binds to your organ

> systems. And then when you die, those drugs can release from the organs, central organs, and go into circulation.
>
> And it happens that all of our major organ systems are in the thoracic cavity. So when we take blood from the peripheral, it is going to be the most accurate to . . . when that individual died and what the drug concentration was in life.
>
> When we take it from the central source, it's going to have a lot more variability, and that number is going to be artificially increased.

Id. at 172-73. He also explained that there is a difference between plasma readings and whole blood readings: whole-blood readings are "absolutely not" indicative of or a one-to-one of a person's plasma readings as plasma and whole blood are two completely different volumes of fluid, and as a medical examiner, he only works with whole blood. Id. at 173-74.

Dr. Webb testified that there are reports that etomidate breaks down in the liver and data shows that after someone dies, if their body temperature stays within a physiological range (probably in the low 90s), etomidate will continue to metabolize, since all metabolism does not instantaneously cease at the time of death. Id. at 174, 179. Dr. Webb explained that while he cannot give an opinion about the rate etomidate continues to decrease after death as no studies have been done, he does know that some appreciable rate of degradation occurs. Id. at 174-75. Because etomidate has a half-life within two-and-one-half hours, Dr. Webb stated that ideally to get a fairly accurate etomidate number, you would need to take a sample within that period of time.

Id. at 175. Dr. Webb was not sure if postmortem etomidate samples taken after that time would be accurate because he has never been asked to compare the two. Id. at 175-76.

Dr. Webb further testified that postmortem etomidate levels cannot predict whether the etomidate used in an execution was expired. Id. at 176. He added that he reviewed the toxicology reports for Michael Bell and Samuel Smithers and saw a tenfold difference in the readings of the two cases. Id. at 176. Even so, Dr. Webb testified that this large disparity does not mean the two men received different amounts of etomidate during their executions; rather these postmortem concentrations were drawn from different body sites (Michael Bell – heart blood; Samuel Smithers – iliac blood) and the difference in these two individuals' body type, blood concentration, etc. must be considered. Id. at 177.

Dr. Webb testified that he reviewed the toxicology reports in Plaintiff's Exhibit 7 and none of the postmortem etomidate levels gave him any concern that an inmate did not receive 200mg of etomidate during the execution process. Id. at 184-85. He also testified that these reports provided no evidence indicating to him that any of the individuals had consciousness at the time of the execution. Id. at 186. Finally, as to the 0.23 mcg/ML plasma level reference code, Dr. Webb explained that number is "completely inconsequential" to him, as that number does not relate to a postmortem whole blood sample; and the

way you test consciousness is with tactile touch or response to pain, not with postmortem blood testing. Id. at 192, 196.

FDLE Agent Graff testified that he was responsible for checking the expiration dates and witnessing the drawing up of the required drugs during the August 19, 2025 execution of Kayle Bates; the September 17, 2025 execution of Joseph Pittman; the September 30, 2025 execution of Victor Jones; the July 15, 2026 execution of Michael Bell; and the October 28, 2025 execution of Norman Grim. Id. at 145-46. He reviewed the packaging and the individual vials of the etomidate used in each of those executions and confirmed the drug was etomidate and it was not expired. Id. at 151-52. According to Agent Graff, on each occasion, after he did so, the etomidate was then handed to the person that would draw the medication who would show it to another member of the execution team who also would confirm the name of the drug and checks the expiration date. Id. at 148, 150, 163. He explained that if a drug was found to be expired, the team would let the team warden know even if it meant potentially delaying the execution. Id. at 164-65.

FDLE Agent Kevin James testified that he was responsible for checking expiration dates and witnessing the drawing of the required drugs during the October 14, 2025 execution of Samuel Smithers. Id. at 198. He reviewed the packaging and vials of the etomidate used in Smithers's execution and confirmed the etomidate was within its expiration date. Id. at 199, 200-01.

Similar to Agent Graff, he testified that after he confirmed the etomidate was not expired, the pharmacist then presented the drug to "two separate [F]DOC employees to confirm the drug name and expiration date as well." Id. at 201.[3]

Dr. Renea Marcano testified that she is a licensed pharmacist who currently works for the FDOC. See E.H. Transcript at 209. On July 4, 2025, FDOC promoted her to the position of Bureau Chief of Pharmacy Services, overseeing all pharmaceutical matters for the FDOC. Id. at 210, 220. In her postition, she regularly monitors the drugs Florida uses in its lethal injection protocol, and routinely audits records for the lethal injection drugs, including purchasing and inventory logs. Id. at 210. According to Dr. Marcano, she is very familiar with the procurement, storage, monitoring, and chain of custody

---

[3] Agent James gave seemingly contradictory answers during his testimony regarding the Smithers execution:

> Q. So our date is October 14, 2025. You were shown both the packaging as well as the vial. Had the etomidate which you were shown, had that expired as of that date?
> A. It had not expired.

Id. at 200

> . . . .
> Q. All right. Let's go to the actual execution of Mr. Smithers. What was the expiration of the etomidate in the Smithers execution?
> A. I'm not sure the exact date, but I know it was prior to October of 2025.

Id. at 206

> . . . .
> Q. Even though you didn't remember the actual expiration date?
> A. Correct. I remember that they – every execution I've been a part of has been within the expiration date.

Id. at 207. Taking into account the entirety of Agent James's testimony, the Court credits his statements that the etomidate used in the Smithers execution had not yet reached its expiration date.

procedures for the three main drugs used in the protocol. Id. at 211. She explained when received, every drug comes with a lot number that is associated with an expiration date; and "[a] lot number is indicative of the batch that the manufacturer made," so if something happened with that particular batch, the manufacturer would be able to identify it for recall. Id. Dr. Marcano described the multiple-lock cabinetry system where the lethal injection drugs are stored and stated only authorized personnel have access to the keys used to enter the secure room housing these drugs. Id. at 212. Once an authorized personnel member is within the secure room, there are two containers – one container houses all the unexpired medications, and one container (the quarantine cabinet) contains all the damaged or expired products. Id. at 212, 226. She explained that each of the lethal injection drugs are stored in conditions "pharmaceutically required for the drug," including rocuronium bromide, which is stored in a locked commercial refrigerator, and that all drugs remain sealed in their unopened boxes with packaging inserts until needed. Id. at 213, 225.

According to Dr. Marcano, personnel have a procedure for handling drugs close to their expiration day – usually this procedure depends on whether an execution is scheduled, meaning they will move soon-to-be expired drugs to the expired container earlier if there are no other executions expected that month, but if there are, they will not move them in advance. Id. at 214. Dr.

Marcano explained, "[w]e can move them up to one business day after they expire"; and they do not permit expired drugs to remain in the good cabinet for months after expiration. Id. Once an expired drug is moved to the "bad cabinet," it is never moved back, and it is never used for an execution. Id. Dr. Marcano stated that she specifically trains all authorized individuals that under no circumstance are expired drugs to be used in executions. Id. at 215.

According to Dr. Marcano, on the day of an execution, two members of the execution team come to the secure pharmacy location to transport the drugs to Florida State Prison. Id. Once they arrive, two caretakers onsite at the secure pharmacy pull out a set of the drugs that will be used and a spare set. Id. at 228. The caretakers check the expiration dates of the drugs, and once custody of the drugs is transferred to the two transporters, the two transporters also check the expiration dates. Id. at 215. She explained they also check for signs of damage or alterations, and once everyone is satisfied with the inspections, the caretakers tightly bag up the spare drugs with staples "to make it not easy to use," and the other set is bagged for easy access. Id. at 229. The transporters then place the drugs into a locked box with a code and take them to the execution site. Id. at 216. After the event, the transporters return to the pharmacy and provide the caretakers with the spare set of drugs that was not used. Id. at 229. According to Dr. Marcano, "at that point, then we document on these logs what was used"; and they return to stock any room-

temperature drug like etomidate and place rocuronium into quarantine because it was out of the refrigerator. Id.

Dr. Marcano testified that FDOC keeps and maintains drug inventory logs tracking the purchase, storage, and use of the lethal injection drugs. Id. at 216. She explained that in December 2025 or January 2026, after becoming Bureau Chief, she discovered entries made in those logs that concerned her. Id. at 216, 221. Specifically, Dr. Marcano identified a number of dates that stood out to her – August 19, 2025; August 29, 2025; September 17, 2025; September 30, 2025; October 14, 2025; and October 28, 2025. Id. at 216-17. Notably, those log entries appeared to show expired etomidate (expiration date of January 31, 2025) was used on those dates. Id. Dr. Marcano advised her supervisor of the concerns and she and her supervisor agreed that Dr. Marcano should conduct an internal investigation. Id. 216, 221, 222-23.

Dr. Marcano testified that she did three things to resolve her concerns about these entries. Id. First, Dr. Marcano traced the lot number and National Drug Code (NDC)[4] number at the top of the log back to three invoices they had previously received, and each of those three invoices indicated that the true expiration date was January 2027, not January 2025. Id. at 217-18. Second, Dr. Marcano looked for etomidate with that NDC number at the top of that log,

[4] The NDC number at the top of the redacted drug logs identifies the manufacturer. E.H. Transcript at 230.

and after searching through all the FDOC invoices, she could not identify ever receiving etomidate with an expiration date of January 31, 2025. Id. at 218. And third, Dr. Marcano explained that she reached out to transporters and asked if they recalled checking all expiration dates, and if they could recall a time that anything could "have went awry"; and they advised her that "they have always checked the expiration date and there has never been expired product that left that site." Id. She testified that her investigation concluded that the initial drug logs that had a 2025 expiration date were not an accurate reading of the date but rather "human error." Id. at 218-19.

Dr. Marcano then explained that based on her investigation, at her direction someone went back and corrected the logs to reflect the correct expiration date: January 31, 2027. Id. at 219, 260-61. Since discovering this error, Dr. Marcano has instituted new procedures to bring more accuracy to the logs, including terminating the individual who made the error; appointing new individuals to handle the logs; and requiring that on days of executions, the two caretakers and the two transporters, along with Dr. Marcano, review the logs for accuracy. Id. at 219, 241. When asked if the individual explained why he had written the wrong expiration date for those entries, Dr. Marcano testified, "English is not his first language. And I believe the year was 2025, so it was just – it was just an error in writing down the current year." Id. at 233.

When asked why 120 vials of etomidate with an expiration date of July 2022, were removed on December 8, 2022, Dr. Marcano explained that they record the movement of expired and unexpired drugs on the drug logs, so they know the drugs are not going somewhere else; thus even if a drug is expired and had been moved to the quarantine cabinet, it is not removed from the drug log until the drug ships out of the facility for destruction or "reverse distributor." Id. at 235, 237 (discussing Pl. Ex. 2 at 3).

Dr. Marcano acknowledged that the drug logs contain discrepancies in dates of executions and dates that drugs were logged out. Id. at 238-39. She also noted that the drug logs indicate 7 vials of potassium acetate were removed on June 12, 2025, but the corresponding execution occurred on June 10, 2025. Id. at 238-39. Similarly, the logs show that 17 vials of potassium acetate were removed on June 25, 2025, but the corresponding execution occurred on June 24, 2025. Id. at 239-40. But since she was not yet in her current position, she had no personal knowledge of why this occurred and could not make a conclusion based on any objective investigation. Id. at 239-40. Dr. Marcano also acknowledged that there were several other drug log entries made the day before or after an execution but clarified that the new procedure she has now implemented requires that entries be made on the same day as the event. Id. at 241, 253, 254. And as to any errors in the amounts or purported shortage of the amount removed for an execution, Dr. Marcano

stated that while she cannot explain those entries, she knows the individuals involved in the process and is confident they would not have left the pharmacy facility shorthanded. Id. at 242-43. Likewise, Dr. Marcano spoke to the execution team members about all discrepancies in log entries made days before or after an execution, and they reassured her that on the day of every execution, the right amount of each drug was brought to the execution site. Id. at 254. Dr. Marcano acknowledged the drug logs did not contain entries for the withdrawal of etomidate for use in the June 24, 2025 execution of Thomas Gudinas and the July 15, 2026 execution of Michael Bell but stated that transporters assured her etomidate was transported to both those executions. Id. at 256-59.

Finally, when asked about the Updated Redacted FDOC Drug Logs and how it appears that someone just "whited out" the "5" in "2025" and put a "7" making it "2027," Dr. Marcano testified "[t]hat's how the person handling the log corrected it upon instruction to change the log to what the investigation had found, that it was 2027." Id. at 260-61 (referring to Pl. Ex. 8 at 8). But she acknowledged that no memorandum was prepared to explain the change. Id. at 261-62.

Following the evidentiary hearing, in light of Dr. Marcano's testimony regarding her investigation and findings, the Court ordered Defendants to submit to the Court, for in camera review, copies of "all pages of the Etomidate

logs in evidence showing the Invoice Numbers and Lot Numbers." See Doc. 53. Defendants then provided the Court with three sets of documents. The first set included page 8 of Plaintiff's Exhibit 8, showing the unredacted Lot Number and Invoice Number that coincided with the January 2027 expiration date; a photograph of a package and vials of etomidate with the same Lot Number and January 2027 expiration date found on page 8 of Plaintiff's Exhibit 8; and three invoices showing receipt of etomidate with the matching Lot Number and a January 2027 expiration date. The second set of documents Defendants provided included an unredacted version of the etomidate logs in Plaintiff's Exhibit 2 showing Invoice Numbers and a Lot Number for each entry. And finally, the third set of documents contained an unredacted version of the etomidate logs in Plaintiff's Exhibit 8, again showing Invoice Numbers and a Lot Number for each entry.

Using the first set of documents, the Court was able to confirm that January 2027 was the correct expiration date for the etomidate used in the August 19, 2025 execution of Kayle Bates; the August 29, 2025 execution of Curtis Windom; the September 17, 2025 execution of David Pittman; and the September 30, 2025 execution of Victor Jones. The other two sets of documents allowed the Court to trace more Lot Numbers back to one of the Invoices provided and confirm that FDOC had ample unexpired etomidate for use in executions that occurred between April 8, 2025 and October 20, 2026.

## IV. Law

### *Eighth Amendment Method-of-Execution Claim*

To state an Eighth Amendment method-of-execution claim, a plaintiff must plead facts sufficient to satisfy the two-prong test established in Glossip v. Gross, 576 U.S. 863 (2015), and Baze v. Rees, 553 U.S. 35 (2008). First, the plaintiff must allege that "the method challenged presents a risk that is 'sure or very likely to cause serious illness and needless suffering,' and gives rise to 'sufficiently imminent dangers.'" Price v. Comm'r, Dep't of Corr., 920 F.3d 1317, 1325-26 (11th Cir. 2019) (quoting Glossip, 576 U.S. at 877; Baze, 553 U.S. at 50) (emphasis in originals)). The possibility that the prisoner may suffer pain is not sufficient to establish a "substantial risk of serious harm." Id. Rather, the conditions must establish the sort of "objectively intolerable risk of harm that qualifies as cruel and unusual punishment prohibited by the Eighth Amendment." Id. (quotations omitted). As such, to prevail, "the inmate must show a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." Id. (quotations omitted)

Second, the plaintiff must identify "'a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason.'" Id. (quoting Bucklew v. Precythe, 587 U.S. 119, 134

(2019)). "[T]he state must be able to implement and carry out that [alternative] method of execution relatively easily and reasonably quickly, and in a manner that 'in fact significantly reduces a substantial risk of pain' relative to the intended method of execution." Boyd v. Warden, Holman Corr. Facility, 856 F.3d 853, 866 (11th Cir. 2017) (quoting Glossip, 576 U.S.at 877). Further, in Bucklew, the United States Supreme Court clarified that "[a]n inmate seeking to identify an alternative method of execution is not limited to choosing among those presently authorized by a particular State's law." 587 U.S. at 139-40. Thus, a plaintiff can identify a "well-established protocol in another State as a potentially viable option." Id. at 140.

***All Writs Act, 28 U.S.C. § 1651(a)***

Under the All Writs Act, courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097, 1099 (11th Cir. 2004). In Dunn v. McNabb, 583 U.S. 941 (2017), the United States Supreme Court addressed whether the All Writs Act can be used to enjoin a death penalty inmate's execution. There, the Court held that "inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all the requirements for a stay, including a showing of a significant possibility of success on the merits . . . . The All Writs Act does not excuse a court from making these findings." Id. (citation omitted); see also

Lecroy v. United States, 975 F.3d 1192, 1197 (11th Cir. 2020) (finding that the All Writs Act cannot be used to evade the requirements for a preliminary injunction). And in Hill v. McDonough, 547 U.S. 573 (2006), the Court emphasized that "a stay of execution is an equitable remedy," and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." Id. at 584. The court "must also apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" Id. (quoting Nelson v. Campbell, 541 U.S. 637, 650 (2004)).

A stay of execution is available "only if the prisoner 'establishes that (1) he has a substantial likelihood of success on the merits, (2) he will suffer irreparable injury unless the injunction issues, (3) the injunction would not substantially harm the other litigant, and (4) if issued, the injunction would not be adverse to the public interest.'" Barwick v. Governor of Fla., 66 F.4th 896, 900 (11th Cir. 2023) (quoting Bowles v. DeSantis, 934 F.3d 1230, 1238 (11th Cir. 2019)). The Court must also consider "the extent to which the inmate has delayed unnecessarily in bringing the claim," Walls v. Sec'y, Dep't of Corr., 161 F.4th 1281, 1284 (11th Cir. 2025) (quoting Nelson, 541 U.S. at 649–50), because "[l]ast-minute stays should be the extreme exception, not the norm, and 'the last-minute nature of an application' that 'could have been brought'

earlier . . . 'may be grounds for denial of a stay.'" Bucklew, 587 U.S. at 150 (quoting Hill, 547 U.S. at 584).

## V. Analysis

Here, Defendants do not argue that Guardado unduly delayed bringing this action. As such, the disposition of the Motion to Stay will turn on the four stay factors.

### *(1) Substantial Likelihood of Success on the Merits*

Guardado argues that he has made a substantial showing that he is likely to succeed on the merits. Motion to Stay at 17. He states that the Redacted FDOC Drug Logs underlying his expired drugs claim first became public in October 2025 during Frank Walls's post-warrant § 1983 litigation in the Northern District of Florida. Id. at 2-3. Having reviewed those Redacted FDOC Drug Logs, Guardado obtained autopsy reports, toxicology reports, and new expert opinions to expand on what Walls argued. He contends his Complaint adequately describes that "due to Defendants' repeated administration of expired etomidate, inmates are not rendered sufficiently unconscious and are thus awake and aware during the procedure, experiencing the physical and mental torture inflicted by the chemical paralytic which immobilizes the diaphragm, and the drowning sensation of pulmonary edema." Id. at 17-18. Guardado equates this terror to Alabama's use of Nitrogen Hypoxia, which the Eleventh Circuit found unconstitutional in Lee, No. 26-

11864, 2026 WL 1651147. Motion to Stay at 18. He also asserts that he has proffered an adequate alternative method of execution – firing squad – which is feasible, readily implemented, and reduces the risk of pain associated with Florida's lethal injection protocol. Id. at 22. To that end, he asserts he has demonstrated a substantial likelihood of success on the merits. Id. at 18.

In response, Defendants argue Guardado has not shown a substantial likelihood of success on the merits. Response Motion to Stay at 9. According to Defendants, the Eleventh Circuit's conclusion in Lee that Alabama's use of Nitrogen Hypoxia violates the Eighth Amendment was dependent upon the inmate being conscious during the use of the gas, which is a fact inapplicable to Florida's protocol. Id. at 10. Defendants maintain that Guardado's claim regarding edema ignores the protocol's "consciousness check" that is mandated after the administration of etomidate; and since Guardado will be unconscious, he will not experience the sensation of suffocating or any "pulmonary edema that occurs during execution." Id. at 10-12. According to Defendants, Guardado's attempt to add allegations that FDOC is possibly using expired etomidate to enhance his pulmonary edema claim "is speculative" but "[s]uch speculation cannot substitute for evidence." Id. at 13.

To determine Guardado's likelihood of success on the merits, the Court must begin by examining FDOC's written protocol and then his specific challenges to it. Florida's current lethal injection protocol provides for

intravenous administration of: (1) 200mg of etomidate (a sedative); (2) 1000mgs of rocuronium bromide (a paralytic agent); and (3) 240 milliequivalents of potassium acetate (a substance to stop the heart). See Doc. 1-4 at 12-14 (etomidate protocol). If the inmate is not fully unconscious when either rocuronium bromide or potassium acetate is injected, it is undisputed that the prisoner will suffer pain. See Lightbourne v. McCollum, 969 So. 2d 326, 351 (Fla. 2007) ("If the inmate is not fully unconscious when either pancuronium bromide or potassium chloride [the second and third drugs in the protocol] is injected, or when either of the chemicals begins to take effect, the prisoner will suffer pain."); see also Baze, 553 U.S. at 53 ("[F]ailing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride.").

Guardado first learned about the Redacted FDOC Drug Logs in late 2025 when Walls filed in the Northern District of Florida a post-warrant § 1983 action and motion to stay his execution, raising an as-applied challenge to the etomidate protocol. Complaint at 8 (citing Walls v. Dixon, No. 4:25-cv-488-MW/MAF (N.D. Fla.)). In addition to the Redacted FDOC Drug Logs, Walls provided an affidavit from Dr. Zivot, in which he discussed Walls's various health conditions that might prolong suffering during the execution. The

district court denied Walls's motion to stay, and the Eleventh Circuit affirmed the denial, concluding that Walls unduly delayed in bringing his challenge because the pulmonary edema associated with the etomidate protocol is a complication "well-documented for years" and Walls was likewise aware of his own health conditions for years. Walls, 161 F.4th at 1285. Neither the district court nor the Eleventh Circuit addressed the merits of Walls's claim and the case was rendered moot by his execution.

Since Walls, two other death-warrant inmates have used the same Redacted FDOC Drug Logs to challenge, in state court, the etomidate lethal injection protocol. First, after the issuance of his January 2026 death warrant, Ronald Heath filed with the trial court a Florida Rule of Criminal Procedure 3.851 motion, attaching the Redacted FDOC Drug Logs and arguing FDOC deviated from its protocol during recent executions, including, inter alia, the possible use of expired drugs. Heath v. State, 426 So. 3d 1253, 1261 (Fla. 2026). Heath also provided a declaration from Dr. Zivot, describing the risks posed by FDOC's alleged recklessness in administering the etomidate protocol. Id. The trial court denied Heath's Rule 3.851 motion. Id. Heath appealed and the Florida Supreme Court affirmed the denial, finding in relevant part:

> The question is not whether protocol deviations occurred but whether the defendant's allegations would demonstrate a substantial and imminent risk that is sure or very likely to cause serious illness and needless suffering. Heath's allegations would not demonstrate such a risk. The alleged failure to document the

> removal of drugs from inventory until one or two days after an execution would not, **without more**, show a substantial and imminent risk that is sure or very likely to cause serious illness and needless suffering during an execution. Nor would the alleged failure to log the removal of etomidate from inventory establish such a risk where the autopsy indicates the drug was, in fact, administered. The allegation that lidocaine was administered on two occasions certainly would not establish a risk of needless suffering. Heath's suggestion that inventory removals on dates that "seemingly correspond[ ]" to executions and reflect amounts less than required by the protocol show that incorrect doses were used is speculative and Heath does not allege that such incorrect doses would create a demonstrated risk of severe pain. The same is true of the alleged use of expired drugs and the execution that took twenty minutes and allegedly involved movement. None of Heath's allegations would establish that the method of execution presents a substantial and imminent risk that is sure or very likely—in other words, a virtual certainty—to cause serious illness and needless suffering.

Id. (emphasis added).

When the Florida Supreme Court issued the Heath decision, Melvin Trotter was litigating a post-warrant Rule 3.851 motion raising similar challenges to the etomidate protocol and relying on the same drug inventory logs and an expert affidavit warning that expired drugs could diminish pharmacological effects or cause complications. State v. Trotter, No. 1986-CF-001225 (Fla. 12th Cir. Ct.). Using the reasoning in Heath to support its decision, the trial court denied the Rule 3.851 motion, finding "none of the heavily redacted FDOC log pages contain any executed defendant's name or indicate that any of the drugs listed were used during any execution, [ ] prompting a finding that [Trotter's] purported 'evidence' of . . .

maladministration . . . is based on speculation and conjecture." Id. Trotter appealed and the Florida Supreme Court affirmed the denial, finding the trial court correctly found the evidence that Trotter provided was "speculative" and Trotter failed to identify an alternative method of execution. Trotter v. State, 428 So. 3d 68, 73 (Fla. 2026).

Trotter sought a stay of his execution from the United States Supreme Court. Trotter v. Florida, 607 U.S. ---, 146 S. Ct. 755 (2026). The Supreme Court denied the stay without discussion. Id. But Justice Sotomayor, who voted to deny the stay "because evidentiary support for [Trotter's] claim is lacking," also issued a written statement expressing her "concern about Florida's implementation of its execution protocol and the secrecy surrounding it." Id. at 755. Justice Sotomayor explained that while "Florida argued . . . that Trotter's claim is speculative because the records at issue do not conclusively show any errors occurred, [ ] the State provides no assurances that it has not (and will not) use expired substances in its executions." Id. She then highlighted her apprehensions:

> At this point, the evidence Trotter has assembled is not, in my view, enough to show that Florida's administration of its lethal-injection protocol is "'sure or very likely to cause serious and needless suffering,'" as the Court's Eighth Amendment precedents require. Even so, the record to date is troubling.
>
> The record reflects at least the possibility that recent Florida executions have involved—in addition to expired drugs—incorrect drug doses, the use of nonprotocol drugs, and recordkeeping lapses

> that could mask yet additional failings. The Florida Supreme Court, moreover, has thus far not allowed further inquiry into these potential problems and has recently denied requests for records that would prove or disprove claims like Trotter's. See, e.g., Heath, [426 So. 3d at 1253]. In doing so, the Florida Supreme Court appears to be placing prisoners in a Catch-22: It has affirmed the denial of requests for records on these issues, at least in part, because the prisoners do not yet have enough information to raise a "colorable" Eighth Amendment claim. The very reason the prisoners are seeking the records, however, is to gather enough information to raise a colorable Eighth Amendment claim.
>
> Individuals seeking to challenge the method of their execution should not have to guess at whether the State is, or is not, following its execution protocol. Nor does the State appear to have any legitimate confidentiality interest in shielding from inspection basic facts about the implementation of its execution protocol, such as whether the State is using expired drugs. If the protocol is in fact being followed, then transparency instills confidence in the protocol for everyone – prisoners, the courts, and the public alike. If it is not, then secrecy is intolerable, and disclosure of the relevant records is indispensable for determining whether the lapses at issue are likely to lead to an Eighth Amendment violation. Cf. Smith v. Hamm, 601 U. S. ---, 144 S. Ct. 414, 416 (2024) (KAGAN, J., dissenting from application for stay and denial of certiorari) (suggesting that the Court's Eighth Amendment precedents "can work fairly only when more is capable of being known about an execution method").
>
> Going forward, I hope that Florida and its courts will recognize the paramount importance of ensuring that it conducts executions consistently with its approved protocol, and assuring all involved that it is preventing any infliction of needless suffering on those being executed in the State. By continuing to shroud its executions in secrecy, Florida undermines both the integrity of its own execution process and, potentially, this Court's ability to ensure the State's compliance with its constitutional obligation

Id. (citations and footnotes omitted).

Seemingly hearing Justice Sotomayor's concerns, Guardado has provided more evidence compared to that presented in Heath and Trotter. In addition to the Redacted FDOC Drug Logs used in Heath and Trotter, Guardado provided Dr. Almgrens's Declaration, and the toxicology reports from Michael Bell and Samual Smithers that show a tenfold decrease in postmortem etomidate levels between an execution where records showed unexpired etomidate had been used and an execution completed after records showed FDOC began using expired etomidate. These pieces of evidence prompted this Court to conduct an evidentiary hearing. Upon consideration of the evidence and testimony presented at that hearing, the Court finds that Guardado has failed to show a substantial likelihood of success on the merits of his Eighth Amendment claim.

First, as to the contention that the Redacted FDOC Drug Logs show expired etomidate was used during the August 19, 2025 execution of Kayle Bates; the August 28, 2025 execution of Curtis Windom; the September 17, 2025 execution of David Pittman; and the September 30, 2025 execution of Victor Jones, Defendants presented evidence that those drug log entries were erroneous. Dr. Marcano testified about her investigation in which using the Invoice Number and Lot Number of the etomidate used in each of those executions, she determined that the true expiration date was January 2027. E.H. Transcript at 217-18. In the Court's in camera review of the Redacted and

Updated Redacted FDOC Drug Logs showing the Invoice Numbers and Lot Numbers, the Court was able to confirm the accuracy of this testimony. The in camera submission included a copy of page 26 of the Redacted FDOC Drug Logs (Pl. Ex. 2), the page of the Log relating to the executions at issue and showing the May 23, 2025 receipt of etomidate with the corresponding Invoice Number, Lot Number, and expiration date of January 31, 2027. The in camera submission also included a copy of page 18 of the Redacted FDOC Drug Logs which is a copy of the invoice for the purchase of the etomidate received on May 23, 2025, showing the Invoice Number and Lot Number of the drug. See Pl. Ex. 2 at 18. The invoice shows the purchase of etomidate which matches the Invoice Number and Lot Number in the drug logs as having an expiration date of January 2027. Consistent with Dr. Marcano's testimony, the submission also included two other April 2025 invoices reflecting the purchase of additional etomidate with the same Lot Number and the January 2027 expiration date. Also, the submission included a photograph of the packaging and vials of etomidate and the expiration date and lot number stamped on the packaging vials by the manufacturer. The expiration date for the specific Lot Number at issue here reads "EXP 2027-1." And that same Lot Number matches the Lot Number shown in the in camera submission of the Redacted FDOC Drug Logs and the three invoices referenced by Dr. Marcano. The same is true for the two additional executions for which the Updated Redacted FDOC Drug Logs

showed FDOC had changed the expiration dates; those also reflected the same Lot Number, which would correspond to an expiration date of January 2027. Dr. Marcano also testified that she found no record of FDOC having any etomidate with an expiration date of January 31, 2025,[5] and that as part of her investigation, she confirmed with execution team members that no expired drugs had been used. This evidence combined with the execution checklists and the testimony of Agents Graff and James that they each checked the expiration dates of the etomidate, and no expired etomidate was used in any execution they attended is sufficient to overcome Guardado's contention that expired etomidate was used in the executions that occurred in August, September, or October of 2025. And to that end, to the extent Guardado questions whether FDOC has enough unexpired etomidate to continue carrying out executions, the Court's in camera review confirms FDOC's receipt of additional etomidate from the same Lot Number that has an expiration date of January 2027. Also, Plaintiff's Exhibit 2 at page 20 shows an additional shipment of etomidate with an expiration date of March 2027. See Pl. Ex. 2 at 20. As such, it appears FDOC currently has an ample supply of etomidate to carry out executions as required by Florida's lethal injection protocol.

---

[5] The Redacted and Updated Redacted FDOC Drug Logs show no etomidate with an expiration date of January 2025 in FDOC inventory.

In any event, even if expired etomidate had been used in the past, Guardado has failed to present evidence to support a finding that FDOC will use expired etomidate in his execution or that the potential use of expired etomidate would result in him not being rendered sufficiently insensate to the pain that accompanies the administration of the second and third drugs in the lethal injection protocol. Dr. Almgren testified that a drug's expiration date is established by the manufacturer and guarantees that the drug will meet all quality standards up until that date. E.H. Testimony at 37. And she explained that anything past the expiration date has "a potential" to degrade. Id. But this "potential" for degradation does not show a risk that is "sure or very likely" to cause serious harm. And Dr. Almgren provided no other more specific opinion on this issue.

To be sure, the Court does not endorse or condone the use of expired drugs in any manner or for any reason. Indeed, the Court's concern regarding the possible use of expired etomidate weighed heavily in the determination that an evidentiary hearing was warranted here. But in resolving the matter at hand, the question before the Court is whether Guardado has shown a likelihood of success on his claim that the method of execution Florida intends to use in his execution "presents a risk that is 'sure or very likely' to cause serious illness and needless suffering and gives rise to sufficiently imminent dangers.'" Glossip, 576 U.S. at 877 (quoting Baze, 553 U.S. at 501) (emphasis

in original)). Based upon the evidence presented regarding the use of potentially expired etomidate, Guardado has not made this showing.

Guardado's allegations about Defendants' use of improper drug dosages during executions also falls short. He contends that the logs show only 7 of the required 12 vials of potassium acetate were removed for the June 10, 2025 execution of Anthony Wainwright, and that only half of the required 20 vials of rocuronium bromide were removed for the June 24, 2025 execution of Thomas Gudinas. See Doc. 57 at 16. But Guardado offers no evidence to overcome the undisputed proposition that if etomidate sufficiently renders him insensate, he will not experience the pain associated with the other two drugs in the protocol. See Baze, 553 U.S. at 49 (recognizing that proper administration of an effective anesthetic "eliminates any meaningful risk that a prisoner would experience pain from the subsequent injections . . . ."); cf. id. at 53 ("[F]ailing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride."). And thus evidence that an inmate received less rocuronium bromide or potassium acetate than that which is called for in the protocol, without more, does not present a risk that is "sure or very likely" to cause needless suffering.

Guardado also contends that Defendants' lack of contemporaneous recordkeeping indicates that Defendants are not using all drugs called for in the protocol during executions. He argues that "[a]t a minimum, there were three executions where according to the logs, no etomidate was removed for use" – the June 24, 2025 execution of Thomas Gudinas; the July 31, 2025 execution of Edward Zakrzewski; and the August 28, 2025 execution of Curtis Windom. See Doc. 57 at 18-21. According to Guardado, the logs reflect either no etomidate was removed on the date of the execution, or it was removed the day before or after the execution. Id. at 18-19. But the toxicology reports which Guardado has presented, and on which he relies, show that etomidate was administered to each of these three inmates during his execution. Pl. Ex. 7 at 202 (Gudinas's postmortem etomidate level of 0.57), 281 (Windom's postmortem etomidate level of 0.62), 288 (Zakrzewski's postmortem etomidate level of 0.59). While the records may well reflect a failure to record the withdrawal from inventory of the sedative etomidate required by the protocol, the evidence establishes that it was indeed administered to each of the three individuals. And, "the alleged failure to log the removal of etomidate from inventory" does not show a substantial and imminent risk that is sure or very likely to cause serious illness or needless suffering "where the autopsy indicates the drug was, in fact, administered." See Heath, 426 So. 3d at 1261.

As to Guardado's allegations about FDOC's use of lidocaine presenting a risk because it is not a drug in the protocol, he again fails to present evidence to support that notion. Indeed, Dr. Almgren testified that the only real concern with the inclusion of lidocaine is that the protocol is very specific, and it has no mention of how much lidocaine one might need. E.H. Transcript at 35. And Dr. Zivot explained that lidocaine is a local anesthetic that is "used classically to create like a local sensation of numbing to the skin . . . ." Id. at 102. He speculated that lidocaine could cause a seizure depending on how much lidocaine might be administered or cause an allergic reaction. Id. But neither he nor Dr. Almgren testified that the addition of lidocaine would present a danger of additional pain or suffering. Without more, the Court cannot find that evidence of the rare use of lidocaine presents a risk "sure or very likely" to cause needless suffering. Heath, 426 So. 3d at 1262 ("The allegations that lidocaine was administered on two occasions certainly would not establish a risk of needless suffering.").

Guardado maintains that the protocol's minimal specifications for how lethal injection drugs are stored or handled amplify Defendants' recklessness with an already risky protocol. Doc. 57 at 24-26. But Dr. Marcano's in-depth testimony about how FDOC stores and maintains its lethal injection drugs overcomes Guardado's speculation on this matter. Dr. Marcano explained that expired drugs are quarantined from the unexpired drugs, and each group is

kept in separate cabinets under a multi-lock system. E.H. Testimony at 212-14. She specifically trains anyone authorized to handle the drugs and instills in them that under no circumstances are expired drugs to be used in executions. Id. at 215. In her testimony she discussed examples of records reflecting FDOC's routine removal of expired drugs from its inventory. Id. at 214. Dr. Marcano also testified that the rocuronium bromide is kept in one of two commercial refrigerators, one for unexpired rocuronium and a quarantine refrigerator for expired rocuronium or the rocuronium transported back to the pharmacy facility because it was included in the spare set of drugs. Id. at 180, 229. While Guardado points to evidence that FDOC fails to maintain an accurate drug log, he points to no evidence undermining Dr. Marcano's explanation about the storage and maintenance of the drugs or evidence of any failure to properly do so. And while it is entirely true that FDOC did not contemporaneously log the use of etomidate and that its records contain a concerning number of errors, this poor record keeping "without more" does not show a substantial and imminent risk that is sure or very likely to cause serious illness and needless suffering during an execution. See Heath, 426 So. 3d at 1261. Moreover, Guardado must show that he risks being subjected to added suffering. But Dr. Marcano's testimony that she has overhauled FDOC's record keeping practices stands unrebutted. She explained that drugs are now logged contemporaneously and that multiple witnesses confirm the accuracy of

the log. E.H. Transcript at 219; see also Cole v. State, 392 So. 3d 1054, 1065 (Fla. 2024) ("[T]he Department of Corrections is entitled to the presumption that it will comply with the lethal injection protocol."). Thus, Guardado's concerns regarding FDOC's past record keeping practices provide little support for his claim that his execution may not be accomplished in accordance with the State's protocol.

Finally, Guardado has failed to present evidence to support his allegation that the disparity in postmortem etomidate levels presents evidence of the necessary "risk" he must show. Dr. Webb testified that the tenfold difference in the postmortem etomidate levels of Michael Bell and Samuel Smithers could be the result of several factors unrelated to the potency or efficacy of the etomidate given to each inmate. Indeed, Dr. Webb explained that Bell's test sample came from heart blood which will show a "multiple-fold" ("maybe four to tenfold") increase in concentration compared to the iliac blood sample measured for Smithers. E.H. Transcript at 171, 177. Dr. Webb further opined that postmortem etomidate levels cannot show if expired etomidate was used during an execution, and variation in postmortem etomidate levels can be the result of the location of the blood draw, and an individual's specific characteristics. Id. at 176. And, likely of more import, the Court's in camera review of the etomidate logs does not support a finding that expired etomidate was used in Samuel Smithers's execution.

Additionally, Dr. Zivot's concern that one-third of the toxicology reports he reviewed showed etomidate levels below 0.23 mcg/mL is unavailing. While Dr. Zivot testified that the manufacturer recommends a plasma level of 0.23 mcg/mL to reach "basic-level hypnosis," Dr. Webb explained that the toxicology reports here measured etomidate levels in "whole blood" not plasma, which are "absolutely not" a one-to-one measurement. E.H. Transcript at 173. And both Dr. Zivot and Dr. Webb testified that following death, there is evidence of drug redistribution and metabolism, which can also affect these toxicology numbers. Id. at 174. While Dr. Webb did not know exactly what rate etomidate continues to decrease after death, he opined that some circulation and degrading continues until the body has become cool. Id. at 175. According to Dr. Webb, it takes his office about two-to-three hours to collect a body from the execution site and transport it to his office where it is refrigerated until the morning when he then obtains the blood samples, and during this travel time, etomidate levels are continuing to degrade. Id. at 179-81. Based on all these possible influences, Dr. Webb stated, "that there is no evidence that [he] reviewed in these cases that would indicate to [him] that any one of the cases [he] reviewed has consciousness at the time of the procedure." Id. at 186. Dr. Webb's testimony regarding the variation of etomidate levels based on the location of the blood draw, the fact that the toxicology reports are based on an analysis of whole blood, not plasma, the fact that individual factors can affect the

etomidate level readings, and the reality that there will be some postmortem drug redistribution and metabolism of etomidate, combined overcome Guardado's allegation that the disparities in the etomidate levels in the 30 toxicology reports reviewed by Dr. Zivot support any suggestion of a risk that is "sure or very likely" to cause needless suffering.[6] Considering all of these arguments, on this record, the Court cannot find that Guardado has demonstrated a substantial likelihood of success on the merits of his Eighth Amendment claim as to warrant a stay of his execution.[7]

---

[6] Notably, while Dr. Zivot opined that the disparity of postmortem etomidate levels "does not support the conclusion that the protocol reliably delivers a consistent dose of etomidate to each prisoner," Zivot Report at 11, what Guardado must show is that the protocol does not reliably deliver a sufficient dose to render him unconscious throughout the execution. He has not done so.

[7] Dr. Zivot's discussion of pulmonary edema fails to support the challenge Guardado raises here. As the district court in Walls noted the "'intense pain and suffering' from pulmonary edema' . . . is [a] publicly known, well-documented" side effect "that [the condemned] could have challenged" long ago. Walls, No. 4:25-cv-488-MW-MAF. Indeed, the court noted that the etomidate protocol, including pulmonary edema, has been the subject of a facial challenge in the Middle District of Florida since 2013. Id. at n.5 (citing Brant v. Palmer, No. 3:13-cv-412-MMH-SJH (M.D. Fla.)). Regardless, neither Dr. Zivot nor any other witness provided evidence suggesting that the pulmonary edema that commonly occurs in an execution by lethal injection happens before the condemned has lost consciousness. See Barr v. Lee, 591 U.S. 979, 981 (2020) (noting that the government presented testimony that "any pulmonary edema occurs only after the prisoner has died or been rendered fully insensate").

### *(2) Remaining Factors*

Because the Court has found that Guardado cannot demonstrate a substantial likelihood of success as to his Eighth Amendment claim, he cannot prevail on his Motion to Stay. And thus, the Court need not determine whether any of the three remaining factors weigh in his favor. See, e.g., Chavez v. Florida SP Warden, 742 F.3d 1267, 1273 (11th Cir. 2014) (finding that because the plaintiff failed to show a substantial likelihood of success on the merits, "his motion for a stay of execution [was] due to be denied without regard to the other three requirements for issuance of one").

## V. Conclusion

A condemned inmate seeking to stay an execution bears a heavy burden particularly in a case such as this where he challenges Florida's lethal injection protocol that the Florida Supreme Court has found not to violate the Constitution. Asay v. Florida, 210 So. 3d 1 (Fla. 2016); Muhammad v. Florida,132 So. 3d 176 (Fla. 2013) (finding of Florida's midazolam protocol constitutional); Valle v. State, 70 So. 3d 530 (Fla. 2011) (finding Florida's sodium thiopental protocol constitutional). To obtain the relief he seeks Guardado must show that he has a substantial likelihood of establishing that allowing FDOC to proceed with his execution utilizing its current lethal injection protocol presents a risk "that is 'sure or very likely to cause serious illness and needless suffering,' and gives rise to 'sufficiently imminent

dangers.'" Price, 920 F.3d at 1325-26 (quoting Glossip, 576 U.S. at 877; Baze, 553 U.S. at 50) (emphasis in originals)). He cannot prevail by showing that he will experience pain as that is not a "substantial risk of serious harm." Id. Rather, he must present evidence likely to show the sort of "objectively intolerable risk of harm that qualifies as cruel and unusual punishment prohibited by the Eighth Amendment." Id. (quotations omitted). Guardado's evidence falls well short of satisfying this heavy burden. His concern regarding the potential use or future use of expired etomidate is not supported by the evidence. And his various other concerns are far too speculative to support a finding that Florida's planned execution protocol presents a risk that is sure or very likely to cause serious illness or needless suffering.

Accordingly, it is

**ORDERED** that Guardado's "Emergency Motion for an Injunction under the All Writs Act or, Alternatively, For a Stay of Execution" (Doc. 11) is **DENIED**.

**DONE AND ORDERED** at Jacksonville, Florida, this 30th day of October, 2026.

MARCIA MORALES HOWARD
United States District Judge

Jax-7
c: counsel of record

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**JESSE GUARDADO**

Plaintiff,

Case No. 3:26-cv-2596

v.

**CAPITAL CASE**

**RICHARD COMERFORD,** Secretary,
Department of Corrections,
in his official capacity;

**EXECUTION OF STATE DEATH SENTENCE SET: NOVEMBER 5, 2026 AT 6:00 P.M.**

and

**RANDALL POLK,** Warden,
Florida State Prison,
in his official capacity,

Defendants.
_______________________________/

**NOTICE OF APPEAL**

Plaintiff Jesse Guardado appeals this Court's October 30, 2026, order denying a stay of execution, ECF No. 63, to the United States Court of Appeals for the Eleventh Circuit.

Respectfully submitted,

/s/ Linda McDermott
LINDA MCDERMOTT
Chief, Capital Habeas Unit
/s/ Sean Gunn
SEAN GUNN
Assistant Federal Public Defender

Northern District of Florida
227 North Bronough St., Suite 4200
Tallahassee, Florida 32301
(850) 942-8818
linda_mcdermott@fd.org
sean_gunn@fd.org

*Counsel for Mr. Guardado*

**CERTIFICATE OF SERVICE**

On October 30, 2026, this filing was electronically served on all attorneys attached to the CM/ECF docket.

/s/ Sean Gunn
Sean Gunn